UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.    1:19-cv-1151

UNITED STATES OF AMERICA, and
THE STATE OF COLORADO

        Plaintiffs,

V.

HIGHPOINT OPERATING CORPORATION,

        Defendant.

---

## COMPLAINT

---

Plaintiffs, the United States of America, by authority of the Attorney General of the United States and acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Colorado, on behalf of the Colorado Department of Public Health and Environment, Air Pollution Control Division ("CDPHE"), file this Complaint and allege the following:

## NATURE OF THE ACTION

1.    This is a civil action against HighPoint Operating Corporation ("HighPoint" or "Defendant") pursuant to Section 113(b) of the Clean Air Act (the "Act"), 42 U.S.C. § 7413(b), and Sections 121 and 122 of the Colorado Air Pollution Prevention and Control Act (the "Colorado Act"), C.R.S. §§ 25-7-121 and 122.

2.    Plaintiffs seek injunctive relief and civil penalties for alleged violations of the

Act, the Colorado Act, Colorado's federally approved State Implementation Plan ("SIP"), and Colorado Air Quality Control Commission Regulation Number 7 ("Regulation 7").   The violations arise from alleged unlawful emissions of volatile organic compounds ("VOC") from storage tanks that are, or were, part of HighPoint's oil and natural gas production operations in the Denver-Julesburg Basin ("D-J Basin") located in Adams and Weld County, Colorado. Plaintiff CDPHE also seeks injunctive relief and civil penalties for violations of the Colorado Act and certain State-enforceable requirements of Regulation 7, over which this Court has supplemental jurisdiction.

3.      Most of HighPoint's storage tanks hold "hydrocarbon liquids" which are defined as "any naturally occurring, unrefined petroleum liquid." *See* Colorado Air Pollution Control Division, Department of Public Health & Environment PS Memo 14-03, Section 1.15. Hydrocarbon liquids include "condensate" or "crude oil," depending on their particular American Petroleum Institute gravity.   Prior to extraction from the ground, hydrocarbon liquids, gases, and associated groundwater (a.k.a. "produced water") are pressurized.   Following extraction, hydrocarbon liquids are separated from the accompanying natural gas and produced water in a device known as a "separator."   Gases from the separator are collected for sale. Produced water is sent from the separator to holding tank(s) where the water, and any residual hydrocarbon fluids, are allowed to settle and separate further.   Hydrocarbon liquids are emptied ("dumped") either continuously or in batches from the separator(s) into storage tank(s).

4.      Storage tanks are kept at or near atmospheric pressure, as over-pressurization of a storage tank could damage the tank.   When the hydrocarbon liquids are dumped from the separator into storage tanks, the liquid pressure drops and gases entrained in the liquid are

released or "flashed" into a gaseous state.   These gases consist of VOC, as well as benzene, toluene, ethyl-benzene, and xylene, which are "hazardous air pollutants," within the meaning of the CAA, 42 U.S.C. § 7412(b).   Additional gases are released from the hydrocarbon liquids resident in the tank(s) due to liquid level changes and temperature fluctuations.

5.     The storage tanks are grouped in "tank batteries," many of which HighPoint's predecessor, the Bill Barrett Corporation ("Bill Barrett"), certified to CDPHE as "controlled" to meet the "system-wide" emission reduction requirements of Regulation 7.   The system-wide emission reduction requirements mandate at least a specific percentage reduction of all emissions across HighPoint's tank batteries with uncontrolled actual VOC emissions of 2 tons per year or more.

6.     To meet the system-wide requirements, each of the hydrocarbon liquid storage tanks that is the subject of this Complaint is required to control emissions through the use of air pollution control equipment.   Generally, to meet this requirement, HighPoint routes tank vapors through vent lines from storage tanks to air pollution control equipment known as "combustors." Combustors are required to have a control efficiency of at least 95%.

7.     HighPoint owns and operates at least 58 tank batteries in the D-J Basin that HighPoint certified as being controlled to comply with Regulation 7's system-wide VOC emissions reduction requirements as of April 2018.

8.     The tank batteries listed in Appendices A.1 and A.2 are located in the D-J Basin within the 8-Hour Ozone Control Area. The tank batteries listed in Appendix A.1 are owned and operated by HighPoint. The tank batteries in Appendix A.2 were previously owned or operated by HighPoint or its predecessor in liability, Bill Barrett.

9.      At the tank batteries listed on Appendices A.1 and A.2, HighPoint failed to comply with the Regulation 7 provisions that require tank batteries to be designed, operated, and maintained so as to minimize leakage of VOC into the atmosphere to the maximum extent practicable.   In addition, at some of these batteries, HighPoint failed to operate and maintain air pollution control equipment consistent with manufacturer specifications and good engineering and maintenance practices, and failed to ensure that such equipment is adequately designed and sized to achieve the control efficiency rates required by Regulation 7.

10.      Between April 2014 and the date this Complaint was filed, HighPoint has violated requirements in Regulation 7 intended to reduce VOC emissions from its storage tanks and their associated Vapor Control Systems.

11.      HighPoint's failure to comply with these requirements has resulted in excess VOC emissions, a precursor to ground-level ozone.   HighPoint operates in an area where the air quality does not meet the National Ambient Air Quality Standards ("NAAQS") for ground-level ozone.   HighPoint's unlawful emissions of VOC into the atmosphere contribute to this exceedance of the ozone NAAQS in this area.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over claims arising under the Act pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

13.      This Court has supplemental jurisdiction over the state law claims asserted by CDPHE pursuant to 28 U.S.C. § 1367.

14.      Venue is proper in this District under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations that are the basis of this

Complaint occurred in this District, and the facilities at issue are, or were at all times relevant to this Complaint, owned and operated by HighPoint or its predecessor Bill Barrett, in this District.

## NOTICES

15.     In a March 2016 meeting and in subsequent discussions, Plaintiffs informed Defendant of its noncompliance with the Act, the Colorado Act, Colorado's SIP, and Regulation 7 as they apply to tank batteries and air pollution control systems.

16.     Notice has been given to Defendant and the appropriate air pollution control agency in the State of Colorado as required by Section 113 of the Act, 42 U.S.C. § 7413.   Notice has also been given to Defendant in accordance with applicable requirements of the Colorado Act.

## DEFENDANT

17.     Bill Barrett was a publicly-traded company engaged in domestic hydrocarbon liquids and natural gas exploration and production.   Bill Barrett was incorporated in Delaware and maintained its principal executive offices in Denver, Colorado.

18.     On March 19, 2018, through a merger of Bill Barrett and Fifth Creek Energy Operating Company, both entities became wholly-owned subsidiaries of HighPoint Resources Corporation.   On April 2, 2018, Bill Barrett changed its name to HighPoint Operating Corporation.   Certain condensate storage tanks that are now part of HighPoint's production system in the D-J Basin were previously owned and operated by Bill Barrett.   HighPoint now owns and operates the tank batteries listed in Appendix A.1.   HighPoint, or its predecessor Bill Barrett, previously owned or operated the tank batteries listed in Appendix A.2.   For purposes of this Complaint reference to "Defendant" shall mean HighPoint itself as well as HighPoint in its

capacity as the successor to Bill Barrett's liability.

19.     HighPoint is a "person" as defined in Section 302(e) of the CAA, 42 U.S.C.
§ 7602(e).

## FACILITIES

20.     HighPoint has hydrocarbon liquid and natural gas production operations in the D-J Basin, in Adams and Weld Counties, Colorado.

21.      On its April 2018 Regulation 7 report for calendar year 2017, HighPoint included 63 tank batteries in the 8-Hour Ozone Control Area.

22.     HighPoint's operations produce a mixture of hydrocarbon liquids, natural gas, and water.   This mixture flows up the well under pressure to the well-head at the surface and then to a device called a separator.

23.     The purpose of a separator is to separate the effluent from the well into its constituent parts: hydrocarbon liquids, natural gas, and water (also known as "produced water").

24.     Hydrocarbon liquids and produced water, once separated from the natural gas, are temporarily held under pressure in the separator until the liquids reach a set level, at which point valves open and the liquids flow into storage tanks kept at or near atmospheric pressure.   This transfer of liquids from the separator is commonly referred to as "dumping" or a "dump event." During a dump event, the hydrocarbon liquids and the produced water flow to separate tanks. Valves controlling the flow of these liquids from the separator may be configured to operate in an on/off mode or, alternatively, may open in proportion to allow the liquids to flow from the well into the separator.

25.     When pressurized hydrocarbon liquids are transferred from a separator to an

atmospheric storage tank, the pressure of the liquids drops.   This pressure drop causes some of the hydrocarbon gases, including VOC entrained in the fluid, to vaporize in a phenomenon known as "flashing."   After flashing occurs, the hydrocarbon liquids continue to emit vapors due to liquid level changes and temperature fluctuations in the storage tanks.   The additional release of gas through diurnal temperature changes occurring while the hydrocarbon liquids are stored in the storage tank or tank battery is known as "breathing" or "standing" losses. Vapors are also emitted due to "working" losses, which refers to emissions during the time-period when liquids are being loaded into, or out of, the storage tank.   Flashing, working, and standing losses must be managed to prevent over-pressurization and the release of uncontrolled emissions into the atmosphere.

26.     The tops of the hydrocarbon liquid storage tanks have openings called "thief hatches."   Thief hatches are equipped with gaskets that should seal tight when the thief hatch is closed.   Thief hatches serve three primary purposes: (a) they provide access to the contents of the tank for taking samples and measuring the liquid level of the tank (known as "gauging"); (b) they provide a means of relieving pressure from the tank to prevent over-pressurization; and (c) they eliminate excessive vacuum buildup within the tanks.

27.     To prevent over-pressurization, thief hatches are designed to open (or vent) when the pressure inside the tank exceeds the pressure setting of the thief hatch.

28.     Thief hatches may also emit vapors to the atmosphere if thief hatch gaskets are worn or otherwise not properly maintained or if the thief hatch is not properly sealed.

29.     In addition to thief hatches, storage tanks may also be equipped with separate pressure relief valves ("PRVs"), which are also designed to vent at set pressures to prevent over-

pressurization.

30.     The storage tanks, vent lines from storage tanks to an air pollution control device or other endpoint, and all connections, fittings, relief valves (including PRVs and thief hatches), combustors, vapor recovery units ("VRUs"), vapor recovery towers ("VRTs"), and any other appurtenance used to contain and collect vapors within a tank battery, and to transport or convey the vapors to a combustor, are collectively referred to herein as a "Vapor Control System."   A single Vapor Control System may be used to transmit vapors from one or more tanks to one or more air pollution control devices.

31.     The specific tank batteries that are the subject of the violations alleged in this Complaint are set forth in Appendices A.1 and A.2, incorporated herein by reference.

## STATUTORY AND REGULATORY BACKGROUND

32.     As set forth in Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1), the purpose of the Clean Air Act is to protect and enhance the quality of the nation's air, so as to promote the public health and welfare and the productive capacity of its population.

### National Ambient Air Quality Standards for Ozone

33.     Section 108 of the Act, 42 U.S.C. § 7408, directs EPA to identify air pollutants that "may reasonably be anticipated to endanger public health or welfare" and to issue air quality criteria for those pollutants based on "the latest scientific knowledge" about their effects on public health and the environment.   These pollutants are known as "criteria pollutants."

34.     Section 109 of the Act, 42 U.S.C. § 7409, requires EPA to establish both primary and secondary NAAQS for criteria pollutants.   The primary standard must be set at the level "requisite to protect the public health" with an adequate margin of safety, and the secondary

standard is intended to protect "the public welfare."   According to Section 302(h) of the Act, 42 U.S.C. § 7602(h), public welfare effects are "effects on soils, water, crops, vegetation" and other environmental impacts including, but not limited to, effects on animals, wildlife, property, and "effects on economic values."

35.     Ground-level ozone, commonly known as "smog," is one of six criteria pollutants for which EPA has promulgated NAAQS, due to its adverse effects on human health and the environment.   Short-term exposures (1 to 3 hours) to ground-level ozone can cause acute health effects observed even at low concentrations, including temporary pulmonary inflammation. Long-term exposure (months to years) may cause permanent damage to lung tissue.   Children and adults who are active outdoors are particularly susceptible to the adverse effects of exposure to ozone.  *See* 73 Fed. Reg. 16,436 (Mar. 27, 2008).

36.     Ozone is not emitted directly from sources of air pollution.   Ozone is a photochemical oxidant, formed when certain chemicals react with oxygen in the presence of sunlight.   These chemicals—VOC and nitrogen oxides ("NOx")—are called "ozone precursors." Sources that emit ozone precursors are regulated to reduce ground-level ozone.  *See* 62 Fed. Reg. 38,856 (July 18, 1997).

37.     In 2008, EPA established a primary and secondary NAAQS for ozone of 0.075 parts per million ("ppm") (measured as an 8-hour average).   73 Fed. Reg. 16,436.   In 2015, EPA lowered the primary and secondary NAAQS for ozone to 0.070 ppm (measured as an 8-hour average).   80 Fed. Reg. 65,292 (Oct. 26, 2015).

**Colorado SIP**

38.     Pursuant to Section 107(a) of the Act, 42 U.S.C. § 7407(a), states are primarily

responsible for ensuring attainment and maintenance of the NAAQS.   States implement the

NAAQS on a region-by-region basis, within air quality control regions (or "areas") throughout

the state.   An area with ambient air concentrations that meet the NAAQS for a particular

pollutant is an "attainment" area.   An area with ambient air concentrations that violate the

NAAQS is a "nonattainment" area.   An area that cannot be classified due to insufficient data is

"unclassifiable."

     39.     EPA designated the following counties in Colorado as being in nonattainment

with the 2008 and 2015 ozone NAAQS: Adams, Arapahoe, Boulder, Broomfield, Denver,

Douglas, Jefferson, and portions of Larimer and Weld Counties ("Denver Nonattainment Area").

77 Fed. Reg. 30,088 (May 21, 2012); 83 Fed. Reg. 25,792 (June 4, 2018).

     40.     In June 2016, EPA reclassified the Denver Nonattainment Area from "marginal"

to the more severe nonattainment status of "moderate" for the 2008 ozone NAAQS.   81 Fed.

Reg. 26,697 (May 4, 2016).   In June 2018, EPA classified the Denver Nonattainment Area as a

"marginal" nonattainment area for the 2015 ozone NAAQS.   83 Fed. Reg. 25,792.

     41.     Pursuant to Section 110(a) of the Act, 42 U.S.C. § 7410(a), each state must adopt

and submit to EPA for approval a plan that provides for the implementation, maintenance, and

enforcement of the NAAQS for each criteria pollutant in each air quality control region within

the state.   This plan is known as a state implementation plan or "SIP."   Section 110(a)(2)(A) of

the Act, 42 U.S.C. § 7410(a)(2)(A), requires that each SIP include enforceable emissions

limitations and other "control measures, means, or techniques" to ensure attainment of the

NAAQS.

     42.     After enforceable state emission limitations are approved by EPA, these SIP

provisions are federally enforceable under Sections 113(a) and (b) of the Act, 42 U.S.C. §§ 7413(a) and (b).

43.     As required by Section 110(a) of the Act, 42 U.S.C. § 7410(a), the State of Colorado has periodically adopted regulations to provide for the implementation, maintenance, and enforcement of the ozone NAAQS.

44.     Initially adopted by Colorado's Air Quality Control Commission ("AQCC") in the 1970s, Regulation 7, as subsequently amended, includes control measures to reduce VOC emissions from condensate collection, storage, handling, and processing operations.   *See* 5 Colo. Code Regs. § 1001-9 [hereinafter Regulation 7].   The State relies, in part, on Regulation 7 to implement, maintain, and enforce the NAAQS for ozone.[1]   *See* 40 C.F.R. § 52.320.

45.     Among other things, Regulation 7, Section XII requires each owner or operator to select which of its condensate tanks to control in order to achieve a required, system-wide percentage VOC emissions reduction.

46.     Many of HighPoint's condensate and natural gas production operations in the D-J Basin, including all the tank batteries that are identified in Appendices A.1 and A.2, are located within the Denver Nonattainment Area.

---

[1] Reg. 7 has been periodically revised over time.   The latest SIP-approved version of Reg. 7 was approved by EPA on July 3, 2018, with an effective date of August 2, 2018. See 83 Fed. Reg. 31,068 (July 3, 2018).   Before EPA acted on these revisions, the EPA-approved SIP used different citations than the State-approved Reg. 7 for provisions relevant here.   *See* 73 Fed. Reg. 8,194 (Feb. 13, 2008).   The State has also since revised Reg. 7.   For ease of reference, the Consent Decree uses citations to the current version of Reg. 7 approved by the Air Quality Control Commission, which includes certain provisions that have been incorporated into the SIP as of the lodging of this Consent Decree and contains other provisions approved only by the State as of the lodging of this Consent Decree.

**Applicable Provisions of the Colorado SIP**

47.     SIP-Approved Regulation 7 sets deadlines and requirements for system-wide

VOC emission reduction requirements for condensate and natural gas operations in the "8-Hour

Ozone Control Area."   In meeting these requirements, emission reductions "shall not be

required for each and every unit, but instead shall be based on overall reductions in uncontrolled

actual emissions from all the atmospheric storage tanks associated with the affected operations

for which the owner or operator filed, or was required to file, an APEN pursuant to Regulation

3."  Reg. 7, Sec. XII.D.   An "APEN" is an Air Pollutant Emission Notice.

48.     The term "8-Hour Ozone Control Area" includes Adams, Arapahoe, Boulder,

Douglas, and Jefferson Counties; the Cities and Counties of Denver and Broomfield; and

portions of Larimer and Weld Counties.   *Id.* Sec. II.A.1.

    a.  Prior to EPA's 2018 approval of Colorado's SIP revisions, system-wide emissions

        reductions under the SIP were required as follows: "For the period of May 1 through

        September 30 of each year beginning with 2012, such emissions shall be reduced by

        78% from uncontrolled actual emissions on a weekly basis."   *Id.* Sec. XII.A.2.d

        (2007).

    b.  Beginning with the year 2008, and for each year thereafter, emissions during the

        non-ozone season (January 1 through April 30 and October 1 through December 31)

        "shall be reduced by 70% from uncontrolled actual emissions, calculated as an

        average of the emission reduction achieved during the seven months covered by the

        two periods."   *Id*. Sec. XII.D.2.a.(viii).

49.     Effective August 2, 2018, system-wide emission reductions under the SIP are

required as follows:[2]   System-wide emissions "shall be reduced by 90% from uncontrolled actual emissions on a calendar weekly basis during the weeks May 1 through September 30 and 70% from uncontrolled actual emissions on a calendar monthly basis during the months October 1 through April 30."   *Id.* Sec. XII.D.2.a(x) (2017).

50.     Each operator must designate which condensate storage tanks it has chosen to control in order to meet the system-wide emission reduction requirements.   *See id.* Sec. XII.F.

51.     Regulation 7, Section XII contains the following general requirements for affected operations:

a.   "All air pollution control equipment used to demonstrate compliance with this Section XII shall be operated and maintained consistent with manufacturer specifications and good engineering and maintenance practices.   The owner or operator shall keep manufacturer specifications on file." *Id.* Sec. XII.C.1.a.

b.     "[A]ll such air pollution control equipment shall be adequately designed and sized to achieve the control efficiency rates required by this Section XII and to handle reasonably foreseeable fluctuations in emissions of volatile organic compounds. Fluctuations in emissions that occur when the separator dumps into the tank are reasonably foreseeable." *Id.*

c.     "All condensate collection, storage, processing and handling operations,

_____

[2] The 90% system-wide emission reduction requirement has been enforceable by the State of Colorado since 2013.   In February 2014, Colorado also amended Regulation 7, Section XVII to provide for further control measures on oil and gas operations on a state-wide basis (i.e., not just in the 8-Hour Ozone Control Area).   These provisions are not enforceable by EPA because they are not part of the Colorado SIP.

regardless of size, shall be designed, operated and maintained so as to minimize leakage

of volatile organic compounds to the atmosphere to the maximum extent practicable." *Id.*

Sec. XII.C.1.b.

These provisions have been federally enforceable since April 14, 2008, when EPA's rule

approving the provisions as part of the Colorado SIP took effect. *See* 73 Fed. Reg. 8194 (Feb. 13,

2008).

52.     Many of HighPoint's condensate and natural gas production operations in the D-J

Basin and all the tank batteries identified on Appendices A.1 and A.2, are located within the 8-

Hour Ozone Control Area.

**Regulation 7:   Applicable State-Enforceable Provisions**

53.     Beginning May 1, 2011 and for each year thereafter, State-enforceable Regulation

7 requires system-wide emissions "be reduced by 90% from uncontrolled actual emissions on a

calendar weekly basis during the weeks May 1 through September 30 and 70% from

uncontrolled actual emissions on a calendar monthly basis during the months October 1 through

April 30."   Reg. 7, Sec. XII.D.2.a(x).

54.     In addition to the requirements in the SIP, Colorado has adopted other

requirements in Regulation 7 that apply to hydrocarbon liquids and natural gas exploration and

production activities.

55.     Regulation 7, Section XVII.B.1.b provides that "[a]t all times, including periods

of start-up and shutdown, the facility and air pollution control equipment must be maintained and

operated in a manner consistent with good air pollution control practices for minimizing

emissions.   Determination of whether or not acceptable operation and maintenance procedures

are being used will be based on information available to the Division, which may include, but is

not limited to, monitoring results, opacity observations, review of operation and maintenance

procedures, and inspection of the source."

56.     Regulation 7, Section XVII.C.2.a provides that "[o]wners or operators of storage

tanks must route all hydrocarbon emissions to air pollution control equipment, and must operate

without venting hydrocarbon emissions from the thief hatch (or other access point to the tank) or

pressure relief device during normal operation, unless venting is reasonably required for

maintenance, gauging, or safety of personnel and equipment.   Compliance must be achieved in

accordance with the schedule in Section XVII.C.2.b.(ii)."

57.     Regulation 7, Section XVII.C.2.b provides, in relevant part, that "[o]wners or

operators of storage tanks subject to the control requirements of Sections XII.D.2, XVII.C.1.a, or

XVII.C.1.b must develop, certify, and implement a documented Storage Tank Emission

Management System ("STEM") plan to identify, evaluate, and employ appropriate control

technologies, monitoring practices, operational practices, and/or other strategies designed to

meet the requirements set forth in Section XVII.C.2.a."

## FACTUAL BACKGROUND

### HighPoint's Hydrocarbon Liquids and Natural Gas Operations

58.     At all times relevant to this Complaint, HighPoint conducted hydrocarbon liquids

and natural gas production operations in the 8-hour Ozone Control Area that are located

upstream of a natural gas plant and for which HighPoint was required to file, and did file,

APENs pursuant to AQCC Regulation No. 3, 5 Colo. Code Regs. § 1001-5.

59.     HighPoint filed APENs with CDPHE for each of the tank batteries identified in

Appendices A.1 and A.2.   The APENs provide specific identification numbers to the facilities.

60.     HighPoint has also filed APENs with CDPHE for many other tank batteries that are also subject to the requirements of Regulation 7 referenced but not specifically identified in Appendices A.1 and A.2.

**Inspections and Follow-Up Investigation**

61.     Between April 2014 and June 2015, inspectors from CDPHE's Air Pollution Control Division conducted inspections of HighPoint's tank batteries in the 8-Hour Ozone Control Area.   Using an optical gas imaging infrared camera ("IR camera"), the inspectors observed emissions at 7 tank batteries.

62.     On December 9, 2015, CDPHE issued a Compliance Advisory to Bill Barrett, Case No. 2015-110 (the "2015 Compliance Advisory").   The 2015 Compliance Advisory identifies violations of Regulation 7 at HighPoint tank batteries.

63.     Following the issuance of the 2015 Compliance Advisory, CDPHE and EPA inspectors conducted additional inspections of HighPoint's tank batteries in the 8-hour Ozone Control Area.   Using IR cameras, CDPHE or EPA inspectors observed VOC emissions from some of the same tank batteries covered by the 2015 Compliance Advisory.   CDPHE or EPA inspectors also observed VOC emissions from 6 other tank batteries not covered by the 2015 Compliance Advisory.

64.     Pursuant to Section 114(a) of the Act, 42 U.S.C. § 7414(a), in August 2015, EPA requested certain information from Bill Barrett about the Vapor Control Systems at 10 tank batteries in the D-J Basin.   EPA also requested information about Bill Barrett's operations and maintenance practices at these tank batteries.   Bill Barrett provided information in response on

November 18, 2015.

65.     Pursuant to Section 114(a) of the Act, 42 U.S.C. § 7417(a), in December 2016, EPA again requested certain information from Bill Barrett about the Vapor Control Systems at an additional 10 tank batteries in the D-J Basin.   EPA also requested information about Bill Barrett's operations and maintenance practices at these tank batteries.   Bill Barrett provided information in response on May 12, 2017.

66.     Based on the responses provided by Bill Barrett, EPA and CDPHE have concluded that for the tank batteries listed in Appendices A.1 and A.2:

> a.  HighPoint failed to conduct an engineering design analysis to ensure that its Vapor Control Systems were adequately sized to route all vapors to an air pollution control device;
>
> b.  Many of the Vapor Control Systems did not have sufficient capacity to route all vapors from the storage tanks to an air pollution control device, causing vapors to be emitted directly to the atmosphere from PRVs, thief hatches, or other tank openings; and
>
> c.  HighPoint's operations and maintenance practices were inadequate to ensure that all storage tank vapors were routed to an air pollution control device.

67.     At all times relevant to this Complaint, HighPoint has designated that VOC emissions from each of the tanks identified in Appendices A.1 and A.2 were being controlled to satisfy HighPoint's system-wide emission reduction requirement under Regulation 7, Section XII.D.2.

68.     At all times relevant to this Complaint, each of the tank batteries referenced in

Appendices A.1 and A.2 have been subject to the general requirements of the Colorado SIP, set forth at Regulation 7, Sections XII.D.2, C.1.a–d and the State-enforceable provisions at Regulation 7, Section XII.D.2.a(x) and Section XVII.B.1.b and C.2.a–b.

## FIRST CLAIM FOR RELIEF

(Joint Claim by EPA and CDPHE - HighPoint Failed to Design, Operate, and Maintain Condensate Storage Tank Vapor Control Systems to Minimize Leakage of Volatile Organic Compounds into the Atmosphere to the Maximum Extent Practicable)

69.     Paragraphs 1 through 68 are re-alleged and incorporated herein by reference.

70.     The allegations of this First Claim for Relief concern each of the tank batteries identified in Appendices A.1 and A.2, and cover the period of time before HighPoint may have addressed the deficiencies described in this Complaint.

71.     Regulation 7, Section XII.C.1.b requires that "[a]ll condensate collection, storage, processing and handling operations, regardless of size, shall be designed, operated and maintained so as to minimize leakage of volatile organic compounds to the atmosphere to the maximum extent practicable."

72.     HighPoint failed to conduct a design analysis to determine if the Vapor Control Systems at one or more of its tank batteries in the 8-Hour Ozone Control Area have the capacity to route all VOC emissions to an air pollution control device so as to minimize leakage of VOC to the atmosphere to the maximum extent practicable.

73.     The Vapor Control Systems at one or more of HighPoint's tank batteries in the 8-Hour Ozone Control Area do not have sufficient capacity to convey all of the condensate tank vapors from all vapor sources to the emission control device, and therefore are not designed to minimize leakage of VOCs to the maximum extent practicable.

74.    At various periods of time relevant to this Complaint, HighPoint's operation and maintenance of Vapor Control Systems at some or all of its tank batteries in the 8-Hour Ozone Control Area failed to minimize VOC emissions to the maximum extent practicable, in violation of Regulation 7, Section XII.C.1.b, due to, among other things, one or more of the following reasons, without limitation:

a.   Failing to promptly respond to emissions observations and take appropriate corrective action to minimize the duration and quantity of emissions;

b.   Failing to take measures to minimize the occurrence or recurrence of preventable emissions from Vapor Control Systems;

c.   Failing to promptly clean stains on condensate storage tanks caused by vapors emanating from PRVs and thief hatches and indicative of tank vapor emissions so that frequency and timing of emissions could be assessed;

d.   Failing to keep and regularly review maintenance records to track recurrent or systemic issues in order to implement proactive measures to replace or upgrade system components to prevent emissions from occurring;

e.   Failing to ensure that all vent lines on Vapor Control Systems have an adequate slope to drain all liquids to adequately sized "drip pots," failing to evaluate the frequency of liquids buildup impairing the vapor carrying capacity of the vent lines and establish a site-specific line blow-out maintenance schedule, or failing to install line pressure gauges to monitor obstructions in the vent lines and promptly clear the lines when obstructed; and

f.   Failing to prevent the venting of VOC directly to the atmosphere through PRVs,

thief hatches, or open or partially open vent lines.

75.     At one or more of the tank batteries identified in Appendices A.1 and A.2, HighPoint has violated, and is violating, the requirements of Regulation 7, Section XII.C.1.b.

76.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), HighPoint is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation of Regulation 7, Section XII occurring between January 13, 2009 and November 2, 2015.   For violations that occurred after November 2, 2015, HighPoint is liable for civil penalties of up to $97,229 per day for each violation.   *See* 40 C.F.R. § 19.4.

77.     Pursuant to Sections 121 and 122 of the Colorado Act, HighPoint is liable for injunctive relief and a civil penalties of up to $15,000 per day for each violation.

## SECOND CLAIM FOR RELIEF

(Joint Claim by EPA and CDPHE - HighPoint Failed to Design, Operate and Maintain Air Pollution Control Equipment in Accordance with State and Federal Requirements.)

78.     Paragraphs 1 through 77 are re-alleged and incorporated herein by reference.

79.     The allegations of this Second Claim for Relief concern each of the tank batteries identified in Appendices A.1 and A.2, and cover the period of time before HighPoint may have addressed the deficiencies described in this Complaint.

80.     Regulation 7, Section XII.C.1.a requires that:

> All air pollution control equipment . . . shall be operated and maintained consistent with manufacturer specifications and good engineering and maintenance practices. . . .   In addition, all such air pollution control equipment shall be adequately designed and sized to achieve the control efficiency rates required by this Section XII and to handle reasonably foreseeable fluctuations in emissions of volatile organic compounds.

Fluctuations in emissions that occur when the separator dumps into the tank are reasonably foreseeable.[3]

81.    At periods of time relevant to this Complaint, HighPoint failed to operate and maintain air pollution control equipment at some or all of the tank batteries in the 8-Hour Ozone Control Area consistent with manufacturer specifications and good engineering and maintenance practices, and failed to ensure that such equipment was adequately designed and sized to achieve the required control efficiency rates in violation of Regulation 7, Section XII.C.1, due to one or more of the following reasons, without limitation:

a.    Failing to operate and maintain air pollution control equipment consistent with manufacturer specifications and good engineering and maintenance practices;

b.    Failing to adequately design and size air pollution control equipment to achieve the control efficiency rates required by applicable State and Federal requirements;

c.    Failing to ensure that air pollution control equipment was capable of handling reasonably foreseeable fluctuations in emissions of VOCs;

d.    Failing to promptly respond to emissions observations and take appropriate corrective action to minimize the duration and quantity of emissions;

e.    Failing to take measures to ensure that the pilot lights on control devices are lit;

f.    Failing to ensure site glasses of the enclosed combustors are clean and can be visually inspected for proper operation;

g.    Failing to take measures to minimize the occurrence or recurrence of preventable emissions from air pollution control equipment; and

---

[3] Section XII.D.2.a in the SIP prior to August 2, 2018.

h.   Failing to keep and regularly review maintenance or inspection records to track recurrent or systemic issues in order to implement proactive measures to replace or upgrade system components to prevent emissions from occurring.

82.   At one or more of the tank batteries identified in Appendices A.1 and A.2, HighPoint has violated, and is violating, the requirements of Regulation 7, Section XII.C.1.a.

83.   Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), HighPoint is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation of Regulation 7, Section XII occurring between January 13, 2009 and November 2, 2015.   For violations that occurred after November 2, 2015, HighPoint is liable for civil penalties of up to $97,229 per day for each violation.   *See* 40 C.F.R. § 19.4.

84.   Pursuant to Sections 121 and 122 of the Colorado Act, HighPoint is liable for injunctive relief and civil penalties of up to $15,000 per day for each violation.

### THIRD CLAIM FOR RELIEF

(CDPHE-Only Claim for Violations of Regulation 7)

85.   Paragraphs 1 through 84 are re-alleged and incorporated herein by reference.

86.   Between April 2014 and the date of filing this Complaint, on one or more occasions CDPHE inspectors observed hydrocarbon emissions from access points to storage tanks at 18 tank Batteries.

87.   Despite being notified of these emissions observations, HighPoint has never made a demonstration to CDPHE that these emissions were not venting from an access point to the storage tank or that HighPoint operated its facilities in a manner consistent with good air pollution control practices for minimizing emissions.   Further, HighPoint has not made a

demonstration that it has developed, certified, and implemented a STEM plan for its facilities

that identifies, evaluates, and employs appropriate control technologies, monitoring practices,

operational practices, and other strategies designed to meet the requirements of Regulation 7,

Section XVII.C.2.a.

88.     As a result, at some or all of the tank batteries listed in Appendices A.1 and A.2,

and potentially at all storage tanks owned or operated by HighPoint that are controlled to meet

the requirements of Regulation 7, Section XII.D.2 or Section XVII.C, HighPoint has violated the

requirement of Regulation 7, Section XVII.B.1.b to maintain and operate the facility and air

pollution control equipment "in a manner consistent with good air pollution control practices for

minimizing emissions."

89.     Further, at some or all of the tank batteries listed in Appendices A.1 and A.2,

HighPoint has violated the requirement of Regulation 7, Section XVII.C.2.a to "operate without

venting hydrocarbon emissions from the thief hatch (or other access point to the tank) or pressure

relief device during normal operation, unless venting is reasonably required for maintenance,

gauging, or safety of personnel and equipment."

90.     HighPoint has also violated the requirement of Regulation 7, Section XVII.C.2.b

to develop, certify, and implement a STEM plan containing the strategies necessary to ensure

compliance with Regulation 7, Section XVII.C.2.a.

91.     Upon information and belief, HighPoint may also have violated the system-wide

control requirement of Regulation 7, Section XII.D.2.a(x), by failing to capture and convey all

tank vapors, including VOCs, to an air pollution control device, as described in this Complaint.

92.     Pursuant to Sections 121 and 122 of the Colorado Act, HighPoint is liable for

injunctive relief and civil penalties of up to $15,000 per day for each violation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, based on the above allegations, Plaintiffs request that this Court:

A.  Permanently enjoin HighPoint from further violations of the Act, the Colorado SIP, and Regulation 7, including both the provisions of the Colorado SIP and those State-enforceable provisions cited in the Complaint;

B.  Order HighPoint to take appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Act, the Colorado SIP, and Regulation 7, including both the provisions of the Colorado SIP and those State-enforceable provisions cited in the Complaint;

C.  Assess a civil penalty against HighPoint for each violation of the applicable provisions of the Act and the Colorado SIP, of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and up to $97,229 per day for each violation that occurred after November 2, 2015;

D.  Assess a civil penalty against HighPoint pursuant to the Colorado Act for each violation of the State-enforceable provisions of Regulation 7, of up to $15,000 per day for each violation; and

E.  Grant such other and further relief as the Court deems just and proper.

Dated:   April 19, 2019.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

*/s/ John N. Moscato*
JOHN MOSCATO   Co. 30394
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
(303) 844-1380 (PHONE)
(303) 844-1350 (FAX)
John.Moscato@usdoj.gov

OF COUNSEL:

JESSICA PORTMESS
Regulatory Enforcement Unit
Legal Enforcement Program
U.S. Environmental Protection Agency
1595 Wynkoop Street
Denver, Colorado 80202

FOR THE STATE OF COLORADO, ON BEHALF
OF THE COLORADO DEPARTMENT OF
PUBLIC HEALTH AND ENVIRONMENT

PHILIP J. WEISER
Attorney General

*/s/ Thomas A. Roan*
THOMAS A. ROAN 30867*
First Assistant Attorney General
Air Quality Unit
Natural Resources and Environment
Attorneys for Colorado Department of Public
    Health and Environment, Air Pollution Control
    Division
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, Colorado 80203
Telephone:  720-508-6268
FAX:  720-508-6039
E-Mail:  tom.roan@coag.gov
*Counsel of Record

- 25 -

| APPENDIX A.1 | | |
|---|---|---|
| | **AIRS ID** | **Facility Name** |
| 1 | 123-5998 | 70 Ranch Laura 24-20 |
| 2 | 123-5205 | 70 Ranch 4-6-20/NHF-LAURA 1 |
| 3 | 123-6000 | Rothe No. 24-31 |
| 4 | 123-6015 | Centennial Rein/CVR 5-63 Pad |
| 5 | 123-9BAC | Pappenheim 6-62-27 CW2 |
| 6 | 123-9385 | Anschutz Windmill 4-22H |
| 7 | 123-9CF9 | Anschutz State 5-61-19_20 |
| 8 | 123-9B63 | Dutch Lake 17-25H |
| 9 | 123-9AD5 | 70 Ranch 05-63 Pad |
| 10 | 123-9BCE | Anschutz Windmill 10-34H |
| 11 | 123-9C29 | Anschutz State 05-62-35 |
| 12 | 123-9A27 | Dutch Lake 16-24H |
| 13 | 123-9700 | Rothe 43-30 |
| 14 | 123-9C98 | 70 Ranch 04-63-03 Pad 2 |

| APPENDIX A.2 | | |
|---|---|---|
| | **AIRS ID** | **Facility Name** |
| 1 | 001-1708 | Champlin-Danford 1 Facility |
| 2 | 001-1709 | Egan State 1 Facility |
| 3 | 001-1714 | Sam Koch 1 Facility |
| 4 | 001-1694 | Leech 1 Facility |
| 5 | 123-9EA0 | Anschutz Windmill 10-34EXT |
| 6 | 123-6-003 | Winzenreid No. 1 |