# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.     1:19-cv-1151

United States of America, and
the State of Colorado,

                    Plaintiffs

     v.

HighPoint Operating Corporation,

                    Defendant.

---

## CONSENT DECREE

---

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ................................................................................ 4
II.     APPLICABILITY ................................................................................................... 5
III.    DEFINITIONS ........................................................................................................ 6
IV.     INJUNCTIVE RELIEF ......................................................................................... 15
V.      ENVIRONMENTAL MITIGATION PROJECTS................................................. 37
VI.     CIVIL PENALTY .................................................................................................. 39
VII.    STATE-ONLY SUPPLEMENTAL ENVIRONMENTAL PROJECTS................... 41
VIII.   PERIODIC REPORTING ...................................................................................... 43
IX.     STIPULATED PENALTIES .................................................................................. 48
X.      FORCE MAJEURE................................................................................................ 55
XI.     DISPUTE RESOLUTION...................................................................................... 57
XII.    INFORMATION COLLECTION AND RETENTION ........................................... 59
XIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ................................ 62
XIV.    COSTS .................................................................................................................. 67
XV.     NOTICES .............................................................................................................. 68
XVI.    SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS.............. 69
XVII.   EFFECTIVE DATE................................................................................................ 72
XVIII.  RETENTION OF JURISDICTION ........................................................................ 72
XIX.    MODIFICATION ................................................................................................... 73
XX.     TERMINATION .................................................................................................... 73
XXI.    PUBLIC PARTICIPATION ................................................................................... 76
XXII.   SIGNATORIES/SERVICE .................................................................................... 76
XXIII.  INTEGRATION/HEADINGS ................................................................................ 77
XXIV.   26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION .................................... 77
XXV.    FINAL JUDGMENT .............................................................................................. 78
XXVI.   APPENDICES ....................................................................................................... 78

WHEREAS, Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and Plaintiff State of Colorado, on behalf of the Colorado Department of Public Health and Environment ("CDPHE"), are filing a Complaint concurrently with the lodging of this Consent Decree, pursuant to Section 113(b) of the Clean Air Act ("Act"), 42 U.S.C. § 7413(b), and Sections 121 and 122 of the Colorado Air Pollution Prevention and Control Act (the "Colorado Act"), C.R.S. §§ 25-7-121 and 122.  The Complaint alleges that Defendant, HighPoint Operating Corporation ("HighPoint") violated requirements of the Act and Colorado's federally approved State Implementation Plan ("SIP"), specifically Colorado Air Quality Control Commission Regulation Number 7 ("Reg. 7"),[1] at Condensate tanks that are part of HighPoint's oil and natural gas production system in the Denver-Julesburg ("D-J") Basin.  The Condensate tanks covered by this Decree are all within the Non-Attainment Area;

WHEREAS, certain Condensate tanks that are part of HighPoint's oil and natural gas production system in the D-J Basin were previously owned and operated by Bill Barrett Corporation ("Bill Barrett").  On March 19, 2018, Bill Barrett and Fifth Creek Energy Operating Company, LLC became wholly owned subsidiaries of HighPoint Resources Corporation, following which Fifth Creek Energy Operating Company, LLC was merged into Bill Barrett

---

[1] Reg. 7 has been periodically revised over time.  The latest SIP-approved version of Reg. 7 was approved by EPA on July 3, 2018, with an effective date of August 2, 2018.  *See* 83 Fed. Reg. 31,068 (July 3, 2018).  Before EPA acted on these revisions, the EPA-approved SIP used different citations than the State-approved Reg. 7 for provisions relevant here.  *See* 73 Fed. Reg. 8,194 (Feb. 13, 2008).  The State has also since revised Reg. 7.  For ease of reference, the Consent Decree uses citations to the current version of Reg. 7 approved by the Air Quality Control Commission, which includes certain provisions that have been incorporated into the SIP as of the lodging of this Consent Decree and contains other provisions approved only by the State as of the lodging of this Consent Decree.

Corporation.  On April 2, 2018, Bill Barrett changed its name to HighPoint Operating Corporation.

WHEREAS, the Condensate tanks store hydrocarbon liquids known as "Condensate" prior to transport and sale.  Condensate is separated from natural gas near the well-head in a device known as a "Separator."  After reaching pre-set levels in the Separator, the Condensate, also known as "Pressurized Liquids," is emptied in batches either directly, or through additional Separators, into storage tanks kept at or near atmospheric pressure.  As Condensate is "dumped" (the term commonly used within the industry) either directly, or through additional Separators, into storage tanks, the pressure decreases and vapors, which include volatile organic compounds ("VOCs") and other air pollutants, are released or "flashed" into a gaseous state.  Such vapors are known as "flash gas."  Additional vapors are released from the Condensate due to temperature fluctuations and liquid level changes.  These are known as "working," "breathing," and "standing" losses;

WHEREAS, the Condensate tanks that are subject to this Decree are equipped with systems to route vapors from the Condensate tanks by vent lines to emission control devices;

WHEREAS, the Condensate tanks that are subject to this Decree are subject to certain requirements of Reg. 7, including the general requirements that:  "[a]ll condensate collection, storage, processing and handling operations, regardless of size, shall be designed, operated and maintained so as to minimize leakage of volatile organic compounds to the atmosphere to the maximum extent practicable," Reg. 7, Sec. XII.C.1.b; and "all such air pollution control equipment shall be adequately designed and sized . . . to handle reasonably foreseeable fluctuations in emissions of [VOCs].  Fluctuations in emissions that occur when the separator dumps into the tank are reasonably foreseeable."  Reg. 7, Sec. XII.C.1.a;

WHEREAS, the Complaint alleges that from April 2014 through May 2016, inspectors from the EPA and CDPHE's Air Pollution Control Division conducted inspections of groups of one or more Condensate tanks with a unique AIRS identification number ("AIRS Tanks"), and using optical gas imaging infrared cameras observed AIRS Tanks emitting VOCs to the atmosphere at the time of the inspection. In some instances, the inspectors had complementary sensory observations of VOC emissions, including observations of hydrocarbon odor, observations of audible hissing, observations of visible wave refractions, and observations of hydrocarbon stains on the Condensate tanks emanating from pressure relief valves ("PRVs") and thief hatches indicative of potential past VOC emissions. The inspectors observed VOC emissions, or signs of VOC emissions, at many of the AIRS Tanks inspected. The inspectors also observed an uncontrolled storage tank subject to control, valves on vent lines and PRV stacks in an open (or not fully closed) position, and a cracked vapor line allowing VOCs to be emitted uncontrolled to the atmosphere;

WHEREAS, in response to August 2015 and December 2016 requests for information by the EPA pursuant to Section 114 of the Act, 42 U.S.C. § 7414, Bill Barrett provided data to EPA and CDPHE regarding certain AIRS Tanks. The data includes detailed analyses of samples of Pressurized Liquids taken at AIRS Tanks and associated production data, as well as detailed information about the Vapor Control Systems at those AIRS Tanks. Based upon an evaluation of this data, the United States and the State further allege in the Complaint that a number of the AIRS Tanks were equipped with Vapor Control Systems that would not have had sufficient capacity to route all the vapors from the Condensate tanks to emission control devices without first building pressure in the Condensate tanks that would have exceeded the set point of the PRVs and/or thief hatches, such that vapors would have been emitted directly to the atmosphere

3

without any combustion;

WHEREAS, CDPHE issued a Compliance Advisory to Bill Barrett on December 16, 2015 regarding alleged violations of Reg. 7, Sec. XII.C.1.b at 17 Bill Barrett well production facilities;

WHEREAS, HighPoint has been constructively notified by EPA of the alleged violations of Reg. 7, Sec. XII.C.1 pursuant to 42 U.S.C. § 7413(a)(1);

WHEREAS, HighPoint does not admit any liability to the United States or the State arising out of the transactions or occurrences alleged in the Complaint; and

WHEREAS, the Parties represent that this Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.   JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action and the Parties pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and Section 113(b) of the Act, 42 U.S.C. § 7413(b).  Venue is proper in this judicial district pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations in the Complaint are alleged to have occurred in, and Bill Barrett conducted, and HighPoint conducts, business in this judicial district.

2.     HighPoint consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Decree. HighPoint further consents to venue in this

judicial district.  Except as expressly provided for herein, this Decree shall not create any rights
in or obligations of any party other than the Parties to this Decree.

3.      The State has actual notice of the commencement of this action in accordance
with the requirements of Section 113 of the Act, 42 U.S.C. § 7413.

## II.      APPLICABILITY

4.      The obligations of this Consent Decree apply to and are binding upon the United
States and the State, and upon HighPoint and any successors, assigns, or other entities or persons
otherwise bound by law, consistent with the Sales and Transfer Provisions in Section XVI.
Unless otherwise noted, the obligations of this Decree shall become enforceable on its Effective
Date as provided in Section XVII (Effective Date).

5.      HighPoint shall (1) provide a copy of this Consent Decree to its CEO, COO,
General Counsel, Senior Vice President of Operations, Production Engineering Manager, EHS
Manager, Northeast Wattenberg Production Superintendent, and all foremen who will be
responsible for implementing the terms of this Consent Decree.  HighPoint shall also ensure that
all officers, employees, contractors, and agents whose duties might reasonably include
compliance with any provision of this Decree are made aware of this Consent Decree and
specifically aware of the requirements of this Consent Decree that fall within such person's
duties; and (2) place an electronic version of the Consent Decree on its internal website.
HighPoint shall be responsible for ensuring that all employees and contractors involved in
performing any work pursuant to this Consent Decree perform such work in compliance with the
requirements of this Consent Decree.

6.      In any action to enforce this Consent Decree, HighPoint shall not raise as a
defense to liability or a stipulated penalty the failure by any of its officers, directors, employees,
agents, or contractors to take any actions necessary to comply with the provisions of this Decree.

This section does not preclude HighPoint from holding any employee, agent, or contractor of any tier who is alleged to have not complied with this Consent Decree liable for their actions.

## III.    DEFINITIONS

7.      For purposes of this Consent Decree, every term expressly defined by this Section shall have the meaning given that term herein.  Every other term used in this Decree that is also defined in the Act, 42 U.S.C. § 7401 *et seq*., in the regulations promulgated pursuant to the Act, or in the Colorado SIP (including Reg. 7 that was approved as part of the Colorado SIP on July 3, 2018, with an effective date of August 2, 2018, 83 Fed. Reg. 31,068 (July 3, 2018)), shall mean in this Decree what such term means under the Act, those regulations, or the Colorado SIP. In the case of a conflict between federal and state definitions, federal definitions shall control.

a.      "Actual Uncontrolled Annual VOC Emissions" shall mean the amount of VOC emissions from an AIRS Tank during the previous 12-month period based on actual production prior to the routing of those VOCs to an emission control device.

b.      "AIRS Tank" shall mean one or more tanks that store Condensate and have a unique AIRS point identification number ("AIRS Point").  The AIRS Tanks that are subject to this Decree are identified in Appendix A.1 and A.2, all of which are operated by HighPoint.  Facilities listed on Appendix A.3 subsequent to the Date of Lodging will be subject to this Consent Decree as specifically stated herein.

c.      "Business Day" shall mean Monday through Friday, with the exception of federal holidays.  In computing any period of time under this Decree expressed in Business Days, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until 11:59 p.m. Mountain Time of the next Business Day.

d.      "Calendar Day" shall mean any of the seven days of the week.  In computing any period of time under this Decree expressed in Calendar Days (as opposed

to Business Days), where the last Calendar Day would fall on a Saturday, Sunday, or federal holiday, the period shall not be extended to the next Business Day.

e.     "CDPHE" shall mean the Colorado Department of Public Health and Environment, and its Air Pollution Control Division ("APCD").

f.     "Closed Loop Vapor Control System" shall mean a Vapor Control System equipped with a system of feedback loops from the Tank System to production equipment upstream of the Tank System to continuously measure, control, and record pressure in the Tank System or tanks within the Tank System.  Closed Loop Vapor Control Systems automatically regulate hydrocarbon flow from separation equipment to the Tank System, thereby controlling the vapor flow rate, duration, and frequency so as to maintain Tank System pressure below the Leak Point of the Tank System pressure relief device as described in the Closed Loop Design Guideline.

g.     "Closed Loop Design Guideline" shall refer to the Design Guideline developed by or on behalf of HighPoint pursuant to Paragraph 8 (Development of Modeling and Design Guidelines) to install a Closed Loop Vapor Control System.

h.     "Complaint" shall mean the Complaint filed by the United States and the State in this action.

i.     "Compromised Equipment" shall mean equipment associated with a Vapor Control System that is beginning to show signs of wear beyond normal wear and tear (and cannot be addressed by cleaning the equipment).  Examples include, but are not limited to, cracks or grooves in gaskets, abnormally or heavily corroded equipment, beveling of sealing surfaces, or other indications of inefficient connection of the thief hatch to the tank.

      j.      "Condensate" shall mean hydrocarbon liquids that remain liquid at standard conditions (68 degrees Fahrenheit and 29.92 inches mercury) and are formed by condensation from, or produced with, natural gas, and which have an American Petroleum Institute gravity ("API gravity") of 40 degrees or greater.

      k.      "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto listed in Section XXVI (Appendices).

      l.      "Control Point" shall mean the designated pressure at which the Closed Loop Vapor Control System control logic takes action (*e.g.*, closes valves) to maintain the Tank System pressure below the Leak Point.  The Control Point should be set below the Trigger Point in accordance with the Closed Loop Design Guideline.

      m.      "Date of Lodging" shall mean the date this Decree is filed for lodging with the Clerk of the Court for the United States District Court for the District of Colorado.

      n.      "Day" or "day" shall mean a Calendar Day unless expressly stated to be Business Day.

      o.      "Defendant" or "HighPoint" shall mean HighPoint Operating Corporation.

      p.      "Effective Date" shall have the definition provided in Section XVII (Effective Date).

      q.      "Engineering Design Standard" shall mean an engineering standard developed by HighPoint pursuant to Appendix B, Paragraph 2 (Open Loop Engineering Design Standards).

      r.      "Environmental Mitigation Project" shall mean the requirements specified in Section V and Appendix D of this Consent Decree to remedy, reduce, or offset past excess ozone precursor emissions resulting from HighPoint's alleged violations of the

Clean Air Act in this matter.  Ozone is formed by chemical reactions between VOC and oxides of nitrogen ("NOx") in the presence of sunlight.

s.        "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

t.        "Flame Arrestor" shall mean a device in a Vapor Control System which allows gas to pass through it but stops a flame from returning to an ignition source in order to prevent a larger, uncontrolled fire or explosion.

u.        "IR Camera Inspection" shall mean an inspection of a Vapor Control System using an optical gas imaging infrared camera designed for and capable of detecting hydrocarbon and VOC emissions, conducted by trained personnel who maintain proficiency through regular use of the optical gas imaging infrared camera.

v.        "Leak Point" shall mean the lowest pressure at which emissions are released from any pressure relief devices on a Tank System, as determined consistent with the Closed Loop Design Guideline.  For purposes of establishing the Leak Point for a Closed Loop Vapor Control System, the value of the Leak Point will not be a value exceeding the Set Point.

w.        "Low Pressure Point" shall mean a low pressure in the Tank System in a Closed Loop Vapor Control System at which the control logic is set to alarm, as established consistent with the Closed Loop Design Guideline.  The Low Pressure Point is established to identify the potential for failed pressure monitors.

x.        "Malfunction" shall mean any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to

operate in a normal or usual manner.  Failures that are caused in part by poor maintenance or careless operation are not Malfunctions.

y.      "Maximum Design Pressure" shall mean the highest pressure that the Vapor Control System is designed to maintain in the Tank System such that uncontrolled emissions to the atmosphere due to over-pressurization are precluded.

z.      "Modeling and Design Guidelines" shall refer to the Open Loop Modeling Guideline and the Closed Loop Design Guideline collectively developed by or on behalf of HighPoint pursuant to Paragraph 8 (Development of Modeling and Design Guidelines).

aa.     "Non-Attainment Area" shall mean the 8-Hour Ozone Control Area within the meaning of Reg. 7, Sec. II.A.1.

bb.     "Normal Operations" shall mean all periods of operation, excluding Malfunctions, periods of well maintenance (*e.g.*, swabbing, liquids unloading), or periods of Shut-In.  For Tank Systems at well production facilities, Normal Operations includes, but is not limited to, receipt or transfer of liquids from the Separator.  For purposes of this Consent Decree, "resuming Normal Operations" means resuming Normal Operations at any Tank System.

cc.     "Open Loop Vapor Control Systems" shall mean Tank Systems with Vapor Control Systems that are not Closed Loop Vapor Control Systems.

dd.     "Open Loop Modeling Guideline" shall refer to the Modeling Guideline developed by or on behalf of HighPoint pursuant to Paragraph 8 (Development of Modeling and Design Guidelines) to determine if a Vapor Control System is adequately designed and sized to handle the Potential Peak Instantaneous Vapor Flow Rate.

ee.     "Paragraph" shall mean a portion of this Decree identified by an Arabic

numeral.

ff.     "Parties" shall mean the United States, the State, and HighPoint.

gg.     "Peak Modeled Pressure" shall mean the highest pressure experienced by

the Vapor Control System during Normal Operations, as determined using the Open

Loop Modeling Guideline and Open Loop Engineering Design Standard.

hh.     "Plaintiffs" shall mean the United States and the State.

ii.     "Potential Peak Instantaneous Vapor Flow Rate" or "PPIVFR" shall mean

the maximum instantaneous rate of vapors routed to a Vapor Control System during

Normal Operations, including flashing, working, breathing, and standing losses, as

determined using the Open Loop Modeling Guideline.

jj.     "Pressurized Liquids" shall mean hydrocarbon liquids separated from,

condensed from, or produced with natural gas while still under pressure and upstream of

the Condensate tanks servicing the well.

kk.     "Project Dollars" shall mean HighPoint's expenditures and payments

incurred or made in carrying out the Environmental Mitigation Project identified in

Appendix D to the extent that such expenditures or payments both:  (a) comply with the

requirements set forth in Section V and Appendix D; and (b) constitute HighPoint's

direct payments for such projects or HighPoint's external costs (*e.g.*, for labor and

equipment).

ll.     "Reliable Information" shall mean any observance or detection of VOC

emissions from a Tank System, associated open-ended line (*e.g.*, vent line, blowdown

valve or line), or associated pressure relief device (*e.g.*, thief hatches or pressure relief

valves) using an optical gas imaging infrared camera, EPA Method 21 monitoring,

CDPHE Approved Instrument Monitoring Method ("AIMM"), or audio, visual, olfactory

("AVO") techniques by EPA, CDPHE, local government inspectors acting as duly

designated representatives of CDPHE, HighPoint employees or HighPoint contractors

trained to conduct inspections for emissions.  Reliable Information may be obtained at

any time after the Date of Lodging of this Decree.

        (1)      In addition, the following shall be considered Reliable

Information:

        (a)      Following the optimization phase, Shut-In of all wells

associated with a Closed Loop Vapor Control System resulting from a

pressure reading at or above the Leak Point.

        (b)      Any observance or detection of Visible Smoke Emissions

from a combustion device in a Vapor Control System by EPA, CDPHE,

local government inspectors acting as duly designated representatives of

CDPHE, HighPoint employees or HighPoint contractors trained to

conduct inspections for emissions.

        (2)      Further, the following shall not be considered Reliable

Information:

        (a)      Observations from a Tank System, associated open-ended

line (*e.g.*, vent line, blowdown valve or line), or associated pressure relief

device (*e.g.*, thief hatches or PRVs) while that Tank System is Shut-In or

observations from a tank(s) within a Tank System while the tank(s) is

Shut-In, and during which working, breathing, and standing emissions may occur.

(b)     For purposes of this Decree only, evidence of surface staining alone.

(c)     Emissions observations while pressure relief devices (*e.g.*, thief hatches) and open-ended lines (*e.g.*, blowdown valves) are open for active maintenance, well unloading, tank truck loadout without emission controls, or gauging activities;

(d)     Emissions observations while a HighPoint representative is onsite performing active well maintenance (*e.g.*, swabbing, liquids unloading) at the well production facility associated with the Tank System;

(e)     Emissions observations during the verification and optimization phase for Closed Loop Vapor Control Systems, except that open thief hatches or open blowdown valves shall be considered Reliable Information unless otherwise provided in this paragraph (subparagraph 7(ll)); or

(f)     Emissions observations during field testing to collect information for use in the Open Loop Engineering Evaluation.

mm.     "Root Cause Analysis" shall mean an assessment conducted through a process of investigation to determine the primary cause and contributing cause(s), if any, of Reliable Information or site investigations pursuant to Paragraph 15 (Tank Pressure Monitoring).

nn.     "Section" shall mean a portion of this Decree identified by a Roman numeral.

oo.     "Separator" shall mean a pressurized vessel used for separating a well stream into gaseous and liquid components.

pp.     "Set Point" shall mean the rated pressure at which the tank pressure relief device is designed to open or relieve.  The Set Point shall be less than or equal to the manufacturer's rated pressure of the associated Condensate tank(s).

qq.     "Shut-In" shall mean flow of all liquids and vapor into the Tank System or piece of equipment has ceased and cannot be resumed without HighPoint personnel opening valves, activating equipment, or supplying a power source.

rr.     "State" shall mean the State of Colorado, acting on behalf of CDPHE.

ss.     "Static Alarm" shall mean the alarm established by the Closed Loop Vapor Control System control logic to indicate failed pressure monitors.  The Static Alarm shall be triggered when pressure readings remain constant for the duration established in the Closed Loop Design Guideline

tt.     "Tank System" shall mean one or more AIRS Tanks, and any other interconnected tank (*e.g.*, produced water tank), that share a common Vapor Control System.

uu.     "TPY" shall mean tons per year.

vv.     "Trigger Point" shall mean a selected tank pressure below the Leak Point and above the Control Point, at which the Closed Loop Vapor Control System control logic triggers an alarm.

ww.     "United States" shall mean the United States of America, acting on behalf of EPA.

xx.     "Vapor Control System" shall mean the system used to contain, convey, or control vapors from one or more Condensate tank(s) (including flashing, working, breathing, and standing losses, as well as any emissions routed to the Condensate tank Vapor Control Systems).  A Vapor Control System includes a Tank System, piping to convey vapors from a Tank System to a combustion device and/or vapor recovery unit, fittings, connectors, liquid knockout vessels, openings on tanks (such as PRVs and thief hatches), and emission control devices.

yy.     "Visible Smoke Emissions" shall mean observations of smoke for any period or periods of duration greater than or equal to one (1) minute in any fifteen (15) minute period during Normal Operations, pursuant to EPA Method 22.  Visible Smoke Emissions do not include radiant energy or water vapor.  EPA Method 22 need only be performed if smoke is observed.

zz.     "VOC" or "VOCs" shall mean volatile organic compounds.

## IV.   INJUNCTIVE RELIEF

8.     Development of Modeling and Design Guidelines. HighPoint has developed written Modeling and Design Guidelines.  The purpose of the Open Loop Modeling Guideline is to determine Potential Peak Instantaneous Vapor Flow Rate for purposes of designing and adequately sizing Vapor Control Systems and to provide procedures for achieving this objective. The purpose of the Closed Loop Design Guideline is to prescribe the steps taken to design, install and optimize Closed Loop Vapor Control Systems by reading tank pressures and controlling liquid flow and vapor flow to the tanks, thereby controlling the Potential Peak

Instantaneous Vapor Flow Rate, PPIVFR duration, or PPIVFR frequency, to ensure tank pressure does not exceed the Leak Point. HighPoint shall apply the injunctive relief requirements in Appendix B (Requirements for Open Loop Modeling Guideline, Engineering Design Standards, Field Survey, Engineering Evaluation and Modification, Initial Verification, and Post-Certification of Completion Modifications) to each Vapor Control System on Appendix A.1 and shall apply the injunctive relief requirements in Appendix C (Requirements for Closed Loop Vapor Control System Design Guideline, Field Survey, Engineering Evaluation, and Initial Verification) to each Vapor Control System on Appendix A.2. At any time, High Point may provide a written request to EPA and CDPHE for approval to either apply the Appendix B (Open Loop Vapor Control Systems) injunctive relief obligations to an Appendix A.2 Vapor Control System, or apply the Appendix C (Closed Loop Vapor Control Systems) injunctive relief obligations to an Appendix A.1 Vapor Control System, including the reasons for such election. Such approval shall not be unreasonably withheld. If such approval is withheld, EPA and CDPHE shall provide a brief written explanation to HighPoint regarding the denial. If EPA and CDPHE have not responded within ten (10) Business Days, HighPoint's request shall be deemed approved.

9.      Deadlines for Requirements of Appendix B and Appendix C. For each Tank System, HighPoint shall: (1) complete all applicable requirements of either Appendix B, Paragraphs 1 through 3 (Development of an Open Loop Modeling Guideline; Open Loop Engineering Design Standards; Open Loop Vapor Control System Field Survey, Engineering Evaluation, and Modification) or Appendix C, Paragraphs 1 through 2(c) (Development of a Closed Loop Vapor Control System Design Guideline; Closed Loop Vapor Control System Field Survey, Engineering Evaluation, and Modification) in accordance with the schedule in the table

below; or (2) Shut-In the Tank System by the applicable deadline in the table below.  For Tank

Systems Shut-In as of the applicable deadline in the table below that have not completed the

applicable requirements of Appendix B, Paragraphs 1 through 3 or Appendix C, Paragraphs 1

through 2(c), HighPoint shall complete the applicable requirements of Appendix B, Paragraphs 1

through 3 or Appendix C, Paragraphs 1 through 2(c) prior to resuming Normal Operations

(except as otherwise authorized pursuant to subparagraph 9(a), below).

| Tank System Group | Deadline |
|---|---|
| Tank Systems on Appendix A.1 (Open Loop Vapor Control Systems) | December 31, 2018 |
| Tank Systems on Appendix A.2 (Closed Loop Vapor Control Systems) | March 31, 2019 |

a.      In the event that Tank Systems are Shut-In as of the applicable deadline in

this Paragraph 9, due to activities required for the wellbore(s) (*e.g.*, wellbore maintenance

or per Colorado Oil and Gas Conservation Commission's ("COGCC") Wellbore Integrity

program) or because well(s) cannot run due to high line pressure, HighPoint shall for the

sole purpose of (i) undertaking an Engineering Evaluation at a Tank System, (ii) making

necessary modifications required of Open Loop Vapor Control Systems pursuant to

Appendix B, subparagraph 3(d) (Open Loop Vapor Control System Modification), or (iii)

taking corrective actions pursuant to Paragraph 12 (Reliable Information, Investigation,

and Corrective Action) be allowed to resume Normal Operations associated with that

Tank System for a period not to exceed 30 Calendar Days.  In the event that Tank

Systems are Shut-In for any other reasons, HighPoint shall, for the purposes identified in

(i)–(iii) above, be allowed to resume Normal Operations associated with that Tank

System for a period not to exceed five Calendar Days.  Upon EPA and CDPHE written approval, the period of resumed Normal Operations associated with a Tank System may be extended for up to five additional Calendar Days.

10.     <u>Directed Inspection and Preventative Maintenance Program</u>.  On October 12, 2018, HighPoint developed and submitted for review and comment by EPA and CDPHE, a directed inspection and preventative maintenance ("DI/PM") program. EPA and CDPHE submitted final comments on the DI/PM program on or about January 31, 2019.  HighPoint shall implement the DI/PM program at each Open Loop and Closed Loop Vapor Control System on Appendices A.1, A.2, and A.3 (as determined in accordance with Paragraph 16) and production equipment (*i.e.*, separators) associated with such Vapor Control Systems, by no later than February 18, 2019.  HighPoint is not required to implement the requirements of subparagraphs 10(a) through (c) at any Shut-In Tank System or associated Shut-In production equipment.  If HighPoint misses any scheduled maintenance or inspection actions required under subparagraph 10(c) while Shut-In, HighPoint shall perform any such missed maintenance or inspection actions prior to resuming Normal Operations of the Shut-In Tank System or associated Shut-In production equipment unless such missed maintenance or inspection cannot be conducted because the Tank System or associated Shut-In production equipment is Shut-In.  Furthermore, HighPoint shall perform the applicable actions specified in subparagraphs 10(a) and 10(b) and any missed maintenance or inspection under subparagraph 10(c) that could not be conducted because the Tank System or associated Shut-In production equipment was Shut-In within seven Calendar Days of resuming Normal Operations of the Shut-In Tank System or associated Shut-In production equipment.  As part of the DI/PM program, HighPoint shall:

a.      Address system-wide inspection and response procedures for the Vapor

Control Systems, including without limitation:

(1)      Weekly AVO inspection of all Vapor Control Systems and

associated production equipment (*i.e.*, separators) to check for VOC emissions,

including checking for hissing, significant new staining around the pressure relief

valves, or other indicators of emissions or operational abnormalities.  HighPoint

has developed and submitted a Standard Operating Procedure ("SOP") for the

AVO inspection for review and comment by EPA and CDPHE.  The SOP defines

the "audio," "visual," and "olfactory" components of AVO inspections to assist in

training of the personnel who will conduct these inspections.  Any subsequent

revisions to the AVO SOP may be informed by the results of Engineering

Evaluations performed by HighPoint.  The AVO inspection will check the

following, where relevant:

(a)      Separators – whether the Separator was properly operating

at time of inspection, whether the dump valve was operating properly as

observed from AVO observation.

(b)      Vapor Control System – PRVs are properly sealed (to the

extent this can be verified by AVO); thief hatches are closed, latched, and

properly sealed (to the extent this can be verified by AVO); other valves

are in the correct position (*e.g.*, blowdown valve is not open); and the

absence of other observed or detected emissions (using AVO

observations) from tank piping (*e.g.*, load line, blowdown line, vapor line,

etc.).

(c)     Combustion Device – proper operation (*e.g.*, no visible

clogging of burner tray); presence of a pilot light; level of liquids in

knock-out vessel; and properly-functioning auto-ignitor (and back

pressure regulator/motor valve, if present).

b.     Within 60 Days of the Open Loop Engineering Evaluation deadline for

each Tank System (see Paragraph 9) associated with an Open Loop Vapor Control

System, HighPoint shall commence and continue addressing any site-specific or system-

wide parameters or practices identified by the Open Loop Engineering Evaluation as

variable, verifiable, and critical for ensuring the Tank System and Open Loop Vapor

Control System are operating as designed (including those parameters or practices

incorporated into a Certification of Completion Report, such as final stage separation

operating pressure).  HighPoint shall ensure that such parameters or practices are readily

identified and available to HighPoint field personnel while on location (via on-site

labeling, HighPoint-provided forms, field data collection software, or other readily

available means) and verified during the weekly AVO inspection required by this

Paragraph 10.

c.     Establish and implement procedures for preventive maintenance, including

evaluation of equipment performance to identify appropriate long-term maintenance and

inspection schedules and a replacement program.  HighPoint shall propose initial

maintenance and inspection schedules and a replacement program in the DI/PM program.

HighPoint shall develop and take all actions necessary to fully implement an SOP for

preventative maintenance activities indicating specific equipment and inspection/work to

be performed, which includes:

(1)      Clean and check PRV and thief hatch seals and gaskets for integrity, check that the spring in the thief hatch/PRV aligns with the parameter identified in the Engineering Evaluation (through visual observation), repair or replace any Compromised Equipment, clean Flame Arrestor (replacing as appropriate) and air-intake, check and clean burner tray (replace as appropriate), check proper operation of dump valve on Separator by manually actuating the dump valve and visually observing its operation (unless actuation occurs without manual activation during the inspection), and perform any other appropriate maintenance and inspection activities to the extent identified by HighPoint in its DI/PM program.  These activities shall occur no less frequently than semi-annually.

(2)      Check Separator dump valve orifices, where present, are in good condition and replace as necessary.  This shall occur no less frequently than annually.

(3)      Clear liquids from any lines where liquids can accumulate no less frequently than quarterly.  Should maintenance activities or other inspection activities, including any Root Cause Analysis, indicate that liquids are accumulating in vapor lines and causing VOC emissions, HighPoint shall update these schedules to be more frequent to prevent, as much as practicable, liquids accumulation in vapor lines.

(4)      For Closed Loop Vapor Control Systems:  (a) check the calibration of tank pressure monitors (*i.e.*, bench test or in-place test) and replace the tank pressure monitor if not calibrated consistent with the procedures developed in

accordance with the DI/PM program; and (b) clean dump valve exhaust ports and solenoids.  These shall occur no less frequently than semi-annually.

d.      Maintain a spare parts program adequate to support normal operating, maintenance, and replacement requirements, establish written procedures for the acquisition of parts on an emergency basis (*e.g.,* vendor availability on a next-day basis), and evaluate appropriate parts to be kept on hand (*e.g.*, gaskets and seals for thief hatches kept on trucks and replacement PRVs kept at a central HighPoint facility).  Beginning February 18, 2019 and for the life of this Consent Decree, HighPoint shall ensure that a current employee has been designated with the responsibility to maintain an adequate spare parts inventory.  The spare parts inventory may be based initially on vendor recommendations.

e.      Establish and implement requirements for appropriate documentation of compliance with DI/PM practices and procedures (by Tank System or AIRS ID) so that the Parties can verify that the DI/PM program is being implemented.  This includes creating and maintaining documentation of the date of the inspection/maintenance activity and any corrective action work (including repair, replacement, or upgrade), except as provided for in this subparagraph 10(e).  Activities identified within the DI/PM plan as being performed on a regular basis that are not a direct result of finding Reliable Information or Compromised Equipment, shall not be considered "corrective action" work for purposes of this subparagraph.  Any activities not defined as "corrective action" in this subparagraph will be described in the DI/PM program.  Activities responsive to Reliable Information or Compromised Equipment are always considered "corrective

action" work for purposes of this subparagraph, regardless of whether such activities were also described in the DI/PM procedures.

      f.     Ensure that all persons (*e.g.*, employees and contractors) responsible for implementation or execution of any part of the DI/PM program, except for independent contractors solely responsible for servicing equipment (*e.g.*, combustor manufacturer personnel replacing a burner tray), have completed training on the aspects of the DI/PM program, including any SOPs, which are relevant to the person's duties.  HighPoint shall develop a training program to ensure that refresher training is performed once per calendar year and that new personnel are sufficiently trained prior to any involvement in the DI/PM program.  New personnel training will include a job shadowing program and refresher training shall include on-the-job review by supervising personnel or personnel familiar with the requirements of this Consent Decree and SOPs.

      g.     Commencing in 2020 for records created or dated in 2019, HighPoint shall perform the following during each Calendar year for each Vapor Control System, and any other equipment subject to the DI/PM:

      (1)     A DI/PM program-trained employee or contractor of HighPoint, whose primary responsibilities do not include performing duties in the DI/PM program on a routine basis for the particular Tank System under evaluation, shall undertake the following for each Vapor Control System, and any other equipment subject to the DI/PM, in consultation with persons performing DI/PM program duties for that particular Tank System:

      (a)     Verify that maintenance and inspection schedules and the replacement program have been followed at the appropriate frequency;

(b)     Review maintenance and corrective action work records required to be maintained by this Consent Decree and records necessary to implement the DI/PM program for the Tank System to confirm proper recordkeeping, timely response to all issues (*e.g.*, emissions or other operational issues), and determine if there are recurrent or systemic issues associated with a particular Tank System; and

(c)     Make any appropriate updates to the DI/PM program, including SOPs.

(2)     Upon completion of review of all Tank Systems, HighPoint shall evaluate whether there are recurrent or systemic issues across HighPoint's Tank Systems.

(3)     Should HighPoint determine that actions need to be taken to address operations or maintenance activities at one or more Tank Systems based on HighPoint's review (as described above), such as making appropriate updates to the DI/PM program, including SOPs, HighPoint shall take such actions as soon as practicable.

(4)     HighPoint shall use best efforts to complete the review required by this subparagraph 10(g) for no fewer than half of its Tank Systems during the first semi-annual period of each Calendar year (*i.e.*, HighPoint would review its 2019 records for no fewer than half of its Tank Systems between January 1 and June 30 of 2020, etc.).

(5)     With the next Semi-Annual Report or the Semi-Annual Report due at least 30 Days following the completion of the review on the schedule described

in subparagraph 10(g)(4), above, HighPoint shall submit documentation of the following information:  (a) the date that review of the Tank System was completed; (b) a discussion of whether HighPoint identified any systemic issues; and (c) the nature and timing of any modifications, corrective actions, or other actions as a result of this review.

11.     Periodic Inspections and Monitoring.  Beginning on the Date of Lodging, HighPoint shall undertake a program for inspection and monitoring of all Vapor Control Systems, in accordance with the following requirements:

a.      These inspections must be conducted pursuant to a written inspection SOP prepared by HighPoint and approved by EPA and CDPHE.  HighPoint must use an AIMM.  AIMM includes optical gas imaging infrared cameras or other inspection methods meeting EPA Method 21 standards.  Alternative methods or technologies may be used subject to the approval of both EPA and CDPHE, which approval shall not be unreasonably withheld.

b.      HighPoint shall perform inspections monthly.  An IR Camera Inspection completed pursuant to Appendix B, Paragraph 4 (Open Loop Vapor Control System Initial Verification) or Appendix C, subparagraph 3(a)(2) (Closed Loop Vapor Control System Verification of Engineering Evaluation) for a Tank System during the applicable inspection period shall also count as an inspection for purposes of this Paragraph.

c.      HighPoint shall maintain one or more logs documenting the following for each inspection:

(1)     The date and AIRS Point for the Condensate tanks associated with the Tank System, and number of tanks inspected;

(2)     The date and time of any instance where Reliable Information is observed;

(3)     The date and type of corrective action taken to address Reliable Information.

(4)     The method and date of verification of corrective action taken to address Reliable Information.  If HighPoint utilizes an IR Camera to verify corrective action taken to address Reliable Information, then HighPoint shall record a video of such verification with the IR Camera.

12.     <u>Reliable Information, Investigation, and Corrective Action</u>.  Beginning as of the Date of Lodging, within five Calendar Days after HighPoint obtains any Reliable Information, including, but not limited to, observances or detections of Reliable Information during inspections required by Appendix B, Paragraph 4 (Open Loop Vapor Control System Initial Verification), Appendix C, subparagraph 3(a)(2) (Closed Loop Vapor Control System Verification of Engineering Evaluation), Paragraph 10 (Directed Inspection and Preventative Maintenance Program), Paragraph 11 (Periodic Inspections and Monitoring), and subparagraph 15(f) (Tank Pressure Monitoring), HighPoint shall either (i) complete the necessary corrective actions to address the Reliable Information or (ii) Shut-In the Tank System.  If the Reliable Information can be addressed by Shutting-In one or more tanks in a Tank System, Shutting-In one or more wells or Separators, or other similar action, such action may be an acceptable corrective action to meet the deadline in this Paragraph if completed within such deadline.

a.     For each Tank System Shut-In pursuant to the requirements of this Paragraph, HighPoint shall proceed as follows:

(1)     If the Tank System has not yet undergone an Engineering Evaluation, the Tank System shall remain Shut-In, subject to subparagraph 9(a), until the Engineering Evaluation and any necessary modifications have been completed.  For an Open Loop Vapor Control System, HighPoint shall comply with the requirements of Appendix B, Paragraph 4 (Open Loop Vapor Control System Initial Verification) within 30 Days of resuming Normal Operations of the Tank System; or for a Closed Loop Vapor Control System, HighPoint shall comply with the requirements of Appendix C, subparagraph 3(a)(2) (Closed Loop Vapor Control System Verification of Engineering Evaluation) at that Tank System prior to resuming Normal Operations of the Tank System.

(2)     If the Tank System has already undergone an Engineering Evaluation, the Tank System shall remain Shut-In until completion of any necessary corrective actions, including (if appropriate) a revised Engineering Evaluation for any Open Loop Vapor Control System.  If a revised Open Loop Engineering Evaluation is appropriate and results in any modifications at the Tank System, HighPoint shall comply with the requirements of Appendix B, Paragraph 4 (Open Loop Vapor Control System Initial Verification) at that Tank System within 30 Days of resuming Normal Operations of the Tank System.

b.      For each Tank System Shut-In pursuant to the requirements of this Paragraph, HighPoint shall provide in a spreadsheet the following:

(1)     The date Reliable Information was obtained resulting in a Shut-In;

(2)     The AIRS ID associated with that Tank System;

(3)     The date the Tank System was Shut-In;

(4)     The date corrective action was taken, including a description of the corrective action and the date and method of verification that the corrective action was successful.  The date and method of verification is not required if the corrective action is taken only in response to exceedances of the Leak Point detected through the Closed Loop Vapor Control System.  If HighPoint utilizes an IR Camera to verify corrective action taken to address Reliable Information, then HighPoint shall record a video of such verification with the IR Camera;

(5)     The date Normal Operations of the Tank System were resumed; and

(6)     The date following any Open Loop Engineering Evaluations or Modification under Appendix B, Paragraph 5 (Open Loop Vapor Control System Post-Certification of Completion Modifications) that an IR Camera Inspection meeting the requirements of an Open Loop Vapor Control System Initial Verification was completed, and the results of that inspection.

c.     For each instance where HighPoint obtains Reliable Information and within the deadline provided in this Paragraph 12, completes all necessary corrective actions to address the emissions, HighPoint shall provide in a spreadsheet the following:

(1)     The date Reliable Information was obtained;

(2)     The AIRS ID associated with that Tank System; and

(3)     The date(s) all necessary corrective actions to address the emissions were made, including a description of such actions and the date and method of verification that the corrective action was successful.  The date and method of verification is not required if the corrective action is taken only in

response to exceedances of the Leak Point detected through the Closed Loop Vapor Control System.  If HighPoint utilizes an IR Camera to verify corrective action taken to address Reliable Information, then HighPoint shall record a video of such verification with the IR Camera.

d.      HighPoint shall attach copies of the spreadsheets required by this Paragraph to the next Semi-Annual Report or the Semi-Annual Report that follows at least 30 Days after all necessary corrective actions to address the emissions were made.

e.      If HighPoint obtains one or more instances of Reliable Information related to any single Tank System in any Calendar quarter, HighPoint shall complete by the end of the following Calendar quarter a Root Cause Analysis for that Tank System and identify any appropriate response actions to be taken to address any common operation, maintenance, or design cause(s) identified, along with a proposed schedule for the implementation of those response actions.  Appropriate response actions may include proactive solutions to maintenance problems (*e.g.*, if thief hatches with gaskets are observed to have an increased failure rate, then a replacement schedule may be appropriate to implement pursuant to subparagraph 10(c) (Directed Inspection and Preventative Maintenance Program)).

(1)      In the next Semi-Annual Report or the Semi-Annual Report due at least 30 Days following the completion of the Root Cause Analysis, HighPoint shall submit the results of the analysis, including the proposed timeline for response actions if those are not already completed at the time of the submission of the Root Cause Analysis results.

13.     Performance Standards.  Following the completion of an Engineering Evaluation and any necessary modifications at a Tank System, HighPoint shall:

        a.      Operate and maintain air pollution control equipment consistent with manufacturer specifications and good engineering and maintenance practices and shall keep manufacturer specifications on file;

        b.      Ensure that all air pollution control equipment is adequately designed and sized to achieve at least a 95% control efficiency for VOCs and to handle reasonably foreseeable fluctuations in emissions of VOCs (fluctuations in emissions that occur when a Separator dumps into the tank are reasonably foreseeable); and

        c.      Ensure that all Condensate collection, storage, processing, and handling operations, regardless of size, are designed, operated, and maintained so as to minimize leakage of VOCs to the atmosphere to the maximum extent practicable.

14.     Compliance with Reg. 7, Sec. XVII.C.2.b.  "STEM Plan" shall mean the Storage Tank Emission Management plan required by Reg. 7, Sec. XVII.C.2.b.  Reg. 7, Sec. XVII.C.2.b has no analogous provision in SIP-Approved Reg. 7, therefore, the Parties intend that the requirements of this Paragraph shall be enforceable under this Decree only by the State.  For purposes of this Paragraph, updates to a STEM Plan may be made by including language in the STEM Plan itself, by appending a document that includes the required information, by cross-referencing the locations of documentation relevant to a specific facility, or by updating appended or cross-referenced documents.  Documents prescribed by this Decree, including but not limited to the inspection and maintenance SOPs, may be cross-referenced in the STEM Plan or other documentation attached to the STEM Plan.  Updates to these cross-referenced or appended documents do not require re-certification by a responsible official.  HighPoint shall:

a.      By no later than the date HighPoint submits a Certification of Completion Report for each Tank System, append an analysis of the Engineering Evaluation for that Tank System to the STEM Plan for that Tank System;

b.      By no later than 30 Days following completion of a Root Cause Analysis for a particular Tank System, make updates to the STEM Plan as necessary; and

c.      By no later than March 31 of each calendar year, beginning with 2020 for the 2019 calendar year, update the STEM Plan(s) to document completion and results of the review completed during the previous calendar year as required by subparagraph 10(g) (Directed Inspection and Preventative Maintenance Program), including a statement describing whether and how the inspection and maintenance schedules referenced by or appended to the STEM Plan need to be updated based upon the results of the review.

15.      <u>Tank Pressure Monitoring</u>.

a.      No later than six months from the Date of Lodging, HighPoint shall install, calibrate (in accordance with manufacturer recommendations, if available), operate, and maintain one electronic pressure monitor per Tank System as described below.  Each electronic pressure monitor shall be linked to and continuously monitored (*i.e.*, one data point at least every 15 seconds with a data transmission at least every hour) by a central monitoring location in accordance with the requirements of Paragraph 15.

b.      The Tank Systems to initially be equipped with monitors are described in subparagraphs 15(b)(1) to (b)(3) below and are reflected on Appendix A.2 to this Consent Decree.  If HighPoint sells, transfers, plugs and abandons, or otherwise removes a Vapor Control System listed on Appendix A.2, then HighPoint shall select another Tank System

from Appendix A.1 or A.3 at which HighPoint will install, calibrate, operate and maintain a pressure monitor (or monitors) or Closed Loop Vapor Control System satisfying the requirements of Paragraph 15.  HighPoint will generate and maintain records for the alternative Tank System it selected from Appendix A-1 or A-3 that will: (a) identify that Tank System; and (b) explain the basis for the selection of that Tank System considering the criteria set forth in subparagraphs 15(b)(1) to (b)(3).

      (1)     All Tank Systems in Appendices A.1 or A.2 (collectively) that had, as of the end of calendar year 2017, Actual Uncontrolled Annual VOC Emissions of 25 TPY or more;

      (2)     At least 25% of all Tank Systems in Appendices A.1 and A.2 (collectively) that had, as of the end of calendar year 2017, Actual Uncontrolled Annual VOC Emissions less than 25 TPY and equal to or greater than 6 TPY; and

      (3)     At least 10% of all Tank Systems in Appendices A.1 and A.2 (collectively) that had, as of the end of calendar year 2017, Actual Uncontrolled Annual VOC Emissions less than 6 TPY.

      c.     HighPoint shall use its best efforts to equally distribute pressure monitors for Tank Systems in each of the groupings described in this subparagraph among differing operating conditions (*e.g.*, sales line pressure).  Where a Tank System has multiple Condensate tanks, HighPoint shall only be required to install a pressure monitor on one of the Condensate tanks.

      d.     HighPoint may utilize a Closed Loop Vapor Control System consistent with Appendix C to fulfill the distribution requirements in Paragraph 15(b).  If HighPoint utilizes a Closed Loop Vapor Control System consistent with Appendix C to fulfill the

distribution requirements, subparagraphs 15(a), and 15(e) through (i) shall not apply to such Closed Loop Vapor Control Systems.

e.     For the first six months after the deadline for installation of pressure monitors, HighPoint shall have a performance optimization period to evaluate calibration and optimize pressure monitor performance and reliability.  This period will allow HighPoint, and its contractors or pressure monitor vendors, an opportunity to ensure that the pressure monitors, to the greatest extent practicable, are producing quality data that may be used to identify the potential for over-pressurization of Tank Systems (*e.g.*, optimization of pressure monitor location on a Tank System, determination of pressure measurements and frequency indicative of potential for over-pressurization).

f.     Following the performance optimization period, if (i) there are two or more measurements within a 48-hour period that exceed the "TPM action point" for a Tank System, or (ii) if a measurement exceeds the TPM action point continuously for a duration of one minute, HighPoint shall conduct a site investigation.  Measurements at a Shut-In Tank System will not initiate a site investigation.  For purposes of this Paragraph, "measurement" means a single data point that exceeds the TPM action point, except that additional consecutive data points exceeding the TPM action point (without dropping below the TPM action point) will be considered a single measurement.  Additional measurements that might occur at a Tank System at which HighPoint is currently performing a site investigation must be evaluated in that analysis, but will not initiate a separate site investigation.

(1)     The site investigation shall include a site visit to test the pressure monitor and evaluate the operating parameters or practices identified by the

Engineering Evaluation as variable, verifiable, and critical for ensuring the Tank System and Vapor Control System are operating as designed (including those parameters or practices incorporated into a Certification of Completion Report for the associated Tank System). During the site investigation, HighPoint shall conduct an inspection of the Tank System using an AIMM. AIMM includes optical gas imaging infrared cameras, inspection methods meeting EPA Method 21 standards, or alternative methods or technologies subject to the approval of both EPA and CDPHE. The site investigation shall be completed within one Calendar Day following the measurement(s) that exceeded the TPM action point.

(2)      For purposes of this Paragraph, "TPM action point" means the lowest Set Point of any device designed to relieve pressure from a tank in a Tank System, minus two ounces. For example, if a tank is equipped with a PRV and a thief hatch and the Set Point of the PRV is 14 ounces and the Set Point of the thief hatch is 16 ounces, the TPM action point would be 12 ounces (*i.e.*, the lowest set point of any device on the tank minus two ounces).

(3)      In the event a Tank System requires three site investigations in a consecutive 30 Calendar Day period, HighPoint shall include that Tank System in the next quarterly Root Cause Analysis conducted, in accordance with subparagraph 12(e), and identify appropriate response actions to be taken to address any common operation, maintenance, or design cause(s) identified, along with a proposed schedule for the implementation of those response actions. Appropriate response actions may include proactive solutions to maintenance problems (*e.g.*, if thief hatches with gaskets greater than one year old are observed

to have an increased failure rate, then a replacement schedule at or before one year after installation may be appropriate to implement pursuant to subparagraph 10(c) (Directed Inspection and Preventative Maintenance Program)).  Additional site investigations at a Tank System at which HighPoint is currently performing a Root Cause Analysis shall be added as additional information in that Root Cause Analysis, but shall not trigger additional Root Cause Analyses until HighPoint has completed the ongoing Root Cause Analysis.  Upon completion of a Root Cause Analysis, HighPoint shall re-initiate its count of inspections at zero for purposes of calculating the number of site investigations in a 30 Calendar Day period.

g.      HighPoint shall maintain records of the following for Tank Systems requiring site investigations and this information shall be provided in a spreadsheet (unless the Parties agree in writing to a different format) with each Semi-Annual Report: (i) the date, time, location, and numerical value of all pressure readings that exceeded the TPM action point, (ii) the date and results of all corresponding site investigations and any corresponding Root Cause Analyses, and (iii) the timeline for response actions identified by the Root Cause Analysis if not already completed.

h.      At any time, HighPoint may submit to EPA and CDPHE a request for alternative criteria (*e.g.*, pressure measurements and number of measurements in a given time period) triggering a site investigation and/or Root Cause Analysis.  EPA may, after consultation with CDPHE, grant or deny HighPoint's request in whole or in part.

i.      After at least 18 months of operation of the pressure monitors, including the six-month performance optimization period, if HighPoint demonstrates and EPA in consultation with CDPHE determines that it is infeasible or overly burdensome in

relation to the benefits to continue operating one or more of the pressure monitors,

HighPoint may discontinue operation of and remove that/those pressure monitor(s).  As

part of HighPoint's demonstration, HighPoint shall submit to EPA and CDPHE an

analysis of operation and maintenance of such monitors to date, including a summary of

all measurements triggering site investigations or Root Cause Analyses, the results of

those site investigations or analyses, and corrective actions taken.  If EPA, after

consultation with CDPHE, rejects HighPoint's demonstration, such conclusions are

subject to Section XI (Dispute Resolution).  Examples of when operation of a pressure

monitor shall be considered infeasible include, if (i) the monitor cannot be kept in proper

condition (including calibration) for sufficient periods of time to produce reliable,

adequate, or useful measurements; or (ii) recurring, chronic, or unusual equipment

adjustment, servicing, or replacement needs cannot be resolved through reasonable

expenditures.

16.    <u>Redirection of Condensate</u>.  If HighPoint redirects Condensate from any well that,

as of the Date of Lodging, is connected to a Tank System identified in Appendix A.1 or A.2 to

another Tank System, HighPoint shall:

a.    If Condensate is redirected from a Tank System identified in Appendix

A.1 or A.2 to one or more Tank Systems that are not identified in Appendix A.1 or A.2

(hereinafter, the "New Tank System(s)"), HighPoint shall add the New Tank System(s) to

Appendix A.3 following the re-direction of the wells to the New Tank System(s) and

shall indicate whether the New Tank System(s) will undergo an Open Loop or Closed

Loop Engineering Evaluation consistent with Paragraph 8, above.  Furthermore, if

HighPoint dismantles the original Tank System that was replaced by the New Tank

System(s), HighPoint shall remove the Tank System from Appendix A.1 or A.2 following dismantling.  At least 30 Days before redirecting the Condensate to New Tank System(s), Highpoint shall propose a schedule for compliance of the New Tank System(s) with the applicable requirements of the Consent Decree, which shall be subject to the approval of both EPA and CDPHE (such approval not to be unreasonably delayed or withheld).  If EPA and CDPHE have not approved or denied the proposed schedule within 21 Business Days of receipt, the proposed schedule shall be deemed approved.

b.      If HighPoint redirects Condensate from all wells that as of the Date of Lodging are connected to a Tank System identified in Appendix A.1 or A.2 to Tank System(s) that are already identified in Appendix A.1 or A.2, and HighPoint dismantles the original Tank System, HighPoint shall remove the original Tank System from Appendix A.1 or A.2 following the dismantling.

c.      HighPoint shall provide a copy of the updated Appendix A.1, A.2, or A.3 (as applicable) with the next Semi-Annual Report following re-direction of the wells to the New Tank System(s) or the dismantling of the Tank System(s) (as appropriate).

d.      Removal of a Tank System from Appendix A.1 or A.2 in accordance with this Paragraph shall constitute termination of the Tank System from this Decree.

## V.      ENVIRONMENTAL MITIGATION PROJECTS

17.     HighPoint shall implement the Environmental Mitigation Project ("Project") described in Appendix D in compliance with the approved plans and schedules for such Project and other terms of this Consent Decree.

18.     HighPoint shall maintain and, within 45 Days of an EPA or CDPHE request, provide copies of all documents to identify and substantiate the Project Dollars expended to implement the Project described in Appendix D.

19.     All plans and reports prepared by HighPoint pursuant to the requirements of this Section V (Environmental Mitigation Projects) and required to be submitted to EPA and CDPHE shall be made available to the public from HighPoint upon request and without charge, except HighPoint may redact information that it claims business confidential pursuant to Paragraph 71.

20.     HighPoint shall certify, as part of the plan submitted pursuant to Appendix D to EPA and CDPHE for the Project, that:

     a.     HighPoint is not required to perform the Project by any federal, state, or local law or regulation or by any agreement, grant, or as injunctive relief awarded in any other action in any forum;

     b.     The Project is not a project that HighPoint was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Consent Decree;

     c.     HighPoint has not received and will not receive credit for the Project in any other enforcement action; and

     d.     HighPoint shall neither generate nor use any pollutant reductions from the Mitigation Project as netting reductions, pollutant offsets, or to apply for, obtain, trade, or sell any pollutant reduction credits.

21.     HighPoint shall use its best efforts to secure as much environmental benefit as possible for the Project Dollars expended, consistent with the applicable requirements and limits of this Decree.

22.     HighPoint shall comply with the reporting requirements described in Appendix D.

23.     In connection with any communication to the public or shareholders regarding HighPoint's actions or expenditures relating in any way to the Environmental Mitigation Project

in this Decree, HighPoint shall include prominently in the communication the information that the actions and expenditures were required as a part of a Decree.

24.     In the Semi-Annual Report due no earlier than 30 Days following the completion of the Project required under this Consent Decree (including any applicable periods of demonstration or testing), HighPoint shall submit to EPA and CDPHE pursuant to Section XV (Notices) a report that documents the date the Project was completed, the results achieved by implementing the Project, including a general discussion of the environmental benefits and the estimated emissions reductions, and the Project Dollars expended by HighPoint in implementing the Project.

## VI.     CIVIL PENALTY

25.     HighPoint shall pay to the Plaintiffs a civil penalty, pursuant to Section 113 of the Act, 42 U.S.C. § 7413, and Section 25-7-122, C.R.S. within 30 Days after the Effective Date, and shall perform one or more State-Only Supplemental Environmental Project(s) ("SSEP(s)") in accordance with Section VII of this Decree, the combined value of which is $550,000.  If any portion of the civil penalty is not paid when due, HighPoint shall pay interest on the amount past due, accruing from the Effective Date through the date of payment at the rate specified in 28 U.S.C. § 1961.

26.     Federal Payment Instructions.  Of the total amount of the civil penalty, HighPoint shall pay $275,000 to the United States by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account in accordance with current EFT procedures.  The costs of such EFT shall be HighPoint's responsibility.  Payment shall be made in accordance with instructions to be provided to HighPoint by the Financial Litigation Unit ("FLU") of the U.S. Attorney's Office for the District of Colorado.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number that HighPoint shall use

to identify all payments required to be made in accordance with this Consent Decree.  The FLU

will provide the payment instructions to:

> HighPoint Operating Corporation
> Attn:  Matt Calhoun, EHS Specialist
> 1099 18th Street, Suite 2300
> Denver, CO 80202
> + 303-312-8118
> mcalhoun@hpres.com

on behalf of HighPoint.  HighPoint may change the individual to receive payment instructions on

its behalf by providing written notice of such change in accordance with Section XV (Notices).

At the time of payment, HighPoint shall send notice that payment has been made:  (i) to

EPA via email at acctsreceivable.cinwd@epa.gov or via regular mail at EPA Cincinnati Finance

Office, 26 Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to the United States via email

or regular mail in accordance with Section XV (Notices); and (iii) to EPA in accordance with

Section XV (Notices).  Such notice shall state that the payment is for the civil penalty owed

pursuant to the Consent Decree in *United States and the State of Colorado v. HighPoint*

*Operating Corporation*, and shall reference the civil action number, CDCS number, and DOJ

case number 90-5-2-1-11484.

27.     State Payment Instructions.  HighPoint agrees to pay $55,000 in civil penalties to

the State, and perform SSEPS as provided for in Paragraphs 30−37, below, valued at no less than

$220,000.  HighPoint shall make payment of the civil penalty of $55,000 by certified, corporate

or cashier's check drawn to the order of "Colorado Department of Public Health and

Environment" and delivered to the attention of Enforcement Unit Supervisor, Air Pollution

Control Division, 4300 Cherry Creek Drive South, APCD-SS-B1, Denver, Colorado 80246-

1530.

28.     At the time of payment, HighPoint shall send notice that payment has been made to the State in accordance with Section XV (Notices).  Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States and the State of Colorado v. HighPoint Operating Corporation*, and shall reference the civil action number.

29.     <u>Not Tax Deductible</u>.  HighPoint shall not deduct any penalties paid under this Consent Decree pursuant to this Section or Section IX (Stipulated Penalties) in calculating its federal, state, or local income tax.

### VII.    STATE-ONLY SUPPLEMENTAL ENVIRONMENTAL PROJECTS

30.     In order to settle the matters contained herein, and in addition to the State portion of the civil penalty identified in Section VI (Civil Penalty), HighPoint agrees to perform one or more SSEP(s), which HighPoint and the CDPHE agree is intended to secure significant environmental or public health protection and improvements.  HighPoint intends to spend not less than $220,000 for SSEP(s).  Any portion of the $220,000 not spent on SSEP(s) shall be remitted to the State as an additional civil penalty.

31.     HighPoint will submit one or more SSEP proposals for CDPHE approval within 90 Days after the Effective Date.  If CDPHE disapproves the SSEP(s) or the State and HighPoint are otherwise unable to agree upon a SSEP or SSEP(s) within 150 Days of the Effective Date, HighPoint shall pay the SSEP component of the civil penalty as an additional civil penalty in the manner prescribed in Paragraph 27 (State Payment Instructions) above and no later than 180 Days after the Effective Date.

32.     HighPoint shall not deduct the payment of the SSEP donation provided for in this Section for any tax purpose or otherwise obtain any favorable tax treatment for such payment or project.

33.     The SSEP(s) performed by HighPoint may not be any project that HighPoint is required to perform or develop by any federal, state, or local law or regulation and may not be one that HighPoint is required to perform or develop by any agreement, grant, or injunctive relief in this or any other case.  HighPoint further agrees that it has not and will not receive any credit in any other enforcement action for the SSEP(s).

34.     HighPoint shall submit a SSEP Completion Report to CDPHE within 60 Days of the completion of each of the SSEP(s).  The SSEP Report shall contain the following information:

      a.     A detailed description of the SSEP as implemented;

      b.     A description of any operating problems encountered and the solutions thereto;

      c.     Itemized costs, documented by copies of purchase orders and receipts or canceled checks;

      d.     Certification that the SSEP has been fully implemented pursuant to the provisions of this Consent Decree; and

      e.     A description of the environmental and public health benefits resulting from implementation of the SSEP (with quantification of the benefits and pollutant reductions, if feasible).

35.     HighPoint agrees that failure to submit the Completion Report with the required information shall be deemed a violation of this Consent Decree and HighPoint shall become liable for penalties as a violation of this Decree.

36.     All SSEPs must be completed to the satisfaction of CDPHE, within four years of the Effective Date of this Consent Decree, and, to the extent applicable, must be operated for the

useful life of the SSEP.  If HighPoint fails to fully and satisfactorily implement a SSEP within

this time period or, as applicable, fails to operate the SSEP for its entire useful life, CDPHE shall

provide written notice of such failure and a demand for payment of the remaining amount up to

$220,000.  Notwithstanding the approval of any SSEP expenditures previously submitted to

CDPHE, the remaining amount up to $220,000 shall be paid to CDPHE within 30 Days of

receipt of a demand for payment by CDPHE.

37.     HighPoint shall include in any public statement, oral or written making reference

to the SSEP the following language:  "This project was undertaken in connection with the

settlement of an enforcement action taken by the Colorado Department of Public Health and

Environment, Air Pollution Control Division, for violations of air quality laws and regulations."

## VIII.   PERIODIC REPORTING

38.     After entry of this Consent Decree, HighPoint shall submit to the United States

and the State in accordance with the requirements of Section XV (Notices), a periodic Semi-

Annual Report ("Semi-Annual Report") within 60 Days after the end of each half of the calendar

year (January through June, and July through December), except the first Semi-Annual Report

shall be due May 1, 2019.  Each Semi-Annual Report shall contain the following information:

a.     Development of an Open Loop Modeling Guideline (Appendix B,
Paragraph 1) or Development of a Closed Loop Vapor Control System Design Guideline
(Appendix C, Paragraph 1(a)):  A copy of the Open Loop Modeling Guideline or Closed
Loop Design Guideline if they were revised during the reporting period.

b.     Vapor Control System Field Survey, Engineering Evaluation, and
Modification (Open Loop Vapor Control Systems (Appendix B, Paragraph 3); Closed
Loop Vapor Control Systems Field Survey and Engineering Evaluation (Appendix C,
Paragraph 2(a) through (c)):  Status and/or completion of either the Open or Closed Loop

Engineering Evaluations and any Open Loop Vapor Control System modifications, including a list of any Tank Systems Shut-In for which either an Open or Closed Loop Engineering Evaluation or any Open Loop Vapor Control System modifications resulting from the Open Loop Engineering Evaluation have not been performed, a summary of modifications to Open Loop Vapor Control Systems completed during the reporting period, and the information specified in either Appendix B, subparagraph 3(b)(3) or Appendix C, subparagraph 2(b)(3) for Tank Systems that underwent the subparagraph Appendix B, subparagraph 3(a)−(b) or Appendix C, subparagraph 2(a)−(b) (Field Survey) evaluation during the reporting period.

      c.      <u>Open Loop Vapor Control System Initial Verification (Open Loop Vapor Control Systems (Appendix B, Paragraph 4); Closed Loop Vapor Control System Verification of Engineering Evaluation (Appendix C, Paragraph 3)</u>:  The information identified in Appendix B, subparagraph 4(b) (Open Loop Vapor Control Systems Certification of Completion Report) or Appendix C, subparagraph 3(c) (Closed Loop Vapor Control Systems Certification of Completion Report).

      d.      <u>Open Loop Vapor Control System Post-Certification of Completion Modifications (Appendix B, Paragraph 5); Closed Loop Vapor Control System Modification (Appendix C, subparagraph 2(d))</u>:  A summary of any evaluations undertaken pursuant to Appendix B, Paragraph 5 or Appendix C, subparagraph 2(d) during that reporting period to determine whether modifications were necessary at Vapor Control Systems for other Tank Systems and the timing, results, locations, and description of any modifications of other Vapor Control Systems or a timeline for the completion such modifications.

e.      Closed Loop Vapor Control System Alarm and Shut-In Log (Appendix C, subparagraph 3(d)):  A copy of the alarm and Shut-In log required under Appendix C, subparagraph 3(d), in a spreadsheet.

f.      Directed Inspection and Preventative Maintenance Program (Paragraph 10):  Status of DI/PM program development and implementation, including a copy of HighPoint's DI/PM program if revised during the reporting period, identification of any new or modified maintenance or inspection schedules or replacement program (see subparagraph 10(c)) during the reporting period, a summary of any reviews of or modifications to the spare parts program (see subparagraph 10(d)) during the reporting period, and, beginning with the Semi-Annual Report due August 29, 2020, the information required by subparagraph 10(g)(5).

g.      Periodic Inspections and Monitoring (Paragraph 11):  The information identified in subparagraph 11(c) for periodic inspections and monitoring.

h.      Reliable Information, Investigation, and Corrective Action (Paragraph 12):  Copies of the spreadsheets as specified and required by subparagraphs 12(b)−(d) for inspections conducted pursuant to Paragraph 12 during the reporting period and the results of any Root Cause Analysis as specified and required pursuant to subparagraph 12(e)(1) during the reporting period.

i.      Open Loop Vapor Control System Verification of Design Analysis (Appendix B, Paragraph 6):  The Verification Report identified in subparagraph 6(e) (as applicable), and the status of any ongoing verification.

   j. <u>Tank Pressure Monitoring (Paragraph 15)</u>:  Status and/or completion of installation of pressure monitors, including the information specified and required by subparagraph 15(g).

   k. <u>Environmental Mitigation Project (Section V and Appendix D)</u>:  A summary of activities undertaken during the reporting period and a summary of costs incurred since the previous report.

   l. <u>State-Only SEP(s) (Section VII)</u>:  A summary of activities undertaken and costs incurred since the previous report.

   m. A summary of any problems encountered or anticipated in complying with this Consent Decree during the reporting period, together with implemented or proposed solutions, if available.

   n. A description of any non-compliance with the requirements of this Consent Decree during the reporting period and an explanation of the likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.

  39. If HighPoint violates, or has reason to believe that it may violate, any requirement of this Consent Decree with an associated stipulated penalty, HighPoint shall notify the United States and the State in accordance with the requirements of Section XV (Notices) of such violation and its likely duration, in writing, within 10 Business Days of the day HighPoint first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, HighPoint shall so state in the report.  HighPoint shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30

Days of the Day HighPoint becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves HighPoint of its obligation to provide the notice required by Section X (Force Majeure). If EPA or CDPHE become aware of any violation of any requirement of this Consent Decree, EPA and CDPHE will use best efforts to promptly notify HighPoint of such violation.

40.     Whenever any violation of this Consent Decree or failure to perform a requirement of this Consent Decree poses an immediate threat to the public health or welfare or the environment, HighPoint shall comply with any applicable federal and state or local laws and, in addition, shall notify EPA and the State as per Section XV (Notices) orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after HighPoint first knew of the violation or failure to perform. This notice requirement is in addition to the requirement to provide notice of a violation of this Decree set forth in the preceding Paragraph.

41.     Each report submitted by HighPoint under this Decree, and each Certification of Completion Report submitted pursuant to the requirements of Appendix B, subparagraph 4(b) or Appendix C, subparagraph 3(c), shall be signed by a responsible official (consistent with the use of that term in Colorado Air Quality Control Commission regulations) of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency notifications where compliance would be impractical.

42.    The reporting requirements of this Consent Decree do not relieve HighPoint of any reporting obligations required by the Act or the Colorado Act, or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

43.    Any information provided pursuant to this Consent Decree may be used by the United States or the State in any proceeding to enforce the provisions of this Decree and as otherwise permitted by law.

## IX.    STIPULATED PENALTIES

44.    HighPoint shall be liable for stipulated penalties to the United States and the State for violations of this Consent Decree as specified below, unless excused under Section X (Force Majeure), or reduced or waived by one or both of the Plaintiffs pursuant to Paragraph 50 of the Decree. A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

a.    Compliance Requirements.

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to evaluate the condition of all PRVs, thief hatches, blowdown valves, mountings, and gaskets at each Tank System by the deadlines set forth in Paragraph 9 (Deadlines for Requirements of Appendix B and Appendix C), as required by (i) Appendix B, subparagraph 3(b) (Open Loop Vapor Control System Field Survey, Engineering Evaluation, and Modification) or Appendix C, subparagraph 2(b) (Closed Loop Vapor Control System Field Survey, Engineering Evaluation, and Modification) and/or (ii) take the actions required by Appendix B, subparagraphs 3(b)(1) or 3(b)(2); or Appendix C, subparagraphs 2(b)(1) or 2(b)(2). | $500 per day per Tank System for the first 30 days of noncompliance; $2,500 per day per Tank System thereafter until an evaluation satisfying the requirements of Appendix B, subparagraph 3(b), or Appendix C, subparagraph 2(b) is performed and actions required by Appendix B, subparagraphs 3(b)(1) or 3(b)(2) or Appendix C, subparagraphs 2(b)(1) or 2(b)(2) are taken. |

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to comply with the recordkeeping requirements of Appendix B, subparagraph 3(b)(3) or Appendix C, subparagraph 2(b)(3) (Vapor Control System Field Survey, Engineering Evaluation, and Modification). | $5,000 per Tank System. |
| Failure to complete an Engineering Evaluation for a Tank System as required by Appendix B, subparagraph 3(c) (Open Loop Vapor Control System Engineering Evaluation) or Appendix C, subparagraph 2(c) (Closed Loop Vapor Control System Engineering Evaluation). | For each Tank System unless Shut-In as required by Paragraph 9:  $1,000 per day for the first 15 days of noncompliance; $2,500 per day from the 16th to 30th days of noncompliance; and $5,000 per day thereafter. |
| Failure to complete modifications for a Vapor Control System as required by Appendix B, subparagraph 3(d) (Open Loop Vapor Control System Modification), or Appendix C, subparagraph 2(d) (Closed Loop Vapor Control System Modification). | For each Tank System unless Shut-In as required by Paragraph 9:  $1,000 per day for the first 15 days of noncompliance; $3,000 per day from the 16th to 30th days of noncompliance; and $9,000 per day thereafter. |
| Failure to conduct an IR Camera Inspection of a Tank System as required by Appendix B, Paragraph 4(a) (Open Loop Vapor Control System Initial Verification), or Appendix C, subparagraph 3(a)(2)(b) (Closed Loop Vapor Control System Initial Verification). | $500 per day per violation for the first 15 days of noncompliance; $1,000 per day per violation from the 16th to 30th days of noncompliance; and $2,000 per day per violation thereafter, until an IR Camera Inspection satisfying Appendix B, subparagraph 4(a) or Appendix C, subparagraph 3(a)(2)(b) is conducted. |
| Failure to complete and submit a Certification of Completion Report as required by Appendix B, subparagraph 4(b) (Open Loop Vapor Control System Initial Verification), or Appendix C, subparagraph 3(c) (Closed Loop Vapor Control System Verification of Engineering Evaluation). | $500 per day for the first 15 days of noncompliance; $2,500 per day from the 16th to 30th days of noncompliance; and $5,000 per day thereafter. |
| Failure to implement the DI/PM program at each Tank System, and associated production equipment, as required by subparagraphs 10(a) and 10(b) (Directed Inspection and Preventative Maintenance Program). | $500 per day per Tank System for the first 30 days of noncompliance; $2,500 per day per Tank System thereafter, until an inspection satisfying subparagraph 10(a) or 10(b) is |

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| | conducted. |
| Failure to establish, implement, or revise schedules as required by subparagraph 10(c); maintain, review, or modify spare parts inventory as required by subparagraph 10(d); train personnel as required by subparagraph 10(f); or perform the verifications, reviews, updates, evaluations, and corrections as required by subparagraph 10(g) (Directed Inspection and Preventative Maintenance Program). | $1,000 per day per violation for the first 15 days of noncompliance; $2,500 per day per violation from the 16th to 30th days of noncompliance; and $5,000 per day per violation thereafter. |
| Failure to conduct periodic inspections as required by Paragraph 11 (Periodic Inspections and Monitoring). | $500 per day per Tank System for the first 30 days of noncompliance; $2,500 per day per Tank System thereafter, until the next periodic inspection satisfying requirements of Paragraph 11 is conducted. |
| Failure to maintain one or more logs documenting Tank System inspection information as required by subparagraph 11(c) (Periodic Inspections and Monitoring). | $5,000 per periodic inspection per Tank System. |
| Failure to complete all necessary corrective actions or Shut-In the Tank System as required by Paragraph 12 and subparagraph 12(a) (Reliable Information, Investigation, and Corrective Action). | $5,000 per day per Tank System for the first 15 days of noncompliance; $10,000 per day per Tank System from the 16th to 30th days of noncompliance; and $20,000 per day per Tank System thereafter. |
| Failure to comply with the recordkeeping and reporting requirements of subparagraphs 12(b), 12(c), or 12(d) (Reliable Information, Investigation, and Corrective Action). | $2,500 per Tank System per failure. |
| Failure to complete a Root Cause Analysis or identify or implement appropriate response actions identified during a Root Cause Analysis as required by subparagraph 12(e) (Reliable Information, Investigation, and Corrective Action). | $500 per day per violation for the first 30 days of noncompliance; and $1,000 per day per violation thereafter. |
| Failure to provide notification to EPA and CDPHE of HighPoint's proposed verification work plan as required by Appendix B, subparagraph 6(a) (Open | $250 per day for the first 30 days of noncompliance; $1,000 per day thereafter. |

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Loop Vapor Control System Verification of Design Analysis). | |
| Failure to complete the Verification of Design Analysis as required by Appendix B, subparagraphs 6(c), 6(d), and 6(e) (Open Loop Vapor Control System Verification of Design Analysis). | $500 per day per Tank System for the first 15 days of noncompliance; $1,000 per day per Tank System from the 16th to 30th days of noncompliance; and $2,000 per day per Tank System thereafter, until verification satisfying the requirements of Appendix B, subparagraphs 6(c), 6(d), and 6(e) has been completed. |
| Failure to equip Tank Systems with pressure monitors or Closed Loop Vapor Control Systems in accordance with the requirements of Paragraph 15 (Tank Pressure Monitoring). | $500 per day per Tank System for the first 30 days of noncompliance; and $1,000 per day per Tank System thereafter. |
| Failure to conduct a site investigation or Root Cause Analysis in accordance with the requirements of subparagraph 15(f) (Tank Pressure Monitoring). | $250 per day per Tank System for the first 15 days of noncompliance; and $500 per day per Tank System thereafter. |
| Failure to comply with the recordkeeping requirements of subparagraph 15(g) (Tank Pressure Monitoring). | $2,500 per Tank System per failure. |

b.      Environmental Mitigation Projects.

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to undertake and complete the Environmental Mitigation Project in compliance with Section V and Appendix D to this Decree. | $1,000 per day per violation for the first 30 days of noncompliance; $5,000 per day per violation thereafter. |

c.      Periodic Reports.

| Consent Decree Violation | Stipulated Penalty |
|---|---|
| Failure to submit a Semi-Annual Report as required by Paragraph 38. | $1,000 per day for the first 30 days of noncompliance; and $2,500 per day thereafter. |

45.     <u>Late Payment of Civil Penalty</u>.  If HighPoint fails to pay the civil penalty required

to be paid under Section VI (Civil Penalty) when due, HighPoint shall pay a stipulated penalty of

$10,000 per day for each day that the payment is late to the United States, and a stipulated

penalty of $10,000 per day for each day that the payment is late to the State.  Late payment of the

civil penalty shall be made in accordance with Section VI (Civil Penalty).  Stipulated penalties

for late payment of the civil penalty shall be paid in accordance with Paragraphs 46, 47, 48, and

49 below.  All transmittal correspondence shall state that any such payment is for late payment

of the civil penalty due under this Consent Decree, or for stipulated penalties for late payment, as

applicable, and shall include the identifying information set forth in Section VI (Civil Penalty).

46.     Stipulated penalties under this Section shall begin to accrue on the day after

performance is due or on the day a violation occurs, whichever is applicable, and shall continue

to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated

penalties shall accrue simultaneously for separate violations of this Consent Decree.

47.     HighPoint shall pay stipulated penalties to the United States and the State within

30 Days of a written demand by either the United States or the State, unless HighPoint invokes

the dispute resolution procedures under Section XI (Dispute Resolution) within the 30-Day

period.  HighPoint shall pay 50% of the total stipulated penalty amount due to the United States

and 50% to the State.  A written demand by the United States or the State for payment of

stipulated penalties will identify the particular violation(s) to which the stipulated penalty relates,

the stipulated penalty amount the United States or the State is demanding for each violation (as

can be best estimated), the calculation method underlying the demand, and the grounds upon

which the demand is based.  Prior to issuing a written demand for stipulated penalties, the United

States or the State may, in their individual unreviewable discretion, contact HighPoint for

informal discussion of matters that the United States or the State believes may merit stipulated penalties.  The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff.

48.      Stipulated penalties shall continue to accrue as provided in Paragraph 46, during any Dispute Resolution, but need not be paid until:

a.      If the dispute is resolved by agreement or by a decision of EPA or the State that is not appealed to the Court, HighPoint shall pay accrued penalties agreed to or determined to be owing, together with interest, to the United States and the State within 30 Days of the effective date of the agreement or the receipt of EPA's or the State's decision or order;

b.      If the dispute is appealed to the Court and the United States or the State prevails in whole or in part, HighPoint shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph 48(c), below; or

c.      If any Party appeals the Court's decision, HighPoint shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

49.      If HighPoint fails to pay stipulated penalties within 30 Days after receiving the United States' or the State's written demand as required by Paragraph 47, HighPoint shall pay interest on unpaid stipulated penalties, as provided for in 28 U.S.C. § 1961, as follows:  (a) if HighPoint has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, interest accrues from the date stipulated penalties are due pursuant to Paragraph 46 until the date of payment; and (b) if

HighPoint does not timely invoke dispute resolution, interest accrues from HighPoint's receipt of the written demand pursuant to Paragraph 47 until the date of payment.  Nothing in this Paragraph limits the United States or the State from seeking any remedy otherwise provided by law for HighPoint's failure to pay any stipulated penalties or interest.

50.     Either the United States or the State may, in the unreviewable exercise of their respective discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.  The determination by one Plaintiff not to seek stipulated penalties, or subsequently to waive or reduce the amount it seeks, shall not preclude the other Plaintiff from seeking the full amount of the stipulated penalties owing.  Stipulated penalties paid to the United States and the State collectively shall not exceed the amounts specified in this Consent Decree for the violation(s) included in the demand.

51.     <u>Obligations Prior to the Effective Date</u>.  Upon the Effective Date, the stipulated penalty provisions of this Consent Decree shall be retroactively enforceable with regard to any and all violations of Appendix B, subparagraph 3(c) (Open Loop Vapor Control System Engineering Evaluation) or Appendix C, subparagraph 2(c) (Closed Loop Vapor Control System Engineering Evaluation) by the deadlines set forth in Paragraph 9 (Deadlines for Requirements of Appendix B and Appendix C) that have occurred after the Date of Lodging and prior to the Effective Date, provided that stipulated penalties that may have accrued after the Date of Lodging and prior to the Effective Date may not be collected until the Effective Date.

52.     HighPoint shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 26 (Federal Payment Instructions), except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.  HighPoint shall pay

stipulated penalties owing to the State in the manner set forth and with the confirmation notices required by Paragraph 27 (State Payment Instructions) except that the transmittal letter shall state the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

53.     HighPoint shall not deduct stipulated penalties paid under this Section in calculating its state and federal income tax.

54.     Subject to the provisions of Section XIII (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State for HighPoint's violation of this Decree or applicable law.  Where a violation of this Decree is also a violation of relevant statutory or regulatory requirements, HighPoint shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation under the applicable federal or State requirement.

## X.     FORCE MAJEURE

55.     "Force majeure," for purposes of this Consent Decree, means any event arising from causes beyond the control of HighPoint, of any entity controlled by HighPoint, or of HighPoint's contractors, which delays or prevents the performance of any obligation under this Decree despite HighPoint's best efforts to fulfill the obligation.  The requirement that HighPoint exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (i) as it is occurring and (ii) after it has occurred to minimize any resulting delay and any adverse effects of the delay to the greatest extent possible.  "Force majeure" does not include HighPoint's financial inability to perform any obligation under this Consent Decree.

56.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, for which HighPoint intends or may intend to assert a claim of force majeure, HighPoint shall provide notice orally or by electronic transmission to EPA and CDPHE as provided in Section XV (Notices), within 72 hours of when HighPoint first knew that the event might cause a delay.  Within 10 Days thereafter, HighPoint shall provide in writing to EPA and CDPHE (i) an explanation and description of the reasons for the delay; (ii) the anticipated duration of the delay; (iii) all actions taken or to be taken to prevent or minimize the delay; (iv) a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; and (v) HighPoint's rationale for attributing such delay to a force majeure event.  HighPoint shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  HighPoint will be deemed to know of any circumstance of which HighPoint, any entity controlled by HighPoint, or HighPoint's contractors knew or should have known.  Failure to comply with the above requirements regarding an event precludes HighPoint from asserting any claim of force majeure regarding that event, provided, however, that if EPA, after reasonable opportunity for review and comment by CDPHE, despite the late notice, is able to assess to its satisfaction whether the event is a force majeure under Paragraph 55 and whether HighPoint has exercised best efforts under Paragraph 55, EPA may, in its unreviewable discretion, excuse in writing HighPoint's failure to submit timely notices under this Paragraph.

57.     If EPA, after a reasonable opportunity for review and comment by CDPHE, agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this Consent Decree that are affected by the force majeure will be extended by EPA, after a reasonable opportunity for review and comment by the

CDPHE, for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure does not, of itself, extend the time for performance of any other obligation.  EPA will notify HighPoint in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

58.     If EPA, after a reasonable opportunity for review and comment by CDPHE, does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify HighPoint in writing of its decision.

59.     If HighPoint elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so no later than 30 Days after receipt of EPA's notice.  In any such proceeding, HighPoint bears the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that HighPoint complied with the requirements of Paragraphs 55 and 56.  If HighPoint carries this burden, the delay at issue will be deemed not to be a violation by HighPoint of the affected obligation of this Consent Decree identified to EPA and the Court.

## XI.     DISPUTE RESOLUTION

60.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section are the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree, provided that the Party invoking such procedure has first made a good faith attempt to resolve the matter with the other Party.

61.     The dispute resolution procedure required herein shall be invoked by one Party giving a brief written notice to the other Party advising of a dispute pursuant to this Section.  The notice shall describe the nature of the dispute and shall state the noticing Party's position with

regard to such dispute.  The Party receiving such a notice shall acknowledge receipt of the

notice, and the Parties in dispute shall expeditiously hold a meeting to discuss the dispute

informally within 14 Calendar Days if possible, but not later than 21 Calendar Days following

receipt of such notice.

62.     Disputes submitted to dispute resolution under this Section shall, in the first

instance, be the subject of informal negotiations among the disputing Parties.  Such period of

informal negotiations shall not extend beyond 30 Days from the date of the first meeting among

the Parties' representatives unless they agree in writing to shorten or extend this period.

63.     If the Parties are unable to reach agreement during the informal negotiation

period, the EPA, after consultation with CDPHE, shall provide HighPoint with a written

summary of its position regarding the dispute.  The written position provided by EPA and

CDPHE shall be considered binding unless, within 45 Days thereafter, HighPoint seeks judicial

resolution of the dispute by filing a petition with this Court.  The United States may respond to

the petition within 45 Days of filing.

64.     Where the nature of the dispute is such that a more timely resolution of the issue

is required, the time periods set forth in this Section may be shortened by agreement of the

Parties or by motion to the Court pursuant to Paragraph 66.

65.     This Court shall not draw any inferences nor establish any presumptions adverse

to either Party as a result of invocation of this Section or the Parties' inability to reach

agreement.

66.     As part of the resolution of any dispute under this Section, in appropriate

circumstances the Parties may agree, or this Court may order, an extension or modification of the

schedule for completion of the activities required under this Consent Decree to account for the

delay that occurred as a result of dispute resolution.  HighPoint shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule, provided that HighPoint shall not be precluded from asserting that a force majeure event has caused or may cause delay in complying with the extended or modified schedule.

67.     The Court shall decide all disputes pursuant to applicable principles of law for resolving such disputes.  In their initial filings with the Court, the Parties shall state their respective positions as to the applicable standard of law for resolving the particular dispute.

## XII.   INFORMATION COLLECTION AND RETENTION

68.     The United States, the State, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility associated with a Tank System covered by this Consent Decree, at all reasonable times (subject to any applicable federal health and safety laws and regulations), upon presentation of credentials, to conduct the items below.  None of the items below will include operating or adjusting HighPoint equipment (*e.g.*, opening thief hatches) without reasonable notice to HighPoint and accompaniment by a HighPoint employee:

  a.     Monitor the progress of activities required under this Decree;

  b.     Verify any data or information submitted to the United States or the State in accordance with the terms of this Decree;

  c.     Obtain samples and, upon request, splits or duplicates of any samples taken by HighPoint or its representatives, contractors, or consultants related to activities under this Decree;

  d.     Obtain documentary evidence, including photographs and similar data related to activities under this Decree; and

e.      Assess HighPoint's compliance with this Decree.

69.      Upon request, HighPoint shall provide EPA, CDPHE, or their authorized representatives, splits or duplicates of any samples taken by HighPoint at a Tank System or other associated equipment.  Upon request, EPA and CDPHE shall provide HighPoint splits or duplicates of any samples taken by EPA, CDPHE, or their authorized representatives.  In both cases, such request shall be made prior to sampling whenever possible to ensure that adequate sample volume is obtained.

70.      Except as provided in subparagraphs 70(a) and (b), until two years after the termination of this Consent Decree, HighPoint shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) (hereinafter referred to as "Records") in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that are material to HighPoint's performance of its obligations under this Decree.  This information-retention requirement applies regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States or the State, HighPoint shall provide copies of any Records required to be maintained under this Paragraph.  This retention requirement does not apply to voicemail or text messages, so long as those forms of communication are not used for substantive discussions concerning compliance with the Decree.  Nor does this retention requirement apply to HighPoint's outside counsel or consultants retained specifically for the purposes of potential litigation.

a.      HighPoint shall retain the data recorded by any pressure monitors required pursuant to Paragraph 15 and Appendix C, subparagraph 3(d) for two years from the date

of recording, except that HighPoint shall keep any such data until two years after termination of this Consent Decree if HighPoint was required to keep the data pursuant to subparagraph 15(g).

b.      HighPoint shall retain any video records of IR Camera Inspections verifying that corrective action was successful pursuant to subparagraphs 11(c)(4), 12(b)(4), and 12(c)(3) for 18 months from the date of recording.

71.      <u>Privileged and Business Confidential Documents</u>.  In response to a request for Records:

a.      HighPoint may assert that all or part of a Record is privileged or protected under federal law.  If HighPoint asserts such a privilege, it shall provide the following: (1) the title of the Record; (2) the date of the Record; (3) the name and title of each author of the Record; (4) the name and title of each addressee and recipient; (5) a general description of the contents of the Record that does not reveal any privileged or protected information; and (6) the privilege or protection asserted by HighPoint.  If a claim of privilege or protection applies only to a portion of a Record, the Record shall be provided to the United States in redacted form to mask the privileged or protected portion only. HighPoint shall retain all Records that it claims to be privileged or protected until the United States has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in HighPoint's favor.

b.      HighPoint may also assert business confidentiality claims covering part or all of the Records required to be provided under this Section to the extent permitted by and in accordance with 40 C.F.R. § 2.203(b) and Section 24-72-204, C.R.S.  Records determined to be confidential by EPA or CDPHE will be afforded the protection

specified in 40 C.F.R. Part 2, Subpart B and Section 24-72-204, C.R.S.  If no claim of confidentiality accompanies Records when they are submitted to EPA and CDPHE, or if EPA or CDPHE has notified HighPoint that the Records are not confidential and followed any procedures under the standards of 40 C.F.R. Part 2, Subpart B or Section 24-72-204, C.R.S., the public may be given access to such Records without further notice to HighPoint.

        c.      HighPoint may make no claim of privilege or protection (other than claims of confidential business information) regarding any Records that HighPoint is required to create or generate pursuant to this Consent Decree.

72.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of HighPoint to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

73.     Except as provided in Section XXI (Public Participation) of this Decree, the Parties consent to the entry of this Decree without further notice.

74.     This Consent Decree resolves the civil and administrative claims that the United States and/or the State may have against HighPoint for the following violations at the Tank Systems listed in Appendices A.1 and A.2 to this Consent Decree and Appendices A.1 and A.2 to the Complaint, including associated Vapor Control Systems, through the Date of Lodging:

        a.      Failure to achieve the system-wide emissions reductions required by Reg. 7, Sec. XII.D and XII.D.2, excluding Reg. 7, Sec. XII.D.1;

        b.      Failure to comply with the requirement of Reg. 7, Sec. XII.C.1.a that:

(1)     "All air pollution control equipment used to demonstrate compliance with this Section XII shall be operated and maintained consistent with manufacturer specifications and good engineering and maintenance practices. The owner or operator shall keep manufacturer specifications on file"; and

(2)     "[A]ll such air pollution control equipment shall be adequately designed and sized to achieve the control efficiency rates required by this Section XII and to handle reasonably foreseeable fluctuations in emissions of volatile organic compounds.  Fluctuations in emissions that occur when the separator dumps into the tank are reasonably foreseeable";

c.     Failure to comply with the requirement of Reg. 7, Sec. XII.C.1.b, that all "condensate collection, storage, processing and handling operations, regardless of size, shall be designed, operated and maintained so as to minimize leakage of volatile organic compounds to the atmosphere to the maximum extent practicable";

d.     Failure to achieve a control efficiency of 95% from any vapor recovery unit or combustion device, or properly install, operate and maintain air pollution control equipment as required by Reg. 7, Sec. XII.C.1.c;

e.     Failure to comply with any of the recordkeeping and reporting requirements under Reg. 7, Sec. XII.F, including, but not limited to, violations related to unreported air pollution control equipment downtime;

f.     Failure to comply with Reg. 7, Sec. XII.C.1.d to have no visible emissions from a flare or other combustion device and have such devices designed so that an observer can determine whether it is properly operating;

g.      Failure to comply with any of the monitoring requirements under Reg. 7, Sec. XII.E; and

h.      Failure to properly report any information to the United States or the State with respect to any of the violations resolved in this Section XIII (Effect of Settlement/Reservation of Rights) of the Consent Decree.

75.     This Consent Decree further resolves the civil and administrative claims that the State may have against HighPoint relating to the following issues at the Tank Systems listed in Appendices A.1 and A.2 to this Consent Decree and Appendices A.1 and A.2 to the Complaint, including associated Vapor Control Systems, through the Date of Lodging:

a.      Failure to collect and control emissions in accordance with Reg. 7, Sec. XII.D.1.

b.      All observations related to emissions from Tank Systems observed by AVO inspection methods;

c.      All observations related to emissions from Tank Systems observed by an optical gas imaging infrared camera;

d.      Any failure to properly design, operate, or maintain a Tank System, including associated Vapor Control Systems, or achieve emission reductions from such Tank System as required by Reg. 7;

e.      Failure to comply with Reg. 7, Sec. XVII.B.1.a that all "intermediate hydrocarbon liquids collection, storage, processing, and handling operations, regardless of size, shall be designed, operated, and maintained so as to minimize leakage of VOCs and other hydrocarbons to the atmosphere to the extent reasonably practicable";

f.      Failure to comply with Reg. 7, Sec. XVII.B.1.b that "[a]t all times, including periods of start-up and shutdown, the facility and air pollution control equipment must be maintained and operated in a manner consistent with good air pollution control practices for minimizing emissions";

g.      Failure to comply with Reg. 7, Sec. XVII.B.2.a that

(1)      "All air pollution control equipment shall be operated and maintained pursuant to the manufacturing specifications or equivalent to the extent practicable, and consistent with technological limitations and good engineering and maintenance practices.  The owner or operator shall keep manufacturer specifications or equivalent on file";

(2)      "[A]ll such air pollution control equipment shall be adequately designed and sized to achieve the control efficiency rates and to handle reasonably foreseeable fluctuations in emissions of VOCs and other hydrocarbons during normal operations.  Fluctuations in emissions that occur when the separator dumps into the tank are reasonably foreseeable";

h.      Failure to comply with Reg. 7, Sec. XVII.B.2.b to have no visible emissions from a flare or other combustion device and have such devices designed so that an observer can determine whether it is properly operating;

i.      Failure to comply with monitoring requirements for storage tanks under Reg. 7, Sec. XVII.C.1.d;

j.      Failure to comply with Reg. 7, Sec. XVII.C.2.a that "[o]wners or operators of storage tanks must route all hydrocarbon emissions to air pollution control equipment, and must operate without venting hydrocarbon emissions from the thief hatch (or other

65

access point to the tank) or pressure relief device during normal operation, unless venting is reasonably required for maintenance, gauging, or safety of personnel and equipment";

k.      Failure to comply with the STEM plan requirements in Reg. 7, Sec. XVII.C.2.b; and

l.      Failure to comply with the recordkeeping requirements of Reg. 7, Sec. XVII.C.3.

76.      Notwithstanding the terms in Paragraphs 74 and 75, the State reserves all rights to obtain penalties or injunctive relief related to visible emissions observed by a CDPHE inspector, or duly designated representative, from combustion devices, in violation of Reg. 7, Secs. XVII.B.2.b and XII.C.1.d, and thief hatches left open by HighPoint, the Defendant's personnel, contractors, or third-party haulers in violation of Reg. 7, Sec. XII.C.1.b.

77.      The United States and the State reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraphs 74 and 75.  This Consent Decree does not limit the rights of the United States or the State to obtain penalties or injunctive relief under the Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraphs 74 and 75.  The United States and the State further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Tank Systems and associated Vapor Control Systems, whether related to the violations addressed in this Decree or otherwise.

78.      In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, civil penalties, or other appropriate relief relating to the Tank Systems and associated Vapor Control Systems or HighPoint's violations, HighPoint shall

not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 74 and 75.

79.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations.  HighPoint is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and HighPoint's compliance with this Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.  The United States and the State do not, by their consent to the entry of this Decree, warrant or aver in any manner that HighPoint's compliance with any aspect of this Decree will result in compliance with provisions of the Act, the Colorado Act, the Colorado SIP, Reg. 7, or with any other provisions of federal, State, or local laws, regulations, or permits.

80.     This Consent Decree does not limit or affect the rights of HighPoint or of the United States or the State against any third parties, not party to this Decree, nor does it limit the rights of third parties, not party to this Decree, against HighPoint, except as otherwise provided by law.

81.     This Consent Decree does not create rights in, or grant any cause of action to, any third party not party to this Decree.

## XIV.   COSTS

82.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and the State shall be entitled to collect the costs (including

attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by HighPoint.

## XV.   NOTICES

83.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, or communications are required by this Decree, they shall be made electronically, unless otherwise requested, and addressed as follows:

As to the United States by email:     eescdcopy.enrd@usdoj.gov
                                      Re: DJ # 90-5-2-1-11484

As to the United States by mail:      EES Case Management Unit
                                      Environment and Natural Resources Division
                                      U.S. Department of Justice
                                      P.O. Box 7611
                                      Washington, D.C.  20044-7611
                                      Re:  DJ # 90-5-2-1-11484

As to EPA:                            Director, Air Enforcement Division
                                      Office of Civil Enforcement
                                      USEPA Headquarters, MC 2242A
                                      1200 Pennsylvania Ave., NW
                                      Washington, D.C. 20460

                                      Director, Air & Toxics Technical Enforcement
                                      Office of Enforcement, Compliance &
                                      Environmental Justice
                                      Environmental Protection Agency, Region 8
                                      1595 Wynkoop Street
                                      Denver, CO  80202

As to the State of Colorado:          First Assistant Attorney General
                                      Air Quality Unit
                                      Natural Resources Section
                                      Colorado Attorney General's Office
                                      1300 Broadway, 7th Floor
                                      Denver, CO 80203

|                   |                                                    |
|-------------------|----------------------------------------------------|
| As to CDPHE:      | Compliance & Enforcement Program Manager           |
|                   | Colorado Department of Public Health and           |
|                   | Environment                                        |
|                   | Air Pollution Control Division                     |
|                   | APCD – SSP – B1                                     |
|                   | 4300 Cherry Creek Drive South                      |
|                   | Denver, CO 80246-1530                              |
|                   |                                                    |
| As to HighPoint:  | HighPoint Operating Corporation                    |
|                   | Director of Environmental, Health and Safety       |
|                   | 1099 18th Street, Suite 2300                        |
|                   | Denver, CO 80202                                   |

84.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

85.     Notices submitted pursuant to this Section shall be deemed submitted upon electronic transmission or mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.  Notices to or communications mailed to HighPoint shall be deemed to be received on the earlier of:  (i) actual receipt by HighPoint, or (ii) receipt of an electronic version sent to the addresses set forth in this Paragraph.  An email is presumed to have been received on the day it is sent.  With the exception of notices sent pursuant to Section X (Force Majeure), if the date for submission of a report, study, notification, or other communication falls on a Saturday, Sunday or federal holiday, the report, study, notification, or other communication will be deemed timely if it is submitted the next Business Day.

## XVI.   SALES OR TRANSFERS OF OPERATIONAL OR OWNERSHIP INTERESTS

86.     This Consent Decree does not condition the sale or transfer of HighPoint's ownership of a working interest in any well(s) associated with a Tank System, provided that HighPoint both (a) remains the operator of the well and associated Tank System and (b) retains the minimum working interest (if any) necessary to remain the operator of the well and associated Tank System.  If HighPoint proposes to transfer operation of any well associated with

a Tank System to a third party unaffiliated with HighPoint, HighPoint shall, at least 30 Days prior to the sale or transfer, (i) notify the United States and the State of the proposed sale or transfer and of the specific Consent Decree provisions that HighPoint proposes the transferee assume; (ii) certify that the transferee is contractually bound to assume the obligations and liabilities of the Consent Decree; and (iii) submit a certified statement from the transferee describing how the transferee has both the financial and technical ability to assume the obligations and liabilities of the Consent Decree.

87.     The transfer of the operation of any well associated with a Tank System shall not relieve HighPoint of any obligations under this Consent Decree until the Court has approved a modification pursuant to Section XIX (Modification) of this Consent Decree.  The modification shall make the third party a party to this Consent Decree and shall establish, as between HighPoint and the third party, their respective responsibilities for compliance with the requirements of this Consent Decree that may be applicable to the transferred or purchased Tank Systems and associated well production assets.

88.     No earlier than 30 Days after giving notice of a proposed sale or transfer pursuant to Paragraph 86, HighPoint may file a motion with the Court to modify this Consent Decree in accordance with Section XIX (Modification) to make the terms and conditions of this Consent Decree specifically relating to the well(s) and associated Tank System(s) sold or transferred applicable to the transferee.  HighPoint shall be released from the specific obligations and liabilities of this Consent Decree relating to the well(s) and associated Tank System(s) sold or transferred unless the United States or the State of Colorado opposes the motion and the Court finds that the transferee does not have the financial or technical ability to assume the obligations and liabilities under this Consent Decree.

89.     This Consent Decree shall not be construed to impede the transfer of the operation of any well associated with a Tank System to a third party unaffiliated with HighPoint so long as the requirements of this Consent Decree are met.  This Consent Decree shall not be construed to prohibit a contractual allocation—as between HighPoint and a third party—of the burdens of compliance with this Consent Decree.

90.     The modification executed pursuant to Paragraph 87 may relieve HighPoint of its liability under this Consent Decree and make the third party liable for all HighPoint's responsibilities that attach to the purchased or transferred Tank Systems and associated well production assets.  Alternatively, the modification may allocate some or all of HighPoint's responsibilities under this Decree for the purchased or transferred Tank Systems and associated well production assets between HighPoint and the third-party purchaser or transferee. Notwithstanding the foregoing, HighPoint may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred Tank Systems and associated well production assets, including the obligations set forth in Sections VI (Civil Penalty) and VII (State-Only Supplemental Environmental Project).  HighPoint and the third-party purchaser or transferee may propose, and the United States and State may agree (such agreement not to be unreasonably delayed or withheld), to make clear that the scope of liability of the purchaser or transferee of any Tank Systems and associated well production assets does not include liability for any obligations of this Consent Decree that are not specific to the transferred or purchased Tank Systems and associated well production assets, to the extent that such obligations may be adequately separated in an enforceable manner.

91.     Effect of Plug and Abandonment.  The permanent plug and abandonment of a well shall be deemed to satisfy all requirements of this Consent Decree applicable to the well and

associated equipment (as long as the associated equipment is no longer servicing wells that have not been plugged and abandoned) after HighPoint has completed the following:  (i) HighPoint's submission of the COGCC's Form 6 subsequently reporting abandonment and (ii) HighPoint's notice of cancellation of an Emissions Permit/APEN Cancellation Request to CDPHE.  Once HighPoint has satisfied the requirements of this Paragraph 91(i), (ii) and (iii), Normal Operations from that well shall not be permissible unless as required to prepare the well for plug and abandonment.  HighPoint shall maintain copies of all documentation required by this Paragraph for inspection and review by EPA and CDPHE.  In each Semi-Annual Report, HighPoint shall update the appropriate Appendix A to reflect any wells and associated Tank Systems that have been permanently plugged and abandoned.  Nothing herein shall preclude HighPoint from reusing any equipment from a plugged and abandoned well.

## XVII.  EFFECTIVE DATE

92.     The Effective Date of this Consent Decree is the date upon which the approval of the Decree is recorded on the Court's docket; provided, however, that HighPoint hereby agrees that it shall be bound to perform duties specifically scheduled to occur under this Consent Decree prior to the Effective Date.  In the event the United States withdraws or withholds consent to this Decree before entry, or the Court rejects the Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date terminates.

## XVIII. RETENTION OF JURISDICTION

93.     The Court retains jurisdiction over this case until termination of this Consent Decree pursuant to Section XX (Termination) for the purpose of resolving disputes arising under this Decree or entering or approving orders modifying this Decree, pursuant to Sections XI (Dispute Resolution) and XIX (Modification), or effectuating or enforcing compliance with the terms of this Decree.

## XIX.   MODIFICATION

94.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it is effective only upon filing with the Court.

95.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XI (Dispute Resolution).  The Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XX.   TERMINATION

96.     <u>Termination as to Specific Tank System(s)</u>.  HighPoint may seek consent to terminate the requirements of this Consent Decree with respect to Tank System(s) on Appendix A.1 or A.2 which are to be transferred entirely from HighPoint's operational control and with respect to Tank System(s) added to Appendix A.3 pursuant to Paragraph 16 (and associated wells and well production assets that are not also associated with a Tank System that will remain subject to the requirements of this Consent Decree) that have completed all requirements of Appendix B, Paragraph 3 (including evaluation of PRVs and thief hatches, Open Loop Engineering Evaluation, and any necessary modifications) or all applicable requirements of Appendix C, Paragraph 2 (including evaluation of PRVs and thief hatches, Closed Loop Engineering Evaluation, and any necessary modifications).

    a.     Such requests for termination shall be provided to the United States and the State, in writing, and contain the following information:

        (1)     The date a Certification of Completion Report was submitted for the Tank System(s); or if such report has not been submitted, HighPoint shall

73

submit a Certification of Completion Report for the Tank System(s) in accordance with the requirements in Appendix B, subparagraph 4(b) (Open Loop Vapor Control System Certification of Completion Report) or Appendix C, subparagraph 3(c) (Closed Loop Vapor Control System Certification of Completion Report); and

(2) Whether any Tank System is satisfying the requirements of Paragraph 15 (Tank Pressure Monitoring) and if so HighPoint shall select another Tank System at which HighPoint will satisfy the requirements of Paragraph 15. HighPoint will generate and maintain records for the alternative Tank System it selected from Appendix A.1 or A.3 that will: (a) identify that Tank System and (b) explain the basis for the selection of that Tank System considering the criteria set forth in subparagraphs 15(b)(1) to (b)(3).

b.      Until such time as the United States and the State consent to HighPoint's request for termination, HighPoint's obligations under this Consent Decree shall remain in effect as to such Tank System(s).  The United States and the State may request additional information as to such Tank System(s) to verify that HighPoint has substantially complied with other requirements of this Consent Decree as to such Tank System(s) up to that time.  Such consent shall not be unreasonably withheld.

c.      Under no circumstances may HighPoint seek termination pursuant to this Paragraph involving more than five Tank Systems identified on Appendices A.1 and A.2 as of the Date of Lodging. HighPoint may not seek termination pursuant to this Paragraph 96 of more than five Tank Systems added to Appendix A.3.

97.     After HighPoint has satisfied the following requirements of this Paragraph 97, HighPoint may send to the United States and the State a Request for Termination of this Consent Decree, which shall be certified in accordance with Paragraph 41, stating that HighPoint has satisfied those requirements, together with all necessary supporting documentation:

a.      Completed the applicable requirements of Appendix B, or Appendix C;

b.      Completed Section V (Environmental Mitigation Project) and Section VII (State-Only Supplemental Environmental Project);

c.      Substantially complied with Appendix B, Paragraph 5 (Open Loop Vapor Control System Post-Certification of Completion Modifications); Paragraphs 10 (Directed Inspection and Preventative Maintenance Program); 11 (Periodic Inspections and Monitoring), 12 (Reliable Information, Investigation, and Corrective Action); 14 (Compliance with Reg. 7, Sec. XVII.C.2.b); and 15 (Tank Pressure Monitoring) for at least two years after completion of the Open Loop Vapor Control System Verification of Design Analysis in accordance with Appendix B, Paragraph 6 or the Closed Loop Vapor Control System Verification of Engineering Evaluation in accordance with Appendix C, subparagraphs 3(a)–(c).  This subparagraph shall not apply to Tank Systems subject to this Consent Decree for which all wells associated with the Tank System are permanently plugged and abandoned in accordance with Paragraph 91 at the time of the Request for Termination of this Consent Decree; and

d.      Has paid the civil penalty and any accrued stipulated penalties not waived or reduced by the United States or the State pursuant to Paragraph 50.

98.     Following receipt by the United States and the State of HighPoint's Request for Termination of this Consent Decree or request to terminate as to a specific Tank System, the

Parties shall confer informally concerning the request and any disagreement that the Parties may have as to whether HighPoint has satisfactorily complied with the requirements for termination, including documentation of compliance with and completion of each requirement.  If the United States, after consultation with the State, agrees that the Decree or Tank System may be terminated, the Parties shall submit to the Court a joint stipulation terminating the Decree or Tank System pursuant to Paragraph 96 or 97.

99.     If the United States, after consultation with the State, does not agree that the Consent Decree or Tank System may be terminated pursuant to Paragraph 96 or 97, HighPoint may invoke Dispute Resolution under Section XI (Dispute Resolution).  However, HighPoint shall not seek Dispute Resolution of any dispute regarding termination until 60 Days after service of its request to terminate.

## XXI.   PUBLIC PARTICIPATION

100.     This Consent Decree will be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Decree disclose facts or considerations indicating that the Decree is inappropriate, improper, or inadequate.  HighPoint consents to entry of this Decree without further notice and agrees not to withdraw from or oppose entry of this Decree by the Court or to challenge any provision of the Decree, unless the United States has notified HighPoint in writing that it no longer supports entry of the Decree.

## XXII.  SIGNATORIES/SERVICE

101.     Each undersigned representative of HighPoint, the State of Colorado, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and

conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

102.    This Consent Decree may be signed in counterparts, and its validity may not be challenged on that basis.

103.    HighPoint shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on its behalf with respect to all matters arising under or relating to this Consent Decree.  HighPoint agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court, including, but not limited to, service of a summons.  HighPoint need not file an answer to the Complaint in this action unless or until the Court expressly rejects this Decree.

## XXIII. INTEGRATION/HEADINGS

104.    This Consent Decree and its Appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Decree.

105.    Headings to the Sections and subsections of this Consent Decree are provided for convenience and do not affect the meaning or interpretation of the provisions of this Consent Decree.

## XXIV. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

106.    For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability), Paragraph 5; Section IV (Injunctive Relief), Paragraphs 8−16, including all requirements set forth in Appendices B and C; Section V (Environmental Mitigation Projects), Paragraphs 17−22

& 24, and Appendix D; Section VIII (Periodic Reporting), Paragraphs 38 (except with respect to the SSEP(s)), 39, and 41; and Section XII (Information Collection and Retention), Paragraphs 68−70, is restitution or required to come into compliance with law.

## XXV.  FINAL JUDGMENT

107.    Upon recognition of this Consent Decree by the Court, this Consent Decree constitutes a final judgment of the Court as to the United States, the State, and HighPoint.

## XXVI. APPENDICES

108.    The following Appendices are attached to and part of this Consent Decree:

"Appendix A.1" is the List of AIRS Tanks/Tank Systems associated with a Vapor
        Control System planned for an Open Loop Vapor Control System Engineering
        Evaluation.

"Appendix A.2" is the List of the AIRS Tanks/Tank Systems associated with a Vapor
        Control System planned for a Closed Loop Vapor Control System Engineering
        Evaluation.

"Appendix A.3" is the List of AIRS New Tanks System(s).

"Appendix B" includes requirements for the Open Loop Modeling Guideline,
        Engineering Design Standards, Field Survey, Engineering Evaluation and
        Modification, Initial Verification, and Post-Certification of Completion
        Modifications.

"Appendix C" includes requirements for the Closed Loop Design Guideline, Field
        Survey, Engineering Evaluation, and Initial Verification.

"Appendix D" includes requirements for the Environmental Mitigation Projects.

Dated and entered this __ day of _____, 2019

_____
UNITED STATES DISTRICT JUDGE

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States and the State of Colorado v. HighPoint Operating Corporation.

FOR THE UNITED STATES OF AMERICA:

4/18/19
Date

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

5/19/2019
Date

JOHN N. MOSCATO
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Denver, CO 80202

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States and the State of Colorado v. HighPoint Operating Corporation.

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION 8:

Date: 3/25/19

SUZANNE J. BOHAN
Assistant Regional Administrator
Office of Enforcement, Compliance
  and Environmental Justice
U.S. Environmental Protection Agency, Region 8

Date: 3/19/19

JESSICA PORTMESS
Attorney
Legal Enforcement Program
Office of Enforcement, Compliance
  and Environmental Justice
U.S. Environmental Protection Agency, Region 8

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States and the State of Colorado v. HighPoint Operating Corporation.

FOR THE STATE OF COLORADO:

Date: 3/21/19

GARRISON KAUFMAN
Director
Air Pollution Control Division
Colorado Department of Public Health and Environment

PHILIP WEISER
Attorney General
State of Colorado

Date: 3-21-19

THOMAS A. ROAN
First Assistant Attorney General
Natural Resources and Environmental Section
Colorado Department of Law

82

THE UNDERSIGNED PARTY enters into this Consent Decree in this action captioned United States and the State of Colorado v. HighPoint Operating Corporation.

FOR HIGHPOINT OPERATING CORPORATION:

Date: _MARCH 15, 2019_

_Kenneth A. Wonstolen_
_Senior Vice President_
_and General Counsel_

APPENDIX A.1

**List of AIRS Tanks/Tank Systems Associated with a Vapor Control System Planned for an Open Loop Vapor Control System Engineering Evaluation**

| CD ID # | Facility Name | Condensate Tanks AIRS Point ID |
|---|---|---|
| 9B63 | DUTCH LAKE 17-25H | 123-9B63-002 |
| 9B05 | GREASEWOOD 11-21H | 123-9B05-001 |
| 9B31 | DUTCH LAKE 12-14H | 123-9B31-002 |
| 9AC4 | ANSCHUTZ 5-61-33-57 | 123-9AC4-004 |
| 9A14 | ESTERLING 44-33H | 123-9A14-004 |
| 9C0D | DUTCH LAKE 8-10H | 123-9C0D-003 |
| 9BCE | ANSCHUTZ WINDMILL 10-34H | 123-9BCE-003 |
| 9C0B | GREASEWOOD 4-08H | 123-9C0B-005 |
| 5999 | 70 RANCH LAURA (Sec 03) | 123-5999-001 |
| 6000 | ROTHE 24-31 (23-31) | 123-6000-001 |
| 9C0C | ROSENBERG 6-61-30 NE | 123-9C0C-003 |
| 9385 | ANSCHUTZ WINDMILL 4-22H | 123-9385-009 |
| 7008 | ROTHE 1 | 123-7008-001 |
| 9CDC | ANSCHUTZ STATE 4-62-2 | 123-9CDC-006 |
| 9B5D | GREASEWOOD 10-20H | 123-9B5D-002 |
| 9CF9 | ANSCHUTZ STATE 5-61-19_20 SWSW | 123-9CF9-004 |
| 9AE0 | 70 RANCH 5-63-22-58H | 123-9AE0-001 |
| 9382 | ANSCHUTZ WINDMILL  5-23H/13-23H/ASBS | 123-9382-011 |
| 9AD5 | 70 RANCH 5-63-27 PAD | 123-9AD5-001 |
| 9C0E | PAPPENHEIM 6-62-23 PAD | 123-9C0E-002 |
| 9CFC | FIDUCIAL 6-62-34_35 | 123-9CFC-004 |
| 9BAC | PAPPENHEIM 6-62-27 PAD | 123-9BAC-008 |
| 9AD7 | 70 RANCH 4-63-3 | 123-9AD7-002 |
| 9C76 | ANSCHUTZ STATE 5-62-25-0108XBH | 123-9C76-006 |
| 9C0F | HAWKINS 5-61-21 | 123-9C0F-005 |
| 9DF8 | ANSCHUTZ STATE 5-62-26_25 SWNW | 123-9DF8-003 |
| 9DBA | FIDUCIAL 6-62-34 SWSW | 123-9DBA-003 |
| 9E22 | ANSCHUTZ STATE 5-62-35_36 NWNW | 123-9E22-005 |
| 9DBF | ANSCHUTZ EQUUS FARMS 4-62-16 NE | 123-9DBF-002 |
| 9700 | ROTHE 43-30 (44-30) | 123-9700-002 |
| 5205 | NHF LAURA 1 | 123-5205-001 |
| 9E4C | WILL 6-62-15_22 NENW PAD | 123-9E4C-005 |

## APPENDIX A.2

**List of AIRS Tanks/Tank Systems Associated with a Vapor Control System Planned for a Closed Loop Vapor Control System Engineering Evaluation**

| CD ID # | Facility Name | Condensate Tanks AIRS Point ID |
|---------|---------------|-------------------------------|
| 9C29 | ANSCHUTZ STATE 5-62-35-6457BH | 123-9C29-007 |
| 9C28 | ANSCHUTZ STATE 5-62-36-6457CH | 123-9C28-003 |
| 9DBB | ANSCHUTZ EQUUS FARMS 4-62-15 NE | 123-9DBB-004 |
| 9C2A | DUTCH LAKE 3-3H | 123-9C2A-003 |
| 5997 | SIEBRING 5-63-32 | 123-5997-004 |
| 9A27 | DUTCH LAKE 16-24H | 123-9A27-003 |
| 9CDB | ANSCHUTZ EQUUS FARMS 4-62-9N | 123-9CDB-007 |
| 9C82 | HELTON 5-63-27 | 123-9C82-007 |
| 9DEB | RUH 6-62-11 NENW | 123-9DEB-001 |
| 9E19 | ANSCHUTZ STATE 5-62-22_23 SWSW | 123-9E19-007/123-9E19-015 |
| 6015 | CVR 5-63-32 PAD | 123-6015-001 |
| 9D9D | ANSCHUTZ EQUUS FARMS 4-62-15 NW | 123-9D9D-004 |
| 9C98 | 70 RANCH 4-63-3 PAD 2 | 123-9C98-003 |
| 9BEA | GREASEWOOD 8-18H | 123-9BEA-006 |
| 5998 | 70 RANCH LAURA (Sec 20) | 123-5998-001 |
| 9BCD | EAST PLATTE 1-01H | 123-9BCD-004 |
| 9DCF | CB RUDD 6-61-18_19 | 123-9DCF-004 |
| 9D9A | Coffelt 5-61-35_36 NWNW | 123-9D9A-006 |

## APPENDIX A.3

### List of AIRS New Tanks System(s)

| CD ID # | Facility Name | Condensate Tanks AIRS Point ID |
|---------|---------------|-------------------------------|
|         |               |                               |

**APPENDIX B**

**Requirements for Open Loop Modeling Guideline, Engineering Design Standards, Field Survey, Engineering Evaluation and Modification, Initial Verification, and Post-Certification of Completion Modifications**

1.     <u>Development of an Open Loop Modeling Guideline</u>.  HighPoint shall develop a written modeling guideline ("Open Loop Modeling Guideline").  The purpose of the Open Loop Modeling Guideline is to determine Potential Peak Instantaneous Vapor Flow Rate for purposes of designing and adequately sizing Vapor Control Systems and to provide procedures for achieving this objective.

a.     The Open Loop Modeling Guideline shall address the following, where relevant:

(1)     Vapor sources (*e.g.*, atmospheric storage tanks and transfer and loading systems) tied or to be tied into the Vapor Control System;

(2)     The maximum operating pressure and minimum operating temperature from the last stage of separation prior to the Tank System;

(3)     Vapor pressure of the final weathered product transported from the Condensate tank(s);

(4)     Estimation of highest potential flow rate of flash gas to the Vapor Control System utilizing:  pressurized or atmospheric liquid sampling (*e.g.*, API gravity); lab analyses, including flash gas to oil ratio; process simulation; correlations; or any combination thereof;

(5)     The maximum design flow rate across the Separator liquid dump valve (reflective of valve size and most open trim unless changes to the trim cannot be made);

(6)     Simultaneous dump events to the same Tank System (unless all potential simultaneous dump events have been precluded through installation of timers, automation, or other measures);

(7)     The calculation methods or simulation tools for processing the data inputs;

(8)     The accuracy of the input data and results (*e.g.*, uncertainty of empirical correlations, representativeness of samples, process conditions); and

(9)     Any other inputs needed to estimate the Potential Peak Instantaneous Vapor Flow Rate (*e.g.*, process heating, blanket gas, purge gas if applicable).

b.     On February 25, 2018, Bill Barrett submitted the Open Loop Modeling Guideline to EPA and CDPHE for their review and comment, which was completed on April 27, 2018.  HighPoint may periodically update the Open Loop Modeling Guideline as appropriate.  Should the Open Loop Modeling Guideline be updated, the use of the version current at the time of the Open Loop Engineering Evaluation is acceptable.  Updates to the Open Loop Modeling Guideline do not in and of themselves require HighPoint to redo Open Loop Engineering Evaluations.

2.     Open Loop Engineering Design Standards.  HighPoint shall develop Engineering Design Standards to assess whether Vapor Control Systems are adequately sized and properly functioning.  The Engineering Design Standards may reside with the Open Loop Modeling Guideline in the same document (*i.e.*, "Oil Production Facility Storage Tank Vapor Control System Design, Guide to") or the results of the Open Loop Engineering Evaluation (*e.g.*, design

assessment or report).  HighPoint will apply Engineering Design Standards to Vapor Control Systems at individual Tank Systems.

    a.      These standards shall include, as appropriate:

    (1)      A review of vapor control technologies applicable to the Tank System, including equipment-specific considerations and any associated pressure losses (*e.g.*, from Flame Arrestor);

    (2)      Identification of site-specific construction constraints (*e.g.*, footprint limitations, setbacks, maximum equipment counts);

    (3)      Size and design of the piping system between the tank(s) and the emission control device, and the size and design of the emission control device (including consideration of equivalent pipe length and back pressure valves or other restrictions on vapor flow);

    (4)      Volume and duration of individual dump events; the nature of the flow of liquids to and from the Separator (*i.e.*, steady flow, slug flow, intermittent flow (*e.g.*, due to discrete well cycling events)); the minimum time between dump events; and the maximum number of dump events associated with a single well cycle with slug or intermittent flow;

    (5)      Minimum available headspace in the tank(s); and

    (6)      Engineering design considerations applied to account for issues associated with the Vapor Control System (*e.g.*, fouling, potential for liquids accumulation in lines, winter operations) and variability of data.

    b.      HighPoint may rely on manufacturer specifications for individual components or pieces of equipment that are part of a Vapor Control System.

c.       These Engineering Design Standards shall be completed in connection with the Open Loop Engineering Evaluations.  HighPoint may, but is not required to, submit the Engineering Design Standards to EPA and CDPHE for their review and comment.  Updates to the Engineering Design Standards do not in and of themselves require HighPoint to redo Open Loop Engineering Evaluations.  HighPoint shall submit site-specific Engineering Design Standards if requested by EPA or CDPHE.

3.       Open Loop Vapor Control System Field Survey, Engineering Evaluation, and Modification.

a.       For each Open Loop Vapor Control System, HighPoint shall conduct a one-time field survey.  During the field survey, HighPoint shall inventory tanks and equipment associated with each Vapor Control System and identify their configuration and operational status.  HighPoint will then apply the Open Loop Modeling Guideline to determine the Potential Peak Instantaneous Vapor Flow Rate to the associated Vapor Control System.

b.       During the field survey, or other Vapor Control System site visit, HighPoint shall conduct a one-time evaluation of the condition of all PRVs, thief hatches, blowdown valves, mountings, and gaskets at each tank in the Vapor Control System, and the possibility of repairing, replacing, or upgrading such equipment to reduce the likelihood of VOC emissions.  This evaluation shall include the following actions:

(1)       HighPoint shall ensure that, at the time of the survey, every thief hatch is mounted with a suitable gasket to the tank at the tank attachment point, in accordance with good engineering practices and manufacturer specifications;

(2)      If while evaluating the PRVs, thief hatches, mountings, and gaskets, HighPoint observes Compromised Equipment, Reliable Information, or evidence of significant staining emanating from pressure relief valves, HighPoint shall repair, replace, or upgrade such equipment, as appropriate.  However, nothing herein shall require HighPoint to repair, replace, or upgrade such equipment on Shut-In Tank Systems and their associated Vapor Control System except that HighPoint must repair, replace, or upgrade such equipment prior to resuming Normal Operations; and

(3)      HighPoint shall maintain records of the following information:

(a)      The date each Tank System underwent this evaluation;

(b)      The name of the employee who performed the evaluation;

(c)      Whether Compromised Equipment, Reliable Information, or evidence of significant staining emanating from pressure relief valves was observed; and

(d)      What, if any, repair, replacement, upgrade, or other corrective action was performed, including a description of the existing PRV, thief hatch, mounting, or gasket, and a description of how that equipment was repaired or with what it was replaced/upgraded. Descriptions of PRVs or thief hatches shall include pressure set points where such information is available, and descriptions of PRVs, thief hatches, mountings, or gaskets shall include the manufacturer and model where such information is available.

        c.      <u>Open Loop Vapor Control System Engineering Evaluation</u>.  Using the results of the field survey activities described in Appendix B, subparagraph 3(a) and the Open Loop Vapor Control System Engineering Design Standard described in Appendix B, Paragraph 2, HighPoint shall then determine if the existing Vapor Control System at each Tank System is adequately designed and sized to handle the Potential Peak Instantaneous Vapor Flow Rate which shall be calculated through the application of the Open Loop Modeling Guideline ("Open Loop Engineering Evaluation").  An Open Loop Engineering Evaluation is not required for a Vapor Control System at a Tank System that is Shut-In, which remains Shut-In, is dismantled, and for which all wells associated with the Tank System are plugged and abandoned before the termination of this Consent Decree.

        d.      <u>Open Loop Vapor Control System Modification</u>.  For those Open Loop Vapor Control Systems that are not adequately designed and sized to handle the Potential Peak Instantaneous Vapor Flow Rate based on the Open Loop Engineering Evaluation, HighPoint shall make all necessary modifications to change the Potential Peak Instantaneous Vapor Flow Rate (as recalculated using the Modeling Guideline), including reducing the rate or otherwise altering the frequency or duration of the Potential Peak Instantaneous Vapor Flow Rate to ensure that Peak Modeled Pressures do not exceed the Maximum Design Pressure of the Vapor Control System, and/or increase the capacity of the Vapor Control System as determined in the applicable Open Loop Engineering Evaluation completed consistent with the Engineering Design Standards.  HighPoint shall ensure that the modifications result in a Vapor Control System that is adequately designed and sized to handle the Potential Peak Instantaneous Vapor Flow Rate, as

determined through application of an Open Loop Engineering Evaluation consistent with the Engineering Design Standard.

4.    <u>Open Loop Vapor Control System Initial Verification</u>.  Except as otherwise provided in this Appendix B, Paragraph 4, HighPoint shall complete the requirements of this Paragraph for each Tank System by January 31, 2019.  For Tank Systems Shut-In as of December 31, 2018, HighPoint shall complete the requirements of Appendix B, subparagraph 4(a) by no later than 30 Days after first resuming Normal Operations, and shall complete the requirements of Appendix B, subparagraph 4(b) by the deadline for the next Semi-Annual Report that is due at least 60 Days after first resuming Normal Operations.  For Tank Systems that have completed the Open Loop Engineering Evaluation as of December 31, 2018, but are Shut-In as of January 31, 2019, HighPoint shall complete the requirements of Appendix B, subparagraph 4(a) by no later than 30 Days after first resuming Normal Operations, and shall complete the requirements of Appendix B, subparagraph 4(b) by the deadline for the next Semi-Annual Report that is due at least 60 Days after first resuming Normal Operations.  No later than March 1, 2019, HighPoint shall submit a written notification to EPA and CDPHE advising of any Tank Systems Shut-In as of December 31, 2018.

a.    Conduct an IR Camera Inspection of all Open Loop Vapor Control Systems during Normal Operations, including while and immediately after Condensate is being sent to the Tank System from all the last points of separation equipped with a dump valve that are not Shut-In at the time of the IR Camera Inspection (or, in the event that the potential for simultaneous dump events has been precluded, from the associated last points of separation equipped with a dump valve that are not Shut-In that yield the highest, non-precluded Potential Peak Instantaneous Vapor Flow Rate) to confirm the

Vapor Control System is adequately designed and sized and not emitting VOCs detected with the IR Camera. In the event that any of the last points of separation equipped with a dump valve associated with a Tank System are Shut-In at the time of this IR Camera Inspection, and the last point of separation equipped with a dump valve that is Shut-In contributes to the highest, non-precluded Potential Peak Instantaneous Vapor Flow Rate, HighPoint shall perform additional IR Camera Inspection(s) in accordance with this subparagraph within 30 Days of resuming Normal Operations from the last points of separation equipped with a dump valve that had been Shut-In. Inspections under this subparagraph must be conducted pursuant to the SOP prepared by HighPoint and approved by EPA and CDPHE pursuant to subparagraph 11(a). A video record of each IR Camera Inspection done to comply with this subparagraph shall be recorded and kept on file;

     b.     Complete and submit to EPA and CDPHE with the next Semi-Annual Report or the Semi-Annual Report due at least 30 Days following the applicable Open Loop Engineering Evaluation deadline in Paragraph 9 the following information as a Certification of Completion Report, in a spreadsheet or database format for each Vapor Control System that underwent Open Loop Engineering Evaluations (see Paragraphs 8−9):

          (1)     The result of the Open Loop Engineering Evaluation, including the Peak Modeled Pressure and the Maximum Design Pressure;

          (2)     An identifier for the report associated with the Open Loop Engineering Evaluation consistent with the Engineering Design Standard (which

could be for an individual Tank System) that was used for each Vapor Control System;

(3)     Identification of any changes made to equipment or operation as a result of the Open Loop  Engineering Evaluation;

(4)     Identification of site-specific or system-wide operational parameters or practices relied upon in the Open Loop Engineering Evaluation and determined by the Open Loop Engineering Evaluation to be necessary for verification during Normal Operations (*e.g.*, maximum operating pressure for final stage of separation, minimum available headspace in tanks);

(5)     The minimum Tank System thief hatch and PRV settings;

(6)     The date an IR Camera Inspection was completed to comply with Appendix B, subparagraph 4(a) and the results of such inspection, along with any corrective actions performed to address Reliable Information and the date and method of verification that the corrective action was successful; and

(7)     Whether the modeling performed in accordance with the Modeling Guideline was transient or steady state.

5.     Open Loop Vapor Control System Post-Certification of Completion Modifications.  If, after HighPoint has submitted a Certification of Completion Report for a Tank System associated with an Open Loop Vapor Control System to EPA and CDPHE, an operational or equipment change is made such that the Potential Peak Instantaneous Vapor Flow Rate is increased beyond what was evaluated in the Open Loop Engineering Evaluation or the Open Loop Vapor Control System capacity decreases, HighPoint shall repeat all requirements of Appendix B, subparagraphs 3(c) and 3(d) within 30 Days of the change and shall repeat all

requirements of Appendix B, subparagraph 4(a) within 30 Days of completing any necessary modifications in accordance with Appendix B, subparagraph 3(d).  HighPoint shall use best efforts to repeat all requirements of Appendix B, subparagraphs 3(c) and 3(d) prior to any such change.  HighPoint shall submit in the next required Semi-Annual Report, or the Semi-Annual Report due at least 30 Days following completion of all requirements of Appendix B, subparagraph 4(a), an updated Certification of Completion Report for any Tank Systems that underwent another Open Loop Engineering Evaluation in accordance with this Paragraph.

6.      <u>Open Loop Vapor Control System Verification of Design Analysis</u>.  HighPoint's Open Loop Engineering Evaluations and Modifications, pursuant to Appendix B, Paragraph 3, shall be subject to verification for all Tank Systems that underwent Open Loop Engineering Evaluation as follows:

a.      No later than April 1, 2019, HighPoint shall provide to EPA and CDPHE HighPoint's proposed verification work plan.  The work plan shall identify the engineer(s) who will conduct the verification (hereinafter the "Reviewer").  The work plan shall provide a curriculum vitae for each Reviewer HighPoint selects to conduct the verification.  EPA and CDPHE may request such other information as they deem necessary to evaluate any Reviewer's qualifications.  Any Reviewer HighPoint selects to conduct the verification duties identified in Appendix B, subparagraphs 6(c)(1) through 6(c)(3) shall not have conducted the Open Loop Engineering Evaluation subject to verification, or have been an employee of any company which conducted the Open Loop Engineering Evaluation subject to verification.

b.      After consultation with CDPHE, EPA shall either approve or disapprove the proposed work plan, including HighPoint's selection of a Reviewer.  If EPA has not

responded within 30 Days, HighPoint's Reviewer shall be deemed approved and HighPoint may proceed with its proposed work plan.  In the event EPA disapproves the proposed work plan, EPA shall state the reasons for its disapproval in writing, and the process will be repeated with HighPoint having 30 Days from the date of disapproval to propose a revised work plan.  In the event a work plan is not approved by June 1, 2019, all deadlines in this Paragraph shall be extended by an equivalent period to the time beyond June 1 that it takes for work plan approval.

      c.      For all Tank Systems that underwent an Open Loop Engineering Evaluation, the Reviewer shall conduct a review (document and/or field visit, as necessary) to verify:

      (1)      Site-specific inputs and assumptions were correctly identified in the Open Loop Engineering Evaluation as informed by the Open Loop Modeling Guideline and Engineering Design Standards (*e.g.*, number of wells connected to the Tank System, well operation type, frequency and duration of dump events, minimum separator temperature and maximum separator pressure, maximum tank liquid level, Open Loop Vapor Control System piping set-up and configuration, vapor sources, etc.);

      (2)      The Potential Peak Instantaneous Vapor Flow Rate, Open Loop Vapor Control System capacity, and Peak Modeled Pressure were determined by methods consistent with the Modeling Guideline and Engineering Design Standards; and

      (3)      Each Open Loop Vapor Control System is adequately designed and sized in accordance with the Modeling Guideline and results of the Open

Loop Engineering Evaluations, by demonstrating that the Peak Modeled Pressure does not exceed the Maximum Design Pressure of the Open Loop Vapor Control System.

d.       HighPoint shall conduct a review (document and/or field visit, as necessary) for each Tank System that underwent an Open Loop Engineering Evaluation to verify that all modifications required by Appendix B, subparagraph 3(d) (Open Loop Vapor Control System Modification) have been fully and correctly implemented in accordance with the requirements of this Decree.

e.       The verification described in this Paragraph shall be completed no later than October 31, 2019, except that Tank Systems that are Shut-In pursuant to subparagraph 9(a) and for which HighPoint has not performed an Open Loop Engineering Evaluation as of October 31, 2019, must complete the verification described in this Paragraph within 30 Days of completing an IR Camera Inspection pursuant to Appendix B, subparagraph 4(a) (Vapor Control System Initial Verification).  HighPoint shall submit a written report ("Verification Report") describing work performed and conclusions reached by the Reviewer(s) pursuant to Appendix B, subparagraphs 6(c)(1) through (3) and 6(d).  The Verification Report shall include (i) a certification from the Reviewer that the requirements of Appendix B, subparagraphs 6(c)(1) through 6(c)(3) were completed in accordance with the applicable provisions of this Decree; and (ii) a certification from HighPoint or the Reviewer (as applicable) that the requirements of Appendix B, subparagraph 6(d) were completed in accordance with the applicable provisions of this Decree.  HighPoint shall submit the Verification Report with the next

Semi-Annual Report or the Semi-Annual Report due at least 30 Days following completion of the Verification Report.

<u>APPENDIX C</u>

**Requirements for Closed Loop Vapor Control System Design Guideline, Field Survey, Engineering Evaluation, and Initial Verification**

1.       <u>Development of a Closed Loop Vapor Control System Design Guideline</u>.

a.       HighPoint has developed a written design guideline ("Closed Loop Design Guideline").  The purpose of the Closed Loop Design Guideline is to describe the steps necessary to properly design, install, and optimize a Closed Loop Vapor Control System. For each Vapor Control System on Appendix A.2, HighPoint will apply the Closed Loop Design Guideline to create a Closed Loop Vapor Control System.

b.       The Closed Loop Design Guideline shall address the following:

(1)      The creation of a site survey sheet to be used at each Closed Loop Vapor Control System, identifying the configuration of the Vapor Control System, pressure setting of thief hatches and PRVs, along with the make and model of thief hatches and PRVs, and inputs (both vapor and liquid) into the Vapor Control System;

(2)      Description of the Closed Loop Vapor Control System Installation Phase (*i.e.*, the installation of hardware and software);

(3)      Identification of the Control Point, Trigger Point, Leak Point, and Set Point, including the methods by which each point will be determined;

(4)      Description of the "optimization phase," also referred to as the shakedown phase, *i.e.*, the phase following equipment installation and verification, during which the wells resume Normal Operations, and wherein calibration and tuning of the Closed Loop Vapor Control System occurs,

C-1

including the duration of the optimization phase and the process for responding to

exceedances of the Trigger Point during the optimization phase; and

(5)     Description of a process of verification, which includes

verification of installation of the Closed Loop Vapor Control System in the field,

and verification that the Trigger Point is below the Leak Point via an IR Camera

Inspection of the Vapor Control System pursuant to Appendix C, subparagraph

3(a)(2)(b), below.

c.     On June 4, 2018, HighPoint submitted the Closed Loop Design Guideline

to EPA and CDPHE for their review and comment.  EPA and CDPHE submitted final

comments on the Closed Loop Design Guideline on or about December 19, 2018.

HighPoint may periodically update the Closed Loop Design Guideline as appropriate.

Should the Closed Loop Design Guideline be updated, the use of the version current at

the time of the Closed Loop Engineering Evaluation is acceptable.  Updates to the Closed

Loop Design Guideline do not in and of themselves require HighPoint to redo Closed

Loop Engineering Evaluations.

2.     <u>Closed Loop Vapor Control System Field Survey, Engineering Evaluation, and

Modification</u>.

a.     For each Closed Loop Vapor Control System, HighPoint shall conduct a

one-time field survey.  During the field survey, HighPoint shall inventory tanks and

equipment associated with each Closed Loop Vapor Control System and identify their

configuration and operational status.  HighPoint will then apply the Closed Loop Design

Guideline to install a Closed Loop Vapor Control System.

b.      During the field survey, HighPoint shall conduct a one-time evaluation of the condition of all PRVs, thief hatches, blowdown valves, mountings, and gaskets at each tank in the Closed Loop Vapor Control System, and the possibility of repairing, replacing, or upgrading such equipment to reduce the likelihood of VOC emissions.  This evaluation shall include the following actions:

(1)      HighPoint shall ensure that, at the time of the survey, every thief hatch is mounted with a suitable gasket to the tank at the tank attachment point, in accordance with good engineering practices and manufacturer specifications;

(2)      If while evaluating the PRVs, thief hatches, mountings, and gaskets, HighPoint observes Compromised Equipment, Reliable Information, or evidence of significant staining emanating from pressure relief valves, HighPoint shall repair, replace, or upgrade such equipment, as appropriate.  However, nothing herein shall require HighPoint to repair, replace, or upgrade such equipment on Shut-In Tank Systems and their associated Vapor Control System except that HighPoint shall repair, replace, or upgrade such equipment prior to resuming Normal Operations at the Tank System; and

(3)      HighPoint shall maintain records of the following information:

(a)      The date each Tank System underwent this evaluation;

(b)      The name of the employee who performed the evaluation;

(c)      Whether Compromised Equipment, Reliable Information, or evidence of significant staining emanating from pressure relief valves was observed; and

(d)      What, if any, repair, replacement, upgrade, or other corrective action was performed, including a description of the existing PRV, thief hatch, mounting, or gasket, and a description of how that equipment was repaired or with what it was replaced/upgraded. Descriptions of PRVs or thief hatches shall include pressure Set Points, and descriptions of PRVs, thief hatches, mountings, or gaskets shall include the manufacturer and model where such information is available.

c.      <u>Closed Loop Vapor Control System Engineering Evaluation</u>.  Using the results of the field survey activities described in this Appendix C, subparagraph 2(a), and through application of the Closed Loop Design Guideline, HighPoint shall install the necessary hardware and software to create a Closed Loop Vapor Control System ("Closed Loop Engineering Evaluation").  A Closed Loop Engineering Evaluation is not required for a Vapor Control System at a Tank System that is Shut-In, which remains Shut-In, is dismantled, and for which all wells associated with the Tank System are plugged and abandoned before the termination of this Consent Decree.

(1)      Following creation of a Closed Loop Vapor Control System pursuant to Appendix C, subparagraph 2(c), HighPoint shall:

(a)      Operate a Closed Loop Vapor Control System as required by this Appendix C and in a manner consistent with the Closed Loop Design Guideline beginning the first date of Normal Operations that follows creation of the Closed Loop Vapor Control System until Termination of the Tank System from this Consent Decree, or until the

Tank System becomes subject to the Appendix B requirements pursuant to Paragraph 8 of the Consent Decree.

        (b)      Operate the Closed Loop Vapor Control System to ensure the Tank System will be Shut-In at the Trigger Point.

        (c)      Operate the Closed Loop Vapor Control System to ensure that all wells associated with the Closed Loop Vapor Control System will Shut-In at the Leak Point.

        (d)      Operate the Closed Loop Vapor Control System to ensure the Tank System will Shut-In at the Low Pressure Point or Static Alarm. Prior to resuming Normal Operations following a Low Pressure Point or Static Alarm, HighPoint shall repair or replace the pressure monitor.

        (e)      Equip all Closed Loop Vapor Control Systems with remote monitoring.

    d.    <u>Closed Loop Vapor Control System Modification</u>.  If, at any time following installation of a Closed Loop Vapor Control System, HighPoint replaces a thief hatch or PRV at a Closed Loop Vapor Control System with a thief hatch or PRV of a lower Set Point or different make and model, or lowers the Set Point of an existing thief hatch or PRV, a new verification of the Leak Point pursuant to Appendix C, subparagraph 3(a)(2)(b), below, shall be performed (i) within seven Calendar Days after the modification is completed, or (ii) if the Tank System is Shut-In, a new verification shall be performed by the date Normal Operations resume.

    3.    <u>Closed Loop Vapor Control System Verification of Engineering Evaluation</u>.  No later than the date that Normal Operations resume at a Vapor Control System following

installation of the Closed Loop Vapor Control System, HighPoint shall conduct the verification

in subparagraph 3(a), identified below.  The optimization phase shall commence immediately

upon resuming Normal Operations and will end 30 Calendar Days after first resuming Normal

Operations.

      a.      Verification of a Closed Loop Engineering Evaluation shall include the

following:

      (1)      A review to ensure that HighPoint or its consultant installing the

Closed Loop Vapor Control System correctly identified the site configuration and

equipment in accordance with the site survey, and installed the appropriate

equipment to create the Closed Loop Vapor Control System;

      (2)      Consistent with the Design Guideline, a verification:

      (a)      That the Tank System will be Shut-In at the Trigger Point

and all wells associated with the Closed Loop Vapor Control System will

Shut-In at the Leak Point;

      (b)      Of the Leak Point via IR Camera Inspection, consistent

with the Closed Loop Design Guideline.  A video record of each IR

Camera Inspection done to comply with this subparagraph shall be

recorded and kept on file; and

      (c)      That the control valve(s) in the Closed Loop Vapor Control

System actuate in response to the control logic.

      b.      No later than 60 Days after the applicable deadline in Paragraph 9 for a

Tank System on Appendix A.2, HighPoint shall submit a written notification to EPA and

CDPHE advising of any Tank Systems Shut-In as of the applicable deadline in Paragraph 9 and where a Closed Loop Vapor Control System has not been installed.

c.      Complete and submit to EPA and CDPHE with the next Semi-Annual Report or the Semi-Annual Report due at least 30 Days following the end of the optimization phase, the following information as a Certification of Completion Report, in a spreadsheet or database format for each Closed Loop Vapor Control System, except as identified in Paragraph 3(d)−(e), below:

(1)      The date when installation of all necessary hardware and software to create a Closed Loop Vapor Control System was completed;

(2)      The date a Tank System or tanks in any Tank System were first in Normal Operations following the installation of a Closed Loop Vapor Control System (*i.e.*, the date the optimization phase began);

(3)      The site survey sheet;

(4)      The Control Point, Trigger Point, Set Point, and Leak Point for each Closed Loop Vapor Control System, and the method by which each point was determined; and

(5)      A summary of the results of the verification of the Closed Loop Engineering Evaluation for each applicable Closed Loop Vapor Control System, including a certification that the verification of the Closed Loop Engineering Evaluation was performed in accordance with Appendix C, subparagraph 3(a).

d.      Following the optimization period for each Closed Loop Vapor Control System, HighPoint shall record the following data:  tank pressure data, pressure alarms, and Shut-In events.  The alarm and Shut-In log will include records of the date and time

of the alarms at, and duration of exceedances of, the Trigger Point and Leak Point; the date and time of the alarm indicating a pressure reading at or below the Low Pressure Point; the date and time of any Static Alarm; the cause and corrective action associated with any such alarms; and any instances in which the actuation of the Closed Loop Vapor Control System control logic automatically Shut-In separator(s) and or well(s).

     e.     HighPoint shall retain the data recorded by the pressure monitors associated with the Closed Loop Vapor Control System required pursuant to Appendix C, Paragraph 3(d) for two years from the date of recording.  HighPoint shall provide this data to EPA and CDPHE upon request.

**APPENDIX D**

**Environmental Mitigation Projects**

HighPoint shall comply with the requirements of this Appendix and with Section V (Environmental Mitigation Projects) of the Consent Decree to implement and secure the environmental benefits of the Project described in this Appendix.

I.   **General**

A.  HighPoint has submitted, and EPA and CDPHE have reviewed and approved: a summary-level budget for the Project, an estimated date of completion for the Project, and a summary of the anticipated environmental benefits of the Project.

B.  Nothing in this Appendix shall relieve HighPoint of its obligation to comply with all applicable federal, state, and local laws and regulations, including, but not limited to, any obligations to obtain any permits pursuant to the Clean Air Act in implementing the Project Plan.

II.   **Installation of Tank Truck Loadout Control Systems**

A.  At a minimum, prior to May 1, 2019, and consistent with the requirements of the Consent Decree and this Appendix, HighPoint shall, in accordance with its Project Plan, install and operate control systems for vapor balancing during tank truck loadout of Condensate tanks ("Loadout Control Systems"). HighPoint shall install and operate Loadout Control Systems on all Tank Systems identified in Table 1 below.

B.  Description of Loadout Control Systems. While loading liquids from Condensate tanks into trucks, vapors present in the truck are displaced by the liquid being placed into the truck. As liquids fill up the available vapor space, these VOC vapors are displaced from the haul truck's tank. Rather than being emitted to the atmosphere,

these truck loadout VOC vapors may be captured by way of a Loadout Control System. The Loadout Control System will consist of a combination of pipes and hoses that route vapors back to the Vapor Control System such that vapors are either returned to the Condensate Tanks as a vacuum is being drawn on the tanks during loading activities or sent to a combustion device. Capture of VOC vapors in such a manner will reduce VOC emissions associated with truck loadout operations at HighPoint production facilities. VOC is an ozone precursor, and the alleged violations being resolved in this Consent Decree are alleged to have resulted in additional emissions of VOC.

C.  By May 1, 2019, HighPoint shall have installed Loadout Control Systems at all Tank Systems identified in Table 1 below.

D.  HighPoint will retain and operate the Loadout Control Systems consistent with manufacturer recommendations and good air pollution practices for minimizing emissions until the joint stipulation terminating the Consent Decree or Tank System is entered by the court, or all wells producing to the Tank System have been permanently plugged and abandoned in accordance with Paragraph 91 of the Consent Decree.

E.  HighPoint estimates that it will cost $ 50,000 to install Loadout Control Systems as required by this Appendix. Consistent with Paragraph 21 of the Consent Decree, HighPoint shall use its best efforts to secure as much environmental benefit as possible for the Project.

**Table 1 to Appendix D**

| CD ID # | Facility Name |
|---------|---------------|
| 9DBA | FIDUCIAL 6-62-34 SWSW |
| 9BAC | PAPPENHEIM 6-62-27 PAD |
| 9DBB | ANSCHUTZ EQUUS FARMS 4-62-15 NE |
| 9CF9 | ANSCHUTZ STATE 5-61-19_20 SWSW |
| 9C0F | HAWKINS 5-61-21 |
| 9D9D | ANSCHUTZ EQUUS FARMS 4-62-15 NW |
| 9C98 | 70 RANCH 4-63-3 PAD 2 |
| 9CFC | FIDUCIAL 6-62-34_35 |
| 9DBF | ANSCHUTZ EQUUS FARMS 4-62-16 NE |
| 9C0C | ROSENBERG 6-61-30 NE |

III.  **Reporting Requirements**

In accordance with Paragraph 38(k) of the Consent Decree, HighPoint shall submit the following in each Semi-Annual Report:

A.  Identification of the Tank Systems retrofitted with Loadout Control Systems during the period covered by the Semi-Annual Report; and

B.  For those Tank Systems retrofitted with Loadout Control Systems during the period covered by the Semi-Annual Report, a summary of expenditures for such retrofits.

C.  A description of measures taken to ensure HighPoint personnel, contractors, or third-party haulers are utilizing Loadout Control Systems when unloading liquids from Condensate tanks into trucks, along with a description of the methods and any challenges encountered during the period covered by the Semi-Annual Report.

## APPENDIX A.1

**List of AIRS Tanks/Tank Systems Associated with a Vapor Control System Planned for an Open Loop Vapor Control System Engineering Evaluation**

| CD ID # | Facility Name | Condensate Tanks AIRS Point ID |
|---|---|---|
| 9B63 | DUTCH LAKE 17-25H | 123-9B63-002 |
| 9B05 | GREASEWOOD 11-21H | 123-9B05-001 |
| 9B31 | DUTCH LAKE 12-14H | 123-9B31-002 |
| 9AC4 | ANSCHUTZ 5-61-33-57 | 123-9AC4-004 |
| 9A14 | ESTERLING 44-33H | 123-9A14-004 |
| 9C0D | DUTCH LAKE 8-10H | 123-9C0D-003 |
| 9BCE | ANSCHUTZ WINDMILL 10-34H | 123-9BCE-003 |
| 9C0B | GREASEWOOD 4-08H | 123-9C0B-005 |
| 5999 | 70 RANCH LAURA (Sec 03) | 123-5999-001 |
| 6000 | ROTHE 24-31 (23-31) | 123-6000-001 |
| 9C0C | ROSENBERG 6-61-30 NE | 123-9C0C-003 |
| 9385 | ANSCHUTZ WINDMILL 4-22H | 123-9385-009 |
| 7008 | ROTHE 1 | 123-7008-001 |
| 9CDC | ANSCHUTZ STATE 4-62-2 | 123-9CDC-006 |
| 9B5D | GREASEWOOD 10-20H | 123-9B5D-002 |
| 9CF9 | ANSCHUTZ STATE 5-61-19_20 SWSW | 123-9CF9-004 |
| 9AE0 | 70 RANCH 5-63-22-58H | 123-9AE0-001 |
| 9382 | ANSCHUTZ WINDMILL  5-23H/13-23H/ASBS | 123-9382-011 |
| 9AD5 | 70 RANCH 5-63-27 PAD | 123-9AD5-001 |
| 9C0E | PAPPENHEIM 6-62-23 PAD | 123-9C0E-002 |
| 9CFC | FIDUCIAL 6-62-34_35 | 123-9CFC-004 |
| 9BAC | PAPPENHEIM 6-62-27 PAD | 123-9BAC-008 |
| 9AD7 | 70 RANCH 4-63-3 | 123-9AD7-002 |
| 9C76 | ANSCHUTZ STATE 5-62-25-0108XBH | 123-9C76-006 |
| 9C0F | HAWKINS 5-61-21 | 123-9C0F-005 |
| 9DF8 | ANSCHUTZ STATE 5-62-26_25 SWNW | 123-9DF8-003 |
| 9DBA | FIDUCIAL 6-62-34 SWSW | 123-9DBA-003 |
| 9E22 | ANSCHUTZ STATE 5-62-35_36 NWNW | 123-9E22-005 |
| 9DBF | ANSCHUTZ EQUUS FARMS 4-62-16 NE | 123-9DBF-002 |
| 9700 | ROTHE 43-30 (44-30) | 123-9700-002 |
| 5205 | NHF LAURA 1 | 123-5205-001 |
| 9E4C | WILL 6-62-15_22 NENW PAD | 123-9E4C-005 |

## APPENDIX A.2

**List of AIRS Tanks/Tank Systems Associated with a Vapor Control System Planned for a Closed Loop Vapor Control System Engineering Evaluation**

| CD ID # | Facility Name | Condensate Tanks AIRS Point ID |
|---------|---------------|--------------------------------|
| 9C29 | ANSCHUTZ STATE 5-62-35-6457BH | 123-9C29-007 |
| 9C28 | ANSCHUTZ STATE 5-62-36-6457CH | 123-9C28-003 |
| 9DBB | ANSCHUTZ EQUUS FARMS 4-62-15 NE | 123-9DBB-004 |
| 9C2A | DUTCH LAKE 3-3H | 123-9C2A-003 |
| 5997 | SIEBRING 5-63-32 | 123-5997-004 |
| 9A27 | DUTCH LAKE 16-24H | 123-9A27-003 |
| 9CDB | ANSCHUTZ EQUUS FARMS 4-62-9N | 123-9CDB-007 |
| 9C82 | HELTON 5-63-27 | 123-9C82-007 |
| 9DEB | RUH 6-62-11 NENW | 123-9DEB-001 |
| 9E19 | ANSCHUTZ STATE 5-62-22_23 SWSW | 123-9E19-007/123-9E19-015 |
| 6015 | CVR 5-63-32 PAD | 123-6015-001 |
| 9D9D | ANSCHUTZ EQUUS FARMS 4-62-15 NW | 123-9D9D-004 |
| 9C98 | 70 RANCH 4-63-3 PAD 2 | 123-9C98-003 |
| 9BEA | GREASEWOOD 8-18H | 123-9BEA-006 |
| 5998 | 70 RANCH LAURA (Sec 20) | 123-5998-001 |
| 9BCD | EAST PLATTE 1-01H | 123-9BCD-004 |
| 9DCF | CB RUDD 6-61-18_19 | 123-9DCF-004 |
| 9D9A | Coffelt 5-61-35_36 NWNW | 123-9D9A-006 |

## APPENDIX A.3

**List of AIRS New Tanks System(s)**

| CD ID # | Facility Name | Condensate Tanks AIRS Point ID |
|---------|---------------|-------------------------------|
|         |               |                               |

**APPENDIX B**

**Requirements for Open Loop Modeling Guideline, Engineering Design Standards, Field Survey, Engineering Evaluation and Modification, Initial Verification, and Post-Certification of Completion Modifications**

1.  <u>Development of an Open Loop Modeling Guideline</u>.  HighPoint shall develop a written modeling guideline ("Open Loop Modeling Guideline").  The purpose of the Open Loop Modeling Guideline is to determine Potential Peak Instantaneous Vapor Flow Rate for purposes of designing and adequately sizing Vapor Control Systems and to provide procedures for achieving this objective.

    a.  The Open Loop Modeling Guideline shall address the following, where relevant:

        (1)  Vapor sources (*e.g.*, atmospheric storage tanks and transfer and loading systems) tied or to be tied into the Vapor Control System;

        (2)  The maximum operating pressure and minimum operating temperature from the last stage of separation prior to the Tank System;

        (3)  Vapor pressure of the final weathered product transported from the Condensate tank(s);

        (4)  Estimation of highest potential flow rate of flash gas to the Vapor Control System utilizing:  pressurized or atmospheric liquid sampling (*e.g.*, API gravity); lab analyses, including flash gas to oil ratio; process simulation; correlations; or any combination thereof;

        (5)  The maximum design flow rate across the Separator liquid dump valve (reflective of valve size and most open trim unless changes to the trim cannot be made);

(6)     Simultaneous dump events to the same Tank System (unless all

potential simultaneous dump events have been precluded through installation of

timers, automation, or other measures);

(7)     The calculation methods or simulation tools for processing the data

inputs;

(8)     The accuracy of the input data and results (*e.g.*, uncertainty of

empirical correlations, representativeness of samples, process conditions); and

(9)     Any other inputs needed to estimate the Potential Peak

Instantaneous Vapor Flow Rate (*e.g.*, process heating, blanket gas, purge gas if

applicable).

b.     On February 25, 2018, Bill Barrett submitted the Open Loop Modeling

Guideline to EPA and CDPHE for their review and comment, which was completed on

April 27, 2018.  HighPoint may periodically update the Open Loop Modeling Guideline

as appropriate.  Should the Open Loop Modeling Guideline be updated, the use of the

version current at the time of the Open Loop Engineering Evaluation is acceptable.

Updates to the Open Loop Modeling Guideline do not in and of themselves require

HighPoint to redo Open Loop Engineering Evaluations.

2.     <u>Open Loop Engineering Design Standards</u>.  HighPoint shall develop Engineering

Design Standards to assess whether Vapor Control Systems are adequately sized and properly

functioning.  The Engineering Design Standards may reside with the Open Loop Modeling

Guideline in the same document (*i.e.*, "Oil Production Facility Storage Tank Vapor Control

System Design, Guide to") or the results of the Open Loop Engineering Evaluation (*e.g.*, design

assessment or report).  HighPoint will apply Engineering Design Standards to Vapor Control Systems at individual Tank Systems.

      a.      These standards shall include, as appropriate:

      (1)      A review of vapor control technologies applicable to the Tank System, including equipment-specific considerations and any associated pressure losses (*e.g.*, from Flame Arrestor);

      (2)      Identification of site-specific construction constraints (*e.g.*, footprint limitations, setbacks, maximum equipment counts);

      (3)      Size and design of the piping system between the tank(s) and the emission control device, and the size and design of the emission control device (including consideration of equivalent pipe length and back pressure valves or other restrictions on vapor flow);

      (4)      Volume and duration of individual dump events; the nature of the flow of liquids to and from the Separator (*i.e.*, steady flow, slug flow, intermittent flow (*e.g.*, due to discrete well cycling events)); the minimum time between dump events; and the maximum number of dump events associated with a single well cycle with slug or intermittent flow;

      (5)      Minimum available headspace in the tank(s); and

      (6)      Engineering design considerations applied to account for issues associated with the Vapor Control System (*e.g.*, fouling, potential for liquids accumulation in lines, winter operations) and variability of data.

      b.      HighPoint may rely on manufacturer specifications for individual components or pieces of equipment that are part of a Vapor Control System.

c.      These Engineering Design Standards shall be completed in connection with the Open Loop Engineering Evaluations.  HighPoint may, but is not required to, submit the Engineering Design Standards to EPA and CDPHE for their review and comment.  Updates to the Engineering Design Standards do not in and of themselves require HighPoint to redo Open Loop Engineering Evaluations.  HighPoint shall submit site-specific Engineering Design Standards if requested by EPA or CDPHE.

3.      Open Loop Vapor Control System Field Survey, Engineering Evaluation, and Modification.

a.      For each Open Loop Vapor Control System, HighPoint shall conduct a one-time field survey.  During the field survey, HighPoint shall inventory tanks and equipment associated with each Vapor Control System and identify their configuration and operational status.  HighPoint will then apply the Open Loop Modeling Guideline to determine the Potential Peak Instantaneous Vapor Flow Rate to the associated Vapor Control System.

b.      During the field survey, or other Vapor Control System site visit, HighPoint shall conduct a one-time evaluation of the condition of all PRVs, thief hatches, blowdown valves, mountings, and gaskets at each tank in the Vapor Control System, and the possibility of repairing, replacing, or upgrading such equipment to reduce the likelihood of VOC emissions.  This evaluation shall include the following actions:

(1)      HighPoint shall ensure that, at the time of the survey, every thief hatch is mounted with a suitable gasket to the tank at the tank attachment point, in accordance with good engineering practices and manufacturer specifications;

(2)      If while evaluating the PRVs, thief hatches, mountings, and gaskets, HighPoint observes Compromised Equipment, Reliable Information, or evidence of significant staining emanating from pressure relief valves, HighPoint shall repair, replace, or upgrade such equipment, as appropriate.  However, nothing herein shall require HighPoint to repair, replace, or upgrade such equipment on Shut-In Tank Systems and their associated Vapor Control System except that HighPoint must repair, replace, or upgrade such equipment prior to resuming Normal Operations; and

(3)      HighPoint shall maintain records of the following information:

(a)      The date each Tank System underwent this evaluation;

(b)      The name of the employee who performed the evaluation;

(c)      Whether Compromised Equipment, Reliable Information, or evidence of significant staining emanating from pressure relief valves was observed; and

(d)      What, if any, repair, replacement, upgrade, or other corrective action was performed, including a description of the existing PRV, thief hatch, mounting, or gasket, and a description of how that equipment was repaired or with what it was replaced/upgraded. Descriptions of PRVs or thief hatches shall include pressure set points where such information is available, and descriptions of PRVs, thief hatches, mountings, or gaskets shall include the manufacturer and model where such information is available.

c.      Open Loop Vapor Control System Engineering Evaluation.  Using the results of the field survey activities described in Appendix B, subparagraph 3(a) and the Open Loop Vapor Control System Engineering Design Standard described in Appendix B, Paragraph 2, HighPoint shall then determine if the existing Vapor Control System at each Tank System is adequately designed and sized to handle the Potential Peak Instantaneous Vapor Flow Rate which shall be calculated through the application of the Open Loop Modeling Guideline ("Open Loop Engineering Evaluation").  An Open Loop Engineering Evaluation is not required for a Vapor Control System at a Tank System that is Shut-In, which remains Shut-In, is dismantled, and for which all wells associated with the Tank System are plugged and abandoned before the termination of this Consent Decree.

d.      Open Loop Vapor Control System Modification.  For those Open Loop Vapor Control Systems that are not adequately designed and sized to handle the Potential Peak Instantaneous Vapor Flow Rate based on the Open Loop Engineering Evaluation, HighPoint shall make all necessary modifications to change the Potential Peak Instantaneous Vapor Flow Rate (as recalculated using the Modeling Guideline), including reducing the rate or otherwise altering the frequency or duration of the Potential Peak Instantaneous Vapor Flow Rate to ensure that Peak Modeled Pressures do not exceed the Maximum Design Pressure of the Vapor Control System, and/or increase the capacity of the Vapor Control System as determined in the applicable Open Loop Engineering Evaluation completed consistent with the Engineering Design Standards.  HighPoint shall ensure that the modifications result in a Vapor Control System that is adequately designed and sized to handle the Potential Peak Instantaneous Vapor Flow Rate, as

determined through application of an Open Loop Engineering Evaluation consistent with the Engineering Design Standard.

4.    <u>Open Loop Vapor Control System Initial Verification</u>.  Except as otherwise provided in this Appendix B, Paragraph 4, HighPoint shall complete the requirements of this Paragraph for each Tank System by January 31, 2019.  For Tank Systems Shut-In as of December 31, 2018, HighPoint shall complete the requirements of Appendix B, subparagraph 4(a) by no later than 30 Days after first resuming Normal Operations, and shall complete the requirements of Appendix B, subparagraph 4(b) by the deadline for the next Semi-Annual Report that is due at least 60 Days after first resuming Normal Operations.  For Tank Systems that have completed the Open Loop Engineering Evaluation as of December 31, 2018, but are Shut-In as of January 31, 2019, HighPoint shall complete the requirements of Appendix B, subparagraph 4(a) by no later than 30 Days after first resuming Normal Operations, and shall complete the requirements of Appendix B, subparagraph 4(b) by the deadline for the next Semi-Annual Report that is due at least 60 Days after first resuming Normal Operations.  No later than March 1, 2019, HighPoint shall submit a written notification to EPA and CDPHE advising of any Tank Systems Shut-In as of December 31, 2018.

a.    Conduct an IR Camera Inspection of all Open Loop Vapor Control Systems during Normal Operations, including while and immediately after Condensate is being sent to the Tank System from all the last points of separation equipped with a dump valve that are not Shut-In at the time of the IR Camera Inspection (or, in the event that the potential for simultaneous dump events has been precluded, from the associated last points of separation equipped with a dump valve that are not Shut-In that yield the highest, non-precluded Potential Peak Instantaneous Vapor Flow Rate) to confirm the

Vapor Control System is adequately designed and sized and not emitting VOCs detected

with the IR Camera.  In the event that any of the last points of separation equipped with a

dump valve associated with a Tank System are Shut-In at the time of this IR Camera

Inspection, and the last point of separation equipped with a dump valve that is Shut-In

contributes to the highest, non-precluded Potential Peak Instantaneous Vapor Flow Rate,

HighPoint shall perform additional IR Camera Inspection(s) in accordance with this

subparagraph within 30 Days of resuming Normal Operations from the last points of

separation equipped with a dump valve that had been Shut-In.  Inspections under this

subparagraph must be conducted pursuant to the SOP prepared by HighPoint and

approved by EPA and CDPHE pursuant to subparagraph 11(a).  A video record of each

IR Camera Inspection done to comply with this subparagraph shall be recorded and kept

on file;

       b.      Complete and submit to EPA and CDPHE with the next Semi-Annual

Report or the Semi-Annual Report due at least 30 Days following the applicable Open

Loop Engineering Evaluation deadline in Paragraph 9 the following information as a

Certification of Completion Report, in a spreadsheet or database format for each Vapor

Control System that underwent Open Loop Engineering Evaluations (see Paragraphs

8−9):

           (1)      The result of the Open Loop Engineering Evaluation, including the

Peak Modeled Pressure and the Maximum Design Pressure;

           (2)      An identifier for the report associated with the Open Loop

Engineering Evaluation consistent with the Engineering Design Standard (which

could be for an individual Tank System) that was used for each Vapor Control System;

(3)      Identification of any changes made to equipment or operation as a result of the Open Loop  Engineering Evaluation;

(4)      Identification of site-specific or system-wide operational parameters or practices relied upon in the Open Loop Engineering Evaluation and determined by the Open Loop Engineering Evaluation to be necessary for verification during Normal Operations (*e.g.*, maximum operating pressure for final stage of separation, minimum available headspace in tanks);

(5)      The minimum Tank System thief hatch and PRV settings;

(6)      The date an IR Camera Inspection was completed to comply with Appendix B, subparagraph 4(a) and the results of such inspection, along with any corrective actions performed to address Reliable Information and the date and method of verification that the corrective action was successful; and

(7)      Whether the modeling performed in accordance with the Modeling Guideline was transient or steady state.

5.      Open Loop Vapor Control System Post-Certification of Completion Modifications.  If, after HighPoint has submitted a Certification of Completion Report for a Tank System associated with an Open Loop Vapor Control System to EPA and CDPHE, an operational or equipment change is made such that the Potential Peak Instantaneous Vapor Flow Rate is increased beyond what was evaluated in the Open Loop Engineering Evaluation or the Open Loop Vapor Control System capacity decreases, HighPoint shall repeat all requirements of Appendix B, subparagraphs 3(c) and 3(d) within 30 Days of the change and shall repeat all

requirements of Appendix B, subparagraph 4(a) within 30 Days of completing any necessary modifications in accordance with Appendix B, subparagraph 3(d).  HighPoint shall use best efforts to repeat all requirements of Appendix B, subparagraphs 3(c) and 3(d) prior to any such change.  HighPoint shall submit in the next required Semi-Annual Report, or the Semi-Annual Report due at least 30 Days following completion of all requirements of Appendix B, subparagraph 4(a), an updated Certification of Completion Report for any Tank Systems that underwent another Open Loop Engineering Evaluation in accordance with this Paragraph.

6.      Open Loop Vapor Control System Verification of Design Analysis.  HighPoint's Open Loop Engineering Evaluations and Modifications, pursuant to Appendix B, Paragraph 3, shall be subject to verification for all Tank Systems that underwent Open Loop Engineering Evaluation as follows:

a.      No later than April 1, 2019, HighPoint shall provide to EPA and CDPHE HighPoint's proposed verification work plan.  The work plan shall identify the engineer(s) who will conduct the verification (hereinafter the "Reviewer").  The work plan shall provide a curriculum vitae for each Reviewer HighPoint selects to conduct the verification.  EPA and CDPHE may request such other information as they deem necessary to evaluate any Reviewer's qualifications.  Any Reviewer HighPoint selects to conduct the verification duties identified in Appendix B, subparagraphs 6(c)(1) through 6(c)(3) shall not have conducted the Open Loop Engineering Evaluation subject to verification, or have been an employee of any company which conducted the Open Loop Engineering Evaluation subject to verification.

b.      After consultation with CDPHE, EPA shall either approve or disapprove the proposed work plan, including HighPoint's selection of a Reviewer.  If EPA has not

responded within 30 Days, HighPoint's Reviewer shall be deemed approved and HighPoint may proceed with its proposed work plan.  In the event EPA disapproves the proposed work plan, EPA shall state the reasons for its disapproval in writing, and the process will be repeated with HighPoint having 30 Days from the date of disapproval to propose a revised work plan.  In the event a work plan is not approved by June 1, 2019, all deadlines in this Paragraph shall be extended by an equivalent period to the time beyond June 1 that it takes for work plan approval.

c.      For all Tank Systems that underwent an Open Loop Engineering Evaluation, the Reviewer shall conduct a review (document and/or field visit, as necessary) to verify:

(1)      Site-specific inputs and assumptions were correctly identified in the Open Loop Engineering Evaluation as informed by the Open Loop Modeling Guideline and Engineering Design Standards (*e.g.*, number of wells connected to the Tank System, well operation type, frequency and duration of dump events, minimum separator temperature and maximum separator pressure, maximum tank liquid level, Open Loop Vapor Control System piping set-up and configuration, vapor sources, etc.);

(2)      The Potential Peak Instantaneous Vapor Flow Rate, Open Loop Vapor Control System capacity, and Peak Modeled Pressure were determined by methods consistent with the Modeling Guideline and Engineering Design Standards; and

(3)      Each Open Loop Vapor Control System is adequately designed and sized in accordance with the Modeling Guideline and results of the Open

Loop Engineering Evaluations, by demonstrating that the Peak Modeled Pressure does not exceed the Maximum Design Pressure of the Open Loop Vapor Control System.

d.      HighPoint shall conduct a review (document and/or field visit, as necessary) for each Tank System that underwent an Open Loop Engineering Evaluation to verify that all modifications required by Appendix B, subparagraph 3(d) (Open Loop Vapor Control System Modification) have been fully and correctly implemented in accordance with the requirements of this Decree.

e.      The verification described in this Paragraph shall be completed no later than October 31, 2019, except that Tank Systems that are Shut-In pursuant to subparagraph 9(a) and for which HighPoint has not performed an Open Loop Engineering Evaluation as of October 31, 2019, must complete the verification described in this Paragraph within 30 Days of completing an IR Camera Inspection pursuant to Appendix B, subparagraph 4(a) (Vapor Control System Initial Verification).  HighPoint shall submit a written report ("Verification Report") describing work performed and conclusions reached by the Reviewer(s) pursuant to Appendix B, subparagraphs 6(c)(1) through (3) and 6(d).  The Verification Report shall include (i) a certification from the Reviewer that the requirements of Appendix B, subparagraphs 6(c)(1) through 6(c)(3) were completed in accordance with the applicable provisions of this Decree; and (ii) a certification from HighPoint or the Reviewer (as applicable) that the requirements of Appendix B, subparagraph 6(d) were completed in accordance with the applicable provisions of this Decree.  HighPoint shall submit the Verification Report with the next

Semi-Annual Report or the Semi-Annual Report due at least 30 Days following completion of the Verification Report.

**APPENDIX C**

**Requirements for Closed Loop Vapor Control System Design Guideline, Field Survey, Engineering Evaluation, and Initial Verification**

1.        Development of a Closed Loop Vapor Control System Design Guideline.

        a.        HighPoint has developed a written design guideline ("Closed Loop Design Guideline").  The purpose of the Closed Loop Design Guideline is to describe the steps necessary to properly design, install, and optimize a Closed Loop Vapor Control System. For each Vapor Control System on Appendix A.2, HighPoint will apply the Closed Loop Design Guideline to create a Closed Loop Vapor Control System.

        b.        The Closed Loop Design Guideline shall address the following:

        (1)        The creation of a site survey sheet to be used at each Closed Loop Vapor Control System, identifying the configuration of the Vapor Control System, pressure setting of thief hatches and PRVs, along with the make and model of thief hatches and PRVs, and inputs (both vapor and liquid) into the Vapor Control System;

        (2)        Description of the Closed Loop Vapor Control System Installation Phase (*i.e.*, the installation of hardware and software);

        (3)        Identification of the Control Point, Trigger Point, Leak Point, and Set Point, including the methods by which each point will be determined;

        (4)        Description of the "optimization phase," also referred to as the shakedown phase, *i.e.*, the phase following equipment installation and verification, during which the wells resume Normal Operations, and wherein calibration and tuning of the Closed Loop Vapor Control System occurs,

C-1

including the duration of the optimization phase and the process for responding to

exceedances of the Trigger Point during the optimization phase; and

(5)     Description of a process of verification, which includes

verification of installation of the Closed Loop Vapor Control System in the field,

and verification that the Trigger Point is below the Leak Point via an IR Camera

Inspection of the Vapor Control System pursuant to Appendix C, subparagraph

3(a)(2)(b), below.

c.     On June 4, 2018, HighPoint submitted the Closed Loop Design Guideline

to EPA and CDPHE for their review and comment.  EPA and CDPHE submitted final

comments on the Closed Loop Design Guideline on or about December 19, 2018.

HighPoint may periodically update the Closed Loop Design Guideline as appropriate.

Should the Closed Loop Design Guideline be updated, the use of the version current at

the time of the Closed Loop Engineering Evaluation is acceptable.  Updates to the Closed

Loop Design Guideline do not in and of themselves require HighPoint to redo Closed

Loop Engineering Evaluations.

2.     Closed Loop Vapor Control System Field Survey, Engineering Evaluation, and

Modification.

a.     For each Closed Loop Vapor Control System, HighPoint shall conduct a

one-time field survey.  During the field survey, HighPoint shall inventory tanks and

equipment associated with each Closed Loop Vapor Control System and identify their

configuration and operational status.  HighPoint will then apply the Closed Loop Design

Guideline to install a Closed Loop Vapor Control System.

b.      During the field survey, HighPoint shall conduct a one-time evaluation of the condition of all PRVs, thief hatches, blowdown valves, mountings, and gaskets at each tank in the Closed Loop Vapor Control System, and the possibility of repairing, replacing, or upgrading such equipment to reduce the likelihood of VOC emissions.  This evaluation shall include the following actions:

(1)      HighPoint shall ensure that, at the time of the survey, every thief hatch is mounted with a suitable gasket to the tank at the tank attachment point, in accordance with good engineering practices and manufacturer specifications;

(2)      If while evaluating the PRVs, thief hatches, mountings, and gaskets, HighPoint observes Compromised Equipment, Reliable Information, or evidence of significant staining emanating from pressure relief valves, HighPoint shall repair, replace, or upgrade such equipment, as appropriate.  However, nothing herein shall require HighPoint to repair, replace, or upgrade such equipment on Shut-In Tank Systems and their associated Vapor Control System except that HighPoint shall repair, replace, or upgrade such equipment prior to resuming Normal Operations at the Tank System; and

(3)      HighPoint shall maintain records of the following information:

(a)      The date each Tank System underwent this evaluation;

(b)      The name of the employee who performed the evaluation;

(c)      Whether Compromised Equipment, Reliable Information, or evidence of significant staining emanating from pressure relief valves was observed; and

(d)     What, if any, repair, replacement, upgrade, or other

corrective action was performed, including a description of the existing

PRV, thief hatch, mounting, or gasket, and a description of how that

equipment was repaired or with what it was replaced/upgraded.

Descriptions of PRVs or thief hatches shall include pressure Set Points,

and descriptions of PRVs, thief hatches, mountings, or gaskets shall

include the manufacturer and model where such information is available.

c.     Closed Loop Vapor Control System Engineering Evaluation.  Using the

results of the field survey activities described in this Appendix C, subparagraph 2(a), and

through application of the Closed Loop Design Guideline, HighPoint shall install the

necessary hardware and software to create a Closed Loop Vapor Control System

("Closed Loop Engineering Evaluation").  A Closed Loop Engineering Evaluation is not

required for a Vapor Control System at a Tank System that is Shut-In, which remains

Shut-In, is dismantled, and for which all wells associated with the Tank System are

plugged and abandoned before the termination of this Consent Decree.

(1)     Following creation of a Closed Loop Vapor Control System

pursuant to Appendix C, subparagraph 2(c), HighPoint shall:

(a)     Operate a Closed Loop Vapor Control System as required

by this Appendix C and in a manner consistent with the Closed Loop

Design Guideline beginning the first date of Normal Operations that

follows creation of the Closed Loop Vapor Control System until

Termination of the Tank System from this Consent Decree, or until the

Tank System becomes subject to the Appendix B requirements pursuant to Paragraph 8 of the Consent Decree.

(b)      Operate the Closed Loop Vapor Control System to ensure the Tank System will be Shut-In at the Trigger Point.

(c)      Operate the Closed Loop Vapor Control System to ensure that all wells associated with the Closed Loop Vapor Control System will Shut-In at the Leak Point.

(d)      Operate the Closed Loop Vapor Control System to ensure the Tank System will Shut-In at the Low Pressure Point or Static Alarm. Prior to resuming Normal Operations following a Low Pressure Point or Static Alarm, HighPoint shall repair or replace the pressure monitor.

(e)      Equip all Closed Loop Vapor Control Systems with remote monitoring.

d.      <u>Closed Loop Vapor Control System Modification</u>.  If, at any time following installation of a Closed Loop Vapor Control System, HighPoint replaces a thief hatch or PRV at a Closed Loop Vapor Control System with a thief hatch or PRV of a lower Set Point or different make and model, or lowers the Set Point of an existing thief hatch or PRV, a new verification of the Leak Point pursuant to Appendix C, subparagraph 3(a)(2)(b), below, shall be performed (i) within seven Calendar Days after the modification is completed, or (ii) if the Tank System is Shut-In, a new verification shall be performed by the date Normal Operations resume.

3.      <u>Closed Loop Vapor Control System Verification of Engineering Evaluation</u>.  No later than the date that Normal Operations resume at a Vapor Control System following

installation of the Closed Loop Vapor Control System, HighPoint shall conduct the verification

in subparagraph 3(a), identified below.  The optimization phase shall commence immediately

upon resuming Normal Operations and will end 30 Calendar Days after first resuming Normal

Operations.

       a.       Verification of a Closed Loop Engineering Evaluation shall include the

following:

       (1)      A review to ensure that HighPoint or its consultant installing the

Closed Loop Vapor Control System correctly identified the site configuration and

equipment in accordance with the site survey, and installed the appropriate

equipment to create the Closed Loop Vapor Control System;

       (2)      Consistent with the Design Guideline, a verification:

       (a)      That the Tank System will be Shut-In at the Trigger Point

and all wells associated with the Closed Loop Vapor Control System will

Shut-In at the Leak Point;

       (b)      Of the Leak Point via IR Camera Inspection, consistent

with the Closed Loop Design Guideline.  A video record of each IR

Camera Inspection done to comply with this subparagraph shall be

recorded and kept on file; and

       (c)      That the control valve(s) in the Closed Loop Vapor Control

System actuate in response to the control logic.

       b.       No later than 60 Days after the applicable deadline in Paragraph 9 for a

Tank System on Appendix A.2, HighPoint shall submit a written notification to EPA and

CDPHE advising of any Tank Systems Shut-In as of the applicable deadline in Paragraph 9 and where a Closed Loop Vapor Control System has not been installed.

       c.       Complete and submit to EPA and CDPHE with the next Semi-Annual Report or the Semi-Annual Report due at least 30 Days following the end of the optimization phase, the following information as a Certification of Completion Report, in a spreadsheet or database format for each Closed Loop Vapor Control System, except as identified in Paragraph 3(d)−(e), below:

             (1)       The date when installation of all necessary hardware and software to create a Closed Loop Vapor Control System was completed;

             (2)       The date a Tank System or tanks in any Tank System were first in Normal Operations following the installation of a Closed Loop Vapor Control System (*i.e.*, the date the optimization phase began);

             (3)       The site survey sheet;

             (4)       The Control Point, Trigger Point, Set Point, and Leak Point for each Closed Loop Vapor Control System, and the method by which each point was determined; and

             (5)       A summary of the results of the verification of the Closed Loop Engineering Evaluation for each applicable Closed Loop Vapor Control System, including a certification that the verification of the Closed Loop Engineering Evaluation was performed in accordance with Appendix C, subparagraph 3(a).

       d.       Following the optimization period for each Closed Loop Vapor Control System, HighPoint shall record the following data:  tank pressure data, pressure alarms, and Shut-In events.  The alarm and Shut-In log will include records of the date and time

of the alarms at, and duration of exceedances of, the Trigger Point and Leak Point; the date and time of the alarm indicating a pressure reading at or below the Low Pressure Point; the date and time of any Static Alarm; the cause and corrective action associated with any such alarms; and any instances in which the actuation of the Closed Loop Vapor Control System control logic automatically Shut-In separator(s) and or well(s).

      e.     HighPoint shall retain the data recorded by the pressure monitors associated with the Closed Loop Vapor Control System required pursuant to Appendix C, Paragraph 3(d) for two years from the date of recording.  HighPoint shall provide this data to EPA and CDPHE upon request.

**APPENDIX D**

**Environmental Mitigation Projects**

HighPoint shall comply with the requirements of this Appendix and with Section V (Environmental Mitigation Projects) of the Consent Decree to implement and secure the environmental benefits of the Project described in this Appendix.

## I.   General

A.  HighPoint has submitted, and EPA and CDPHE have reviewed and approved: a summary-level budget for the Project, an estimated date of completion for the Project, and a summary of the anticipated environmental benefits of the Project.

B.  Nothing in this Appendix shall relieve HighPoint of its obligation to comply with all applicable federal, state, and local laws and regulations, including, but not limited to, any obligations to obtain any permits pursuant to the Clean Air Act in implementing the Project Plan.

## II.   Installation of Tank Truck Loadout Control Systems

A.  At a minimum, prior to May 1, 2019, and consistent with the requirements of the Consent Decree and this Appendix, HighPoint shall, in accordance with its Project Plan, install and operate control systems for vapor balancing during tank truck loadout of Condensate tanks ("Loadout Control Systems"). HighPoint shall install and operate Loadout Control Systems on all Tank Systems identified in Table 1 below.

B.  Description of Loadout Control Systems. While loading liquids from Condensate tanks into trucks, vapors present in the truck are displaced by the liquid being placed into the truck. As liquids fill up the available vapor space, these VOC vapors are displaced from the haul truck's tank. Rather than being emitted to the atmosphere,

these truck loadout VOC vapors may be captured by way of a Loadout Control System. The Loadout Control System will consist of a combination of pipes and hoses that route vapors back to the Vapor Control System such that vapors are either returned to the Condensate Tanks as a vacuum is being drawn on the tanks during loading activities or sent to a combustion device. Capture of VOC vapors in such a manner will reduce VOC emissions associated with truck loadout operations at HighPoint production facilities. VOC is an ozone precursor, and the alleged violations being resolved in this Consent Decree are alleged to have resulted in additional emissions of VOC.

C.  By May 1, 2019, HighPoint shall have installed Loadout Control Systems at all Tank Systems identified in Table 1 below.

D.  HighPoint will retain and operate the Loadout Control Systems consistent with manufacturer recommendations and good air pollution practices for minimizing emissions until the joint stipulation terminating the Consent Decree or Tank System is entered by the court, or all wells producing to the Tank System have been permanently plugged and abandoned in accordance with Paragraph 91 of the Consent Decree.

E.  HighPoint estimates that it will cost $ 50,000 to install Loadout Control Systems as required by this Appendix. Consistent with Paragraph 21 of the Consent Decree, HighPoint shall use its best efforts to secure as much environmental benefit as possible for the Project.

**Table 1 to Appendix D**

| CD ID # | Facility Name |
|---------|---------------|
| 9DBA | FIDUCIAL 6-62-34 SWSW |
| 9BAC | PAPPENHEIM 6-62-27 PAD |
| 9DBB | ANSCHUTZ EQUUS FARMS 4-62-15 NE |
| 9CF9 | ANSCHUTZ STATE 5-61-19_20 SWSW |
| 9C0F | HAWKINS 5-61-21 |
| 9D9D | ANSCHUTZ EQUUS FARMS 4-62-15 NW |
| 9C98 | 70 RANCH 4-63-3 PAD 2 |
| 9CFC | FIDUCIAL 6-62-34_35 |
| 9DBF | ANSCHUTZ EQUUS FARMS 4-62-16 NE |
| 9C0C | ROSENBERG 6-61-30 NE |

## III.    Reporting Requirements

In accordance with Paragraph 38(k) of the Consent Decree, HighPoint shall submit the following in each Semi-Annual Report:

A.  Identification of the Tank Systems retrofitted with Loadout Control Systems during the period covered by the Semi-Annual Report; and

B.  For those Tank Systems retrofitted with Loadout Control Systems during the period covered by the Semi-Annual Report, a summary of expenditures for such retrofits.

C.  A description of measures taken to ensure HighPoint personnel, contractors, or third-party haulers are utilizing Loadout Control Systems when unloading liquids from Condensate tanks into trucks, along with a description of the methods and any challenges encountered during the period covered by the Semi-Annual Report.